**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL NURSES UNITED,
    8455 Colesville Road
    Suite 1100
    Silver Spring, MD 20910,

NEW YORK STATE NURSES
ASSOCIATION,
    131 West 33rd Street
    4th Floor
    New York, NY 10001,

CALIFORNIA NURSES
ASSOCIATION/NATIONAL NURSES
ORGANIZING COMMITTEE,
    155 Grand Avenue,
    Oakland, CA 94612,

AMERICAN FEDERATION OF
TEACHERS,
    555 New Jersey Avenue, NW
    Washington, DC 20001,

UNITED MINE WORKERS OF
AMERICA,
    18354 Quantico Gateway Drive
    Suite 200
    Triangle, VA 22172,

UNITED STEEL, PAPER AND
FORESTRY, RUBBER,
MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL, AND
SERVICE WORKERS
INTERNATIONAL UNION, AFL-CIO,
    60 Boulevard of the Allies
    Pittsburgh, PA 15222,

INTERNATIONAL ASSOCIATION
OF MACHINISTS AND AEROSPACE
WORKERS, AFL-CIO,
    9000 Machinists Place
    Upper Marlboro, MD 20772,

Civil Action No.

NATIONAL FEDERATION OF
FEDERAL EMPLOYEES, IAM,
   1225 New York Avenue, NW
   Suite 450
   Washington, DC 20005,

INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA,
   8000 E. Jefferson Avenue
   Detroit, MI 48214,

ASSOCIATION OF OCCUPATIONAL
AND ENVIRONMENTAL CLINICS,
   P.O. Box 91096
   Washington, DC 20090,

DENTEC SAFETY SPECIALISTS,
   8101 Lenexa Drive
   Lenexa, KS 66214,

LOCAL 983, DISTRICT COUNCIL 37,
AFSCME,
   125 Barclay Street
   New York, NY 10007, and

AMERICAN FEDERATION OF
LABOR AND CONGRESS OF
INDUSTRIAL ORGANIZATIONS,
   815 Black Lives Matter Plaza, NW
   Washington, DC 20006,

       *Plaintiffs*,

       v.

ROBERT F. KENNEDY, JR., in his
official capacity as Secretary of Health
and Human Services,
   200 Independence Avenue, SW
   Washington, DC 20201, and

U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES,
    200 Independence Avenue, SW
Washington, DC 20201,

        *Defendants.*

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.    Congress created the National Institute for Occupational Safety and Health (NIOSH) in 1970 as an agency within the U.S. Department of Health and Human Services (HHS) and tasked NIOSH with conducting research and investigations aimed at protecting workers' safety and health. Over the years, Congress has assigned NIOSH statutory responsibility for administering numerous specific programs, and HHS has by regulation and established practice delegated responsibility to NIOSH for administering many more. Pursuant to its statutory and regulatory mandates, NIOSH oversees a vast portfolio of research, medical, and investigatory programs and services that protect the safety and health of workers every day in some of the highest-risk industries—including mining, firefighting, agriculture, commercial fishing, construction, and healthcare—while providing essential support to American businesses.

2.    Among many other things, NIOSH:

- Evaluates and certifies respirators and tests other personal protective equipment (PPE) for use on worksites across industries;

- Screens miners for black lung disease and certifies experts qualified to analyze their chest X-rays;

- Administers medical monitoring for miners, and monitoring and treatment for September 11 victims and first responders;

- Provides scientific and technical support for medical-compensation programs for nuclear weapons workers and September 11 victims and first responders;

- Investigates disease clusters and other potential safety or health hazards that occur at the workplace and researches mitigation measures for industries;

- Develops criteria that identify safe exposure levels for toxic substances for various periods of employment;

- Investigates individual workplaces to identify and mitigate potential safety or health hazards at these sites;

- Administers the National Firefighter Registry for Cancer, the nation's largest study to track and understand the incidence of cancer among firefighters;

- Funds training programs for medical residents and other students entering the field of occupational safety and health; and

- Assists states in collecting and analyzing worksite safety and health data.

After 50 years of making groundbreaking advances in occupational safety and health, NIOSH is the nation's premier scientific authority in that field.

3.     Notwithstanding the substantial, cost-effective, and well-recognized benefits that NIOSH confers on the nation at Congress's command, the current presidential administration has over the past month or so set out on a campaign to eliminate the agency and suspend its legally mandated functions. After announcing a plan to radically restructure HHS, the administration initiated massive staff cuts at NIOSH; abruptly curtailed new and pending projects and investigations; ended services that NIOSH had long provided to miners, firefighters, and September 11 victims; and ceased the certification process that enables businesses to place and keep effective, government-approved respirators and other safety gear on the market without unfair competition from counterfeit products.

4.     Defendants' actions shutting down NIOSH and its activities are ultra vires, contrary to law, procedurally improper, and arbitrary and capricious. Congress has directed that NIOSH should exist and operate, and it has appropriated funds for that purpose. By flouting Congress's express directives, Defendants have violated the separation-of-powers principle enshrined in the U.S. Constitution, as well as federal statutes governing the executive branch's use of appropriated funds. What is more, Defendants' actions effectively revoke duly promulgated regulations that direct NIOSH's operations without satisfying procedural requirements for doing so. And Defendants' actions flout principles of sound decision-making by failing to account for the considerations that drove Congress to create NIOSH and the programs it administers and that justify the agency's continued existence and operation.

5.     In anticipation of Defendant Robert F. Kennedy, Jr.'s testimony at congressional committee hearings on May 14, 2025, Defendants issued reinstatements on May 13, 2025, for a portion of NIOSH staff who had received notices of termination. While that development is welcome, Defendants have not resumed the many NIOSH programs, investigations, research, and other services they have unlawfully halted. And even if Defendants intend at some future time to restore a stripped-down subset of the programming they have eliminated, the agency's critical worker safety and health research is interdivisional and cannot be accomplished unless the whole of NIOSH is functional.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Constitution and laws of the United States.

7.     Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1)(A) because defendants are officers and agencies of the United States and because at least one defendant resides in Washington, DC.

## PARTIES

8.     Plaintiff National Nurses United (NNU) is a national labor organization and unincorporated federation, the country's largest union and professional association of registered nurses. NNU affiliate unions represent approximately 245,000 registered nurses in dozens of states across the United States. NNU provides information to its affiliates about workplace safety and health for nurses, and it relies on NIOSH in order to do so.

9.     Plaintiff New York State Nurses Association (NYSNA), an affiliate of NNU, is a labor union of 42,000 frontline nurses and healthcare professionals. NYSNA is New York's largest union and professional association for registered nurses. NYSNA's members include healthcare workers who face a wide range of hazards on the job, including needles and other sharp objects, infectious diseases, toxic chemicals and drugs, musculoskeletal hazards, violence, and stress. Healthcare settings have some of the highest workplace injury rates of any industry, and NYSNA has a robust safety and health program to educate members and advocate for better workplace conditions.

10.     Plaintiff California Nurses Association/National Nurses Organizing Committee (CNA/NNOC), another affiliate of NNU, is a nonprofit corporation that represents approximately 150,000 registered nurses who work in hospitals, clinics, and home health agencies in California and other states across the United States. CNA/NNOC's mission is to improve working conditions for registered nurses. Its members provide direct bedside patient care, including to patients who are or may be infectious. Its staff also includes industrial hygienists who provide critical

information, training, and guidance to nurses about workplace safety and health issues, including infectious disease transmission and workplace violence.

11.     Plaintiff American Federation of Teachers (AFT) is a labor organization representing 1.8 million members, who reside in every U.S. state, the District of Columbia, Puerto Rico, Guam, and the U.S. Virgin Islands and who are employed as pre-K through 12th-grade teachers, early childhood educators, paraprofessionals, and other school-related personnel; higher education faculty and professional staff; federal, state, and local government employees; and nurses and other healthcare professionals. AFT represents more than 250,000 healthcare professionals. The organization's purpose is to promote fairness; democracy; economic opportunity; and high-quality public education, healthcare, and public services for students, their families, and the communities that their members serve. AFT fulfills this purpose by ensuring that its members receive fair pay and benefits for their critical work, and by fighting for safe working conditions that benefit students, patients and all those who use public services.

12.     Plaintiff United Mine Workers of America (UMWA) is the largest labor union of coal miners in the United States, representing thousands of working miners. The UMWA's membership is comprised of miners who work in the nation's coal, metal, and non-metal mines. During their working lives, the UMWA's members are routinely exposed to the environmental and physical hazards inherent in the mining industry. These members suffer from injuries, occupational disease, and death as a result of these hazards, including death from black lung disease and silicosis resulting from exposure to coal and silica dust.

13.     Plaintiff United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial, and Service Workers International Union, AFL-CIO (USW) is the largest industrial union in North America, representing 500,000 workers in manufacturing and processing steel,

aluminum, other metals, paper, rubber, glass, and cement; and in mining, chemicals, refining, energy, and utility facilities; as well as those working in healthcare, education, service, and other sectors. The USW is the predominant labor union in North American metal and non-metal mining, representing approximately 20,000 miners in the United States and an equal number in Canada. These miners work in underground and surface mines and quarries, using many different mining methods and mining almost every commodity. The USW's members also include more than 3,500 workers in the U.S. atomic sector, who are engaged in a variety of work including uranium enrichment, decommissioning and decontamination, and waste storage.

14.    Plaintiff International Association of Machinists and Aerospace Workers, AFL-CIO (IAM) represents 600,000 workers in nearly 1,000 local unions. IAM members work in the aerospace, transportation, manufacturing, automotive, defense, and woodworking industries, among others, as well as in the federal government.

15.    Plaintiff National Federation of Federal Employees (NFFE), an affiliate of IAM, is an unincorporated association and the oldest federal labor union. NFFE represents approximately 110,000 professional and non-professional federal government workers and federal contractors across the United States. NFFE members include nurses, psychologists, doctors, and physical therapists caring for our nation's veterans in the Department of Veterans Affairs (VA); civilian employees in the Department of Defense (DoD), including structural firefighters, who support our military personnel and their families; healthcare workers serving on military bases; wildland firefighters, rangers, and land management specialists preserving and managing our public lands in the U.S. Forest Service, National Park Service, U.S. Fish and Wildlife Service, Bureau of Land Management (BLM), and Bureau of Reclamation; veterinarians ensuring the humane treatment of animals across the country; and scientists conducting critical research across multiple agencies. A

majority of NFFE members work in occupations that require use of PPE that is certified and continually evaluated by NIOSH for safety and efficacy.[1]

16.     Plaintiff International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) is one of the largest and most diverse unions in North America, with members in virtually every sector of the economy. UAW-represented workplaces range from multinational corporations, small manufacturers, and state and local governments to colleges and universities, hospitals, and private non-profit organizations. The UAW has more than 400,000 active members and more than 580,000 retired members in the United States, Canada and Puerto Rico. There are more than 600 local unions in the UAW. The UAW currently has 1,750 contracts with some 1,050 employers. The UAW is committed to improving the lives of all working people, which includes ensuring that all workplaces are healthy and safe.

17.     Plaintiff Association of Occupational and Environmental Clinics (AOEC), a nonprofit organization established in 1987, is a professional association made up of member clinics and individual members who provide care to workers who are injured or become ill on the job and to people who are exposed to environmental hazards. AOEC has approximately 150 members; more than 40 of these members are clinics consisting of specialists in the field of occupational health. These specialists include occupational and environmental medicine physicians, occupational health nurses, industrial hygienists, injury prevention specialists, ergonomists, audiologists, pulmonologists and more. AOEC's members diagnose, treat, and care for Americans that have dedicated their working lives to serving and providing for others—firefighters; first

---

[1] Because Executive Order 14251 excludes several agencies from collective bargaining, NFFE's representation, as relevant here, is currently in contention as to DoD, VA, and BLM.

responders; coal miners; farmworkers; healthcare workers; teachers; workers in the transportation sector; and workers in the oil, gas, and other industries.

18.     Plaintiff Dentec Safety Specialists (Dentec) is a company, headquartered in Kansas, that is dedicated to making high-quality respirators and other PPE, all manufactured in the United States. The company supplies a wide range of PPE, including safety glasses, N95 filters, advanced reusable respirators, and air-supplied products, which are used in such industries as healthcare, construction, metalwork, refining, and food service. Dentec manufactures multiple types of respirators, each in several sizes and with dozens of combinations of cartridges, filters, and other parts. Every permutation must be approved by NIOSH. Dentec has received approximately 150 approvals from NIOSH. Each approval represents a significant investment for Dentec—for product development, the fees Dentec pays to NIOSH when it submits a product for approval, annual licensing and recordkeeping fees, and rigorous biannual onsite audits. Dentec also relies on NIOSH's rigorous product-certification and evaluation work to protect it from unfair and potentially ruinous competition from counterfeit products.

19.     Plaintiff Local 983, District Council 37, AFSCME (Local 983) is one of the earliest-established locals of District Council 37, New York City's largest labor union. Local 983 represents more than 3,000 people who work in 18 different municipal and public employee job titles across all five boroughs of New York City. Local 983's members include asbestos handlers, motor vehicle operators, members of New York City's Police and Fire Departments, and members of the New York City Parks Enforcement Patrol. Many Local 983 members were among the individuals who responded to the September 11, 2001, terrorist attacks or who assisted with the recovery efforts.

20.     Plaintiff American Federation of Labor and Congress of Industrial Organizations (AFL-CIO) is a federation of 63 national and international labor organizations collectively representing 15 million working people in nearly every type of workplace in the United States, from hospitals and mines to factories and offices. The AFL-CIO, through its health and safety staff, relies on research and data provided by NIOSH to update and inform affiliated unions about key new findings and recommendations on workplace hazards and to advocate with lawmakers and negotiate with employers for the formulation of new safety standards and the protection of existing ones.

21.     Defendant Robert F. Kennedy, Jr., is the Secretary of Health and Human Services and is sued in his official capacity.

22.     Defendant U.S. Department of Health and Human Services is an agency of the United States, headquartered in Washington, DC.

## FACTS

**NIOSH and its statutory and regulatory functions**

23.     In the Occupational Safety and Health Act of 1970 (OSH Act), Pub. L. No. 91-596, § 2(b), 84 Stat. 1590, 1590, Congress declared a national policy of "assur[ing] so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b). To further that aim, the Act created NIOSH as an agency within HHS, *id.* § 671(a), and charged it—whether directly or by delegation from HHS, *see id.* §§ 671(c)(2), 669(e)—with investigating and giving notice of toxic substances in the workplace, *id.* § 669(a)(6); "develop[ing] criteria dealing with" toxic materials, which "will describe exposure levels that are safe for various periods of employment," *id.* § 669(a)(3); "develop[ing] and establish[ing] recommended occupational safety and health standards," *id.* § 671(c)(1); conducting its own research and funding

third-party research into occupational safety and health, *id.* §§ 669(a)(1)-(2) and (4), 671(d); and administering training and education programs on issues related to occupational safety and health, *id.* § 670.

24.     At the same time, the OSH Act authorized the Secretary of Labor to create and enforce "mandatory occupational safety and health standards applicable to businesses," 29 U.S.C. § 651(b)(3); *see id.* § 655, giving rise to the Occupational Safety and Health Administration (OSHA), *see id.* § 553 (requiring the Department of Labor to establish an Assistant Secretary of Labor for Occupational Safety and Health). While OSHA is responsible for the inherently policy-based task of setting binding safety and health rules for workplaces, NIOSH conducts and funds safety and health research and makes evidence-based recommendations that inform OSHA's rules. *See, e.g.*, *id.* §§ 669(a)(2)-(3), 671(c)(1). This division of labor enables NIOSH to generate neutral research and recommendations that are free from the policy-based considerations that necessarily influence OSHA's regulatory work.

25.     Congress made a similar division of labor in the Federal Mine Safety and Health Amendments Act of 1977, Pub. L. No. 95-164, 91 Stat. 1290. In that statute, Congress created the Mine Safety and Health Administration (MSHA) within the Department of Labor, 29 U.S.C. § 557a, and charged it with promulgating mandatory safety and health standards applicable to mines, *see* 30 U.S.C. § 811(a). Meanwhile, the Act directs NIOSH to conduct and award grants to fund studies, research, and experiments into aspects of mine safety, *id.* §§ 951(a)-(c), and authorizes it to make research-based recommendations to the MSHA, *id.* § 811(a)(1).

26.     Before the events giving rise to this lawsuit, NIOSH resided within HHS as part of the Centers for Disease Control and Prevention (CDC).

27.    Over the years, Congress has assigned specific responsibilities for NIOSH to fulfill in carrying out its role as the primary federal agency tasked with occupational safety and health research and investigation. For example:

(a)  In the Black Lung Benefits Act of 1972, Pub. L. No. 92-303, § 5(6), 86 Stat. 150, 155, Congress directed NIOSH to conduct research into respiratory and pulmonary impairments in coal miners and to make grant awards to third-party researchers investigating similar topics. 30 U.S.C. § 937(b).

(b)  In the Toxic Substances Control Act of 1976, Pub. L. No. 94-469, §§ 4(b)(2)(A) and (e)(2)(A), 90 Stat. 2003, 2007, 2011, as amended, Congress required the U.S. Environmental Protection Agency to consult with NIOSH in prescribing epidemiological studies to assess the effects of potentially hazardous chemical substances and mixtures, 15 U.S.C. § 2603(b)(2)(A), and to include NIOSH and OSHA on a committee to recommend chemical substances for priority consideration, *id.* §§ 2603(e)(2)(A)(ii) and (v).

(c)  In a 2000 Appropriations Act, Pub. L. No. 106-398, div. C, tit. XXXVI, 114 Stat. 1654, 1654A-504, Congress directed NIOSH to assist HHS in administering the Energy Employees Occupational Illness Compensation Program, which compensates people with health conditions arising from workplace exposure to atomic weapons, beryllium, or uranium. 42 U.S.C. § 7384p; *see id.* §§ 7384n, 7384q, 7384s, 7384u; *see also* Exec. Order 13179, § 2(b), 65 Fed. Reg. 77487 (2000) (assigning responsibilities under § 7384n to HHS).

(d) In the Interagency Coordinating Committee on the Validation of Alternative Methods Authorization Act of 2000, Pub. L. No. 106-545, § 3(c)(10), 114 Stat. 2721, 2722, Congress directed NIOSH to participate in a standing interagency committee tasked with developing, coordinating, and evaluating toxicological test protocols on an ongoing basis. 42 U.S.C. § 285*l*-3(c)(10); *see id.* § 285*l*-3(e).

(e) In the Public Health Security and Bioterrorism Preparedness and Response Act of 2002, Pub. L. No. 107-188, § 153, 116 Stat. 594, 631, Congress directed NIOSH to perform research "on the health and safety of workers who are at risk for bioterrorist threats or attacks in the workplace." 29 U.S.C. § 669a.

(f) In the aftermath of the Sago Mine disaster in West Virginia, Congress enacted the Mine Improvement and New Emergency Response Act of 2006, Pub. L. No. 109-236, § 6, 120 Stat. 493, 498-500. In that Act, Congress created the Office of Mine Safety and Health within NIOSH, 29 U.S.C. § 671(h)(1), and directed it to award grants and contracts and establish an interagency working group to promote "research, development, and testing of new technologies and equipment designed to enhance mine safety and health," *id.* § 671(h)(3).

(g) In the James Zadroga 9/11 Health and Compensation Act of 2010, Pub. L. No. 111-347, § 101 (§ 3306(14)), 124 Stat. 3623, 3634, Congress tasked NIOSH with administering aspects of the World Trade Center Health Program, which conducts research into health conditions arising as a result of the September 11, 2001, terrorist attacks and administers medical evaluations and services to

14

individuals who participated in rescue, recovery, or cleanup activities or were

otherwise affected by the attacks. 42 U.S.C. § 300mm-5(16); *see id.* § 300mm.

28.    In addition to the statutory functions that Congress has assigned to NIOSH, the

agency performs many functions that Congress has assigned to HHS and that HHS has delegated

to NIOSH by regulation. For example:

(a) As part of the Coal Workers' Health Surveillance Program, Congress required

HHS to work with coal mine operators to provide ongoing medical monitoring,

including periodic chest X-rays, for mine workers. 30 U.S.C. § 843. HHS, in

turn, has promulgated regulations that assign responsibility for aspects of this

program to NIOSH. *See* 42 C.F.R. § 37.100(a) (requiring coal mine operators

to receive NIOSH approval for medical monitoring plans); *id.* § 37.102(a)

(authorizing NIOSH to identify mine workers who meet a medical-risk

threshold that entitles them to elect to transfer to a less dusty worksite); *see also*

30 C.F.R. § 72.100 (requiring coal mine operators to use NIOSH-approved

facilities for periodic medical exams).

(b) Congress has directed HHS to evaluate and approve the respiratory protective

devices that employers must provide to workers who are exposed to potentially

harmful levels of respirable dust, 30 U.S.C. § 842(h); *id.* § 844, and HHS

regulations assign the evaluation and approval process to NIOSH. *See* 42 C.F.R.

§ 84.1(a).

(c) Congress authorized HHS to conduct worksite inspections, 29 U.S.C.

§ 657(g)(2), and, in particular, mandated that HHS or the Secretary of Labor

"shall make frequent inspections and investigations in coal or other mines each

year," 30 U.S.C. § 813(a). Importantly, the OSH Act directs that HHS—and thus, NIOSH, *see* 29 U.S.C. § 671(c)(2)—"shall determine[,] following a written request by any employer or authorized representative of employees, . . . whether any substance normally found in the place of employment has potentially toxic effects in such concentrations as used or found." *Id.* § 669(a)(6). HHS has promulgated regulations delegating to NIOSH responsibility for conducting such inspections of potential worksite health hazards. 42 C.F.R. §§ 85.4, 85a.3.

29.    Even where HHS has not promulgated a regulation delegating to NIOSH certain of its statutorily assigned functions, since NIOSH's inception HHS has designated NIOSH as the agency that "[p]lans, directs, and coordinates the national program effort to develop and establish recommended occupational safety and health standards and to conduct research, training, and related activities to assure safe and healthful working conditions for every man and woman" and created specific divisions within NIOSH to carry out these responsibilities. 36 Fed. Reg. 12320, 12320-21 (June 30, 1971). Pursuant to this delegation, and as a matter of longstanding practice, NIOSH has assumed responsibility (and has developed the resources, staffing, and expertise) for carrying out additional statutory directives. For example:

(a) Congress required HHS to determine "on a continuing basis" whether "each toxic material or harmful physical agent which is found in a mine . . . is potentially toxic at the concentrations in which it is used or found," 30 U.S.C. § 811(a)(6)(B), and to respond to requests from mine operators or mine worker representatives for a determination of any potentially hazardous effects associated with substances or equipment used in mine work, *id.* § 951(a)(11).

16

NIOSH carries out these functions within HHS, publishing recommended exposure limits for hundreds of chemicals and substance groupings and investigating possible workplace hazards and making recommendations.

(b) In the Firefighter Cancer Registry Act of 2018, Pub. L. No. 115-194, § 2(a), 132 Stat. 1506, 1506, Congress directed that HHS "shall develop and maintain . . . a voluntary registry of firefighters . . . to collect relevant health and occupational information of such firefighters for purposes of determining cancer incidence." 42 U.S.C. § 280e-5(a). NIOSH is the agency within HHS that has been responsible for enrolling participants in and maintaining this national registry and studying what it reveals about the link between firefighting and cancer.

(c) Congress requires HHS to work with the Department of Labor to "develop and maintain an effective program of collection, compilation, and analysis of occupational safety and health statistics," 29 U.S.C. § 673(a), including by awarding grants and contracts to achieve this goal, *id.* § 673(b). NIOSH both performs this mandatory information-gathering function and awards research grants to states and political subdivisions that perform similar functions.

30. Congress regularly appropriates funds to enable NIOSH to carry out its designated functions. For Fiscal Year 2024, Congress set NIOSH's funding at $362.8 million. *See* Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. D, tit. II, 138 Stat. 460, 654. That amount includes $119.5 million for the National Occupational Research Agenda, including $29 million specifically for agriculture, forestry, and fishing; $32 million for Education and Research Centers; $23 million for personal protective technology; $66.5 million for mining

research; $5.5 million for the Firefighter Cancer Registry and $1.2 million for the National

Mesothelioma Registry; and $115.1 million for other occupational safety and health research,

including $11.8 million for Total Worker Health. *See* Explanatory Statement, 170 Cong. Rec.

H1501, 1889 (Mar. 22, 2024) (incorporated into law by Pub. L. No. 118-47, § 4, 138 Stat. 461);

see also S. Rep. No. 118-84, at 82-84 (2023) (incorporated by Explanatory Statement, 170 Cong.

Rec. H1886).

31.    Congress's continuing appropriations legislation for Fiscal Year 2025 left these

funding levels in place. *See* Full-Year Continuing Appropriations and Extensions Act of 2025,

Pub. L. No. 119-4, §§ 1101(a)(8) and (c), 139 Stat. 9, 1012.

**NIOSH's implementation of its legal mandates**

32.    Over the 50-plus years since Congress created NIOSH and began assigning it

critical functions in protecting workplace safety and health, NIOSH has worked to implement its

statutory and regulatory mandates. Employers and employees throughout America, as well as

businesses, nonprofit organizations, educators, and governments, have come to rely on the ongoing

programs operated by NIOSH's staff of highly trained scientific experts. Some of these programs

include:

- ***Respiratory Protection and the National Personal Protective Technology Laboratory***

33.    For more than a century, the federal government has played the leading role in

developing and certifying respiratory devices to protect workers from inhaling hazardous

substances. The Bureau of Mines in the Department of Interior (and later, MSHA in the

Department of Labor) led these efforts for many decades, certifying the first respiratory protection

devices for mine workers and developing the first respirator performance standards in 1919.

NIOSH assumed a key role in respiratory protection in the early 1970s, fulfilling its responsibility

under the OSH Act to recommend occupational safety health standards to protect workers from harmful exposures by developing respirator performance and certification standards for respirators used in workplaces subject to the OSH Act. In 1995, federal responsibility for certifying respirators was transferred to NIOSH, making NIOSH the singular federal agency responsible for respiratory-protection performance, testing, and certification for the nation as a whole.

34.    In 2001, at Congress's request, NIOSH established the National Personal Protective Technology Laboratory (NPPTL), to improve PPE, including respiratory protection, for workers. The NPPTL is charged with performing research, surveillance, and standards development to support the more than 20 million American workers who rely on PPE to ensure their safety and health at work. *See* S. Rep. No. 106-293, at 109-10 (2000) (calling for the creation of the NPPTL).

35.    Through its Respirator Approval Program, for example, the NPPTL approves and certifies respirators for use in workplaces across multiple industry sectors, including healthcare, mining, firefighting, construction and abatement, utilities, maintenance, and manufacturing. *See, e.g.*, 30 U.S.C. § 842(h) (providing for HHS approval of respiratory equipment); *id.* § 844 (same); 42 C.F.R. pt. 84 (assigning this function to NIOSH and describing the approval and certification process); 29 C.F.R. § 1910.134(d) (OSHA standard requiring certain employers to select a NIOSH-certified respirator). During the COVID-19 pandemic, for example, the NPPTL's role included certifying respirators, such as the widely used N95 respirators, known colloquially as N95 masks.

36.    Even after approving a respirator, moreover, the NPPTL performs ongoing post-market evaluations to ensure that the respirator continues to meet safety and quality standards; conducts audits of manufacturer sites every two years; requires manufacturers to secure extensions of approvals whenever changes are made to the product's design or supplier or the manufacturer's

quality management program; and monitors the market for counterfeit and substandard products. In Fiscal Year 2024, the NPPTL oversaw more than 10,000 approved respirators and flagged 450 respirators for enforcement action—*i.e.*, to have them removed from the market. In 2023 alone, the NPPTL made 460 respirator approval decisions and conducted 375 quality assurance audits. *See* HHS, CDC, *Fiscal Year 2025 Justification of Estimates for Appropriation Committees* 252 (Mar. 2024).[2] With rising rates of airborne transmissible diseases including measles, tuberculosis and pertussis, as well as novel infectious pathogens such as avian influenza, certification and monitoring of respirator integrity remains critical to protecting the healthcare workforce.

37.    In addition to respirators, the NPPTL performs research on a wide range of other forms of PPE, including fluid-resistant clothing and eye and ear protection, to ensure, among other things, that they function as specified and that they properly fit workers of various sizes and body types. For example, research and testing by the NPPTL identified many fluid-resistant gowns commonly in use that do not meet American National Standards Institute performance standards, thus exposing healthcare workers to infectious pathogens from bodily fluids including blood. NIOSH Science Blog, *NIOSH Research Highlights Importance of Rigorous Standards for Gowns Used to Protect Healthcare Workers* (July 22, 2025).[3] Furthermore, the NPPTL runs trainings and workshops to ensure the proper use of PPE.

38.    The NPPTL's continued work is necessary for businesses to comply with their legal obligations under OSHA standards and numerous other federal regulations that require the use of NIOSH-approved equipment in certain settings. *See, e.g.*, 29 C.F.R. § 1910.94(a)(5)(iii); *id.* §§ 1910.134(d)(1)(ii), (d)(2)(i)(A), (d)(2)(ii), (d)(3)(iii)(B)(1), (d)(3)(iv), (h)(4)(i), (i)(9), and (j);

---

[2] https://stacks.cdc.gov/view/cdc/177367.

[3] https://blogs.cdc.gov/niosh-science-blog/2015/07/22/isolation-gowns.

*id.* § 1910.156(f)(1)(iv); *id.* § 1926.57(f)(5)(i); 30 C.F.R. §§ 56.5005(a), 57.5005(a), 57.5060(d)(1), 58.610(a), 72.610(a), 72.700(a), 75.1714-1, 75.1714-2(e)(2), 75.1714-3(c)-(d), 75.2 (definitions of "filter self-rescuer" and "self-contained self-rescuer"). And even where a regulation does not incorporate NIOSH standards, employers sometimes invoke compliance with those standards as an alternative method of complying with their regulatory obligations. *See, e.g.*, MSHA, *Petition for Modification of Application of Existing Mandatory Safety Standards*, 90 Fed. Reg. 16567 (Apr. 18, 2025) (describing a petition from manufacturer 3M Company for a determination that use of NIOSH-tested clothes-cleaning booths would provide an alternative means of satisfying applicable mandatory safety standards).

39.    The Department of Defense also relies upon NIOSH-approved respirators for the protection of civilian and military personnel. Binding DoD directives and instructions mandate compliance with OSHA standards, including the required use of NIOSH-approved respirators, by civilian personnel at all DoD workplaces and military personnel on nonmilitary-unique DoD operations and workplaces. For military personnel on strictly military operations and workplaces, compliance with OSHA standards, including the use of NIOSH-approved respirators, is required to the extent practicable. See Department of Defense Instruction Number 6055.01, DoD Safety and Occupational Health (SOH) Program, at 12 (Oct. 14, 2014).[4]

40.    No other agency in the federal government has the expertise or authority to certify respirators for workplace use, deter counterfeits from entering the market, and carry out the other research and oversight functions conducted by the NPPTL.

---

[4] https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/605501p.pdf.

- ***Research Programs, Public Notice of Hazards, and Other Publications***

41.    NIOSH conducts a range of additional safety and health research across a variety of industries and disseminates its findings for the benefit of employers, workers, and others. *See* 29 U.S.C. §§ 669, 671(c)(2) (directing NIOSH to conduct occupational safety and health research).

42.    For example, NIOSH publishes and regularly updates the *NIOSH Pocket Guide to Chemical Hazards*—its most widely-used publication—which offers industrial hygiene information for hundreds of chemicals or substance groupings that are found in workplaces.[5] And NIOSH updates the Guide as new potential hazards enter the marketplace. *See, e.g.*, 30 U.S.C. § 811(a)(6)(B) (directing HHS to assess on an ongoing basis the toxicity of chemical substances that occur in the mining industry).

43.    NIOSH publishes and regularly updates the *NIOSH Manual of Analytical Methods*, which describes best practices for monitoring workplace exposure to potentially toxic substances, including methods for testing air, surfaces, blood, and urine.[6]

44.    NIOSH publishes and regularly updates the *Best Practices for Dust Control in Coal Mining*, which, as the title indicates, describes the best practices for controlling dust in coal mines.[7]

45.    NIOSH publishes and regularly updates the *NIOSH List of Hazardous Drugs in Healthcare Settings*, which identifies hazardous drugs to which workers in the healthcare industry may be exposed, so that employers and workers can take appropriate precautions.[8]

---

[5] NIOSH, *NIOSH Pocket Guide to Chemical Hazards*, https://www.cdc.gov/niosh/npg/default.html (Feb. 18, 2020).

[6] NIOSH, *NIOSH Manual of Analytical Methods (NMAM) 5th Edition*, https://www.cdc.gov/niosh/nmam/default.html (Sept. 20, 2018).

[7] NIOSH Mining Program Information Circular, *Best Practices for Dust Control in Coal Mining* (2d ed.), https://www.cdc.gov/niosh/docs/2021-119/default.html.

[8] NIOSH, *NIOSH List of Hazardous Drugs in Healthcare Settings, 2024*, https://www.cdc.gov/niosh/docs/2025-103/default.html (Dec. 18, 2024).

46.    NIOSH also conducts research into specific workplace hazards and offers guidance on how best to address them. Among other things, NIOSH has issued guidance on selecting, evaluating, and using disposal containers for sharp objects[9]; preventing musculoskeletal injuries on the worksite[10]; identifying ways to mitigate the risk of workplace violence[11]; and responding to risks associated with robotics in workplaces.[12]

47.    Since 1982, NIOSH has also run the Fatality Assessment and Control Evaluation (FACE) Program, which investigates selected workplace fatalities in order to identify occupational hazards and make recommendations about how to prevent similar deaths in the future. The FACE Program is part of the larger NIOSH Surveillance Program, which improves worker safety and health by identifying and tracking workplace injuries, illnesses, hazards, deaths, and exposures in the United States.

48.    NIOSH also develops criteria (often called criteria documents), which consist of a comprehensive set of recommendations for OSHA that identify safe exposure levels for toxic substances in the workplace. Employers, unions, and workers across industries depend on these criteria documents, particularly where OSHA has yet to regulate.

---

[9] NIOSH, *Selecting, Evaluating and Using Sharps Disposal Containers*, https://www.cdc.gov/niosh/docs/97-111/default.html (Aug. 8, 2023).

[10] NIOSH, *Musculoskeletal Disorders and Workplace Factors—a Critical Review of Epidemiologic Evidence for Work-Related Musculoskeletal Disorders of the Neck, Upper Extremity, and Low Back*, https://www.cdc.gov/niosh/docs/97-141/default.html (Aug. 10, 2023); NIOSH, *Applications Manual for the Revised NIOSH Lifting Equation*, https://www.cdc.gov/niosh/docs/94-110/default.html (June 6, 2014).

[11] NIOSH, *Violence in the Workplace*, https://www.cdc.gov/niosh/docs/96-100/default.html (June 6, 2014).

[12] NIOSH, *Robotics in the Workplace: An Overview*, https://www.cdc.gov/niosh/robotics/about/index.html.

49.     In addition to administering its own programs, NIOSH provides funding to support critical safety and health surveillance activities by third parties, including states. For example, through the State Occupational Safety and Health Surveillance Program, NIOSH provides 23 states funding to collect, analyze, and interpret occupational safety and health data and sometimes to perform additional follow-up investigations and develop policy or other interventions. During the COVID-19 pandemic, this program led to critical insights that helped states develop safe return-to-work policies and mitigation measures.

- ***Health Hazard Evaluations and Hazard Reviews***

50.     NIOSH operates the Health Hazard Evaluation (HHE) Program, which implements the OSH Act's guarantee that employers or authorized representatives of employees can enlist NIOSH to conduct a field investigation of a workplace where a potential health hazard is suspected. *See* 29 U.S.C. § 669(a)(6) (directing HHS to conduct investigations, upon request, into potentially toxic substances at a worksite); *see also id.* §§ 669(e), 671(c)(2) (assigning this function to NIOSH); 30 U.S.C. § 813(a) (requiring "frequent" inspections and investigations of conditions in mines); 42 C.F.R. pts. 85, 85a (establishing procedures for HHE requests and NIOSH's worksite investigations). If NIOSH decides that an investigation is necessary, it evaluates workplace conditions and employee health concerns and makes recommendations in a written report—which is made public—on how to eliminate or reduce any identified hazards.

51.     Between January 2023 and March 2024, NIOSH conducted at least 132 health hazard evaluations across 37 states to address the occupational health concerns of thousands of employees and managers, and its reports were downloaded 14,397 times. *See Fiscal Year 2025 Justification*, *supra* n.2, at 252, 258. These HHEs are vital to worker safety because they identify hazards and recommend mitigation measures, and because they provide information that unions

can use to offer training and guidance to their members and when negotiating with employers and advocating to lawmakers for improvements to workplace health.

52.    For example, following the Maui wildfires, NIOSH performed an HHE that investigated the respiratory hazards faced by emergency responders, identified serious airborne risks, and recommended critical improvements in PPE use and health monitoring. *See* NIOSH, *Evaluation of First Responders' Biological Monitoring Results After Maui County Hawaii Wildfires* (July 2024).[13] Another of NIOSH's HHEs addressed the risk to police officers of hazardous exposure to fentanyl and other opioids while carrying out their duties. *See* NIOSH, *Evaluation of Occupational Exposure to Opioids in a City Police Department* (Aug. 2021).[14]

53.    The lessons that NIOSH learns in conducting a health hazard evaluation of a particular workplace are often transferable to similar workplaces in other industries. Accordingly, NIOSH and other groups that strive to improve workplace safety and health conditions can and do use the findings and recommendations from NIOSH's HHEs to advocate for workplace improvements across sectors.

54.    In addition to workplace-specific HHEs, NIOSH also performs hazard reviews aimed at developing recommendations for mitigating the risks associated with occupational hazards that cut across multiple industries. For example, last year HHS tasked NIOSH with developing recommendations related to outdoor workers' exposure to smoke from wildland fires. More than 80 subject-matter experts across multiple NIOSH divisions worked together to draft an extensive hazard review document. *See* 89 Fed. Reg. 74960 (Sept. 13, 2024) (opening a draft report for public comment and technical review). The final report's cancellation or delay would deny or

---

[13] https://www.cdc.gov/niosh/hhe/reports/pdfs/2023-0136-0142-3400.pdf.

[14] https://www.cdc.gov/niosh/hhe/reports/pdfs/2018-0015-3383.pdf.

stall valuable safety recommendations to the many firefighters and other workers confronting this hazard.

- ***Miner Safety and Health***

55.     NIOSH plays a critical role in protecting the safety and health of mine workers. *See, e.g.*, 29 U.S.C. § 671(h) (creating the Office of Mine Safety and Health within NIOSH); 30 U.S.C. §§ 937(b), 951(a)-(b) (requiring NIOSH to conduct research on mine worker health and mine safety); *id.* § 811(a)(1) (tasking NIOSH with recommending safety standards to MSHA).

56.     In addition to its responsibilities in approving and monitoring respirators, conducting health hazard evaluations, and carrying out research and investigations, NIOSH is also responsible for administering the Coal Workers' Health Surveillance Program (CWHSP), which provides medical monitoring to ensure the safety and health of coal miners. *See* 30 U.S.C. § 843 (requiring HHS to work with coal mine operators to provide medical monitoring); 42 C.F.R. pt. 37 (establishing NIOSH as the HHS component responsible for fulfilling this requirement). As part of this program, NIOSH provides free screenings—including mobile screenings—to coal miners to evaluate them for black lung disease. Detecting black lung disease early and providing miners with the opportunity to transfer to areas of the mine with lower dust exposure are critical in enabling timely interventions to slow disease progression. *See* 30 U.S.C. § 843; 30 C.F.R. pt. 90.

57.     Another critical function that NIOSH performs as part of the CWHSP is training and certifying physicians as "B Readers" who are able to analyze miners' chest X-rays and assess the extent of lung damage. *See* 42 C.F.R. pt. 37. NIOSH's work training B Readers is essential not only to the CWHSP but also to other statutory and regulatory programs administered by a variety of agencies. *See, e.g.*, 42 U.S.C. 1395rr-1(e)(2)(B)(i)(I) (establishing a role for NIOSH-certified

B Readers in assessing eligibility for certain Medicare benefits); 10 C.F.R. § 850.34(b)(1)(iv) (establishing a role for NIOSH-certified B Readers in implementing a medical monitoring program for beryllium run by the Department of Energy).

58.     NIOSH also runs the Mining Program, which conducts and funds research to reduce occupational illnesses, traumatic injuries, and fatalities among mine workers. Through this program, NIOSH has disseminated training modules to increase miners' ability to escape emergencies, created tools for reducing heat-stress incidents, and launched software that allows mine operators to assess workplace air quality. The Mining Program further encompasses NIOSH's Pittsburgh and Spokane Mining Research Divisions (MRDs) and a facility in Morgantown, West Virginia, which perform field and laboratory research into issues such as how to guard against the risk of mine cave-ins and how to reduce miners' exposure to harmful respirable substances. *See Fiscal Year 2025 Justification*, *supra* n.2, at 256 (describing Mining Program).

- ***Firefighter Safety and Health***

59.      NIOSH programs play an essential role in protecting the safety and health of firefighters.

60.     In addition to its responsibilities in approving and monitoring respirators, conducting health hazard evaluations, and carrying out research and investigations, NIOSH is responsible for fulfilling HHS's statutory mandate to create and maintain a National Firefighter Registry for Cancer (NFR). *See* 42 U.S.C. § 280e-5 (establishing this mandate); *id.* § 280e-5(h) (authorizing appropriations for this program through Fiscal Year 2028).

61.     The NFR is the largest effort ever undertaken to understand and reduce the risk of cancer among U.S. firefighters. NIOSH's goal is to enroll more than 200,000 fighters in the registry. By enrolling and gathering information on a large population of firefighters with and

without cancer throughout the country—including firefighters of different ages, races, and genders—NIOSH intends to regularly monitor and assess the data to determine whether firefighters' occupational exposure to particular chemicals poses an increased risk of developing cancer. The findings from these ongoing assessments will then be used to develop recommendations to reduce firefighters' exposures and cancer risks.

62.    NIOSH also runs the Fire Fighter Fatality Investigation and Prevention Program, which conducts in-depth investigations into firefighter deaths that occur in the line of duty to identify the causes and factors contributing to the fatalities and to formulate recommendations for preventing future deaths and injuries. Through this program, NIOSH has issued hundreds of detailed reports stemming from decades' worth of fatalities and made innumerable recommendations that have saved firefighters' lives.[15]

- *Education and Research Centers, Training Project Grants, and Other Extramural Programs*

63.    Recognizing the importance of developing a cadre of well-trained safety and health professionals to implement the OSH Act, Congress directed NIOSH to conduct "education programs to provide an adequate supply of qualified personnel to carry out the purposes" of the OSH Act and "informational programs on the importance of and proper use of adequate safety and health equipment." 29 U.S.C. § 670(a); *see id.* § 671(c)(2). To fulfill these mandates, NIOSH created the Education and Research Center program and currently funds and coordinates 18 Education and Research Centers at universities throughout the country. The Centers provide interdisciplinary graduate and post-graduate training in occupational safety and health disciplines such as industrial hygiene, occupational medicine, occupational health psychology, mining safety,

---

[15] *See* https://wwwn.cdc.gov/NIOSH-fire-fighter-face.

and ergonomics. Since the program's inception, it has been the primary source of advanced training for occupational safety and health doctors and other professionals in the United States, training more than 20,000 safety and health professionals.

64.    NIOSH also awards academic and non-academic Training Project Grants (TPGs). NIOSH is currently administering 30 TPGs. *See* 42 C.F.R. pts. 86-87 (guiding NIOSH in the administration of its grant programs).

65.    NIOSH's academic TPGs provide funds for academic institutions to use to help selected students in specific undergraduate, graduate, and post-graduate programs cover expenses, tuition, and fees. These grants also support the Occupational Health Internship Program, which is housed within Plaintiff AOEC. With training sites across the country, this internship program provides undergraduate and graduate students the opportunity for real-world field experience through summer internship placements in labor unions and other organizations, with 20 students participating each summer and over 400 students participating since the internship program's inception in 2004.

66.    NIOSH's non-academic TPGs help meet specific training needs of workers in particular industries, such as firefighting or commercial fishing.

67.    Additionally, NIOSH supports and funds targeted research and outreach activities through multidisciplinary centers that focus on high-risk industries that contribute disproportionately to work-related injury and illness in the United States. For example, NIOSH supports twelve Centers for Agricultural Safety and Health, which conduct research, education, and prevention projects in agriculture, forestry, and fishing. The National Construction Center, meanwhile, focuses on applied research on the safety and health hazards in construction. And ten Centers of Excellence for Total Worker Health, which NIOSH also supports and funds, conduct

multidisciplinary research, intervention, and outreach in a range of industries with the aim of improving the safety, health, and well-being of the nation's workers.

- ***World Trade Center Health Program***

68.    NIOSH operates the World Trade Center (WTC) Health Program to implement HHS's statutory obligation to provide medical evaluations and treatment to first responders and survivors affected by the September 11 attacks and their aftermath. *See* 42 U.S.C. § 300mm (establishing the program); *id.* § 300mm-61 (providing for annual funding of the program); 42 C.F.R. pt. 88 (establishing NIOSH's role in administering the program). By statute, the Director of NIOSH serves as the WTC Program Administrator. 42 U.S.C. § 300mm-5(16).

69.    The WTC Health Program, under the Administrator's direction, approves individual applications for enrollment in the program and certifies a patient's conditions for government-funded medical monitoring and treatment. These approvals are required before services and treatment can be provided through the program, and they are also a prerequisite for eligibility for financial compensation from the September 11 Victims' Compensation Fund, administered by the Department of Justice.

70.    The WTC Health Program serves nearly 150,000 patients, with roughly 10,000 new enrollees in 2024 alone. *See* NIOSH, *World Trade Center Health Program: External Quarterly Program Summary* 3-4 (Feb. 7, 2025).[16] The program provides cost-free treatment for over 100,000 certified health conditions, with more than 13,000 conditions newly certified in 2024. *Id.* at 23-24.

71.    In addition, NIOSH determines whether new health conditions should be added to the list of recognized WTC-Related Health Conditions for which treatment through the program

---

[16] https://www.cdc.gov/wtc/pdfs/statistics/External_QuarterlyProgramSummary_20241231.pdf.

can be provided. Several petitions requesting the addition of new health conditions, including petitions for the addition of autoimmune and cardiac conditions filed in September 2023 by the City of New York Fire Department and six of the WTC Health Program Clinical Centers of Excellence, are currently pending. In December 2024, in a letter to members of Congress, the WTC Program Administrator, Dr. John Howard, stated that review of these petitions was expected to be completed by the end of March 2025. To date, they remain pending.

- ***Division of Compensation Analysis and Support***

72.    NIOSH's Division of Compensation Analysis and Support (DCAS) carries out the agency's statutory obligation under the Energy Employees Occupational Illness Compensation Program to provide financial support for individuals experiencing health conditions as a result of workplace exposure to radiation or certain hazardous substances while performing activities related to the production of nuclear weapons at facilities that are owned by or that have contracted with the Department of Energy. *See* 42 U.S.C. § 7384p (establishing the statutory mandate); 42 C.F.R. pts. 81-83 (guiding NIOSH's implementation of the mandate).

73.    DCAS is responsible for estimating work-related radiation exposure for certain workers with cancer who file claims for compensation and medical benefits under the Program. This process, known as "dose reconstruction," is highly technical, requiring the collection and evaluation of data on the claimant's work history and exposure and available information about the worksite to make a determination whether the cancer condition is related to radiation exposure. Each year, the Department of Labor, which administers the overall compensation program, sends NIOSH an estimated 3,000 requests for dose reconstructions needed to make eligibility determinations. Without these determinations, a worker cannot be approved for compensation. In addition, DCAS performs research to develop methods for estimating levels of radiation exposure

and for assessing the likelihood that a particular medical condition arises from workplace exposures.

74.     DCAS is also responsible for receiving and evaluating petitions requesting the addition of new classes of employees to the "Special Exposure Cohort" (SEC). By statute, members of an SEC may be compensated without the completion of a dose reconstruction. 42 U.S.C. § 7384q. DCAS staff determine whether the SEC petitions meet the minimum requirements for review and evaluation, review and evaluate the petitions if so, and provide a report to an independent Advisory Board on Radiation and Worker Health for expert review and recommendation. There are presently five pending SEC petitions under review for the addition of new groups of workers at the following sites: Pinellas (FL), Savannah River (SC), Los Alamos (NM), Hanford (WA), and Lawrence Livermore (CA).

**The Trump Administration's actions dismantling NIOSH**

75.     Immediately after being sworn into office on January 20, 2025, President Trump began taking measures to cut federal operations and reduce the size of the federal workforce. On the day of his inauguration, he signed a presidential memorandum barring agencies from filling any vacant federal civilian position and from creating new positions, unless otherwise authorized. *See Hiring Freeze*, Presidential Mem. (Jan. 20, 2025).[17] The memorandum further directed that the Office of Management and Budget (OMB) and Office of Personnel Management (OPM), in consultation with the United States DOGE Service, should "submit a plan to reduce the size of the Federal Government's workforce" within 90 days. *Id.*

76.     One week later, OPM sent an email to federal employees announcing a voluntary deferred resignation program. *See* OPM, *Deferred Resignation Email to Federal Employees*

---

[17] https://www.whitehouse.gov/presidential-actions/2025/01/hiring-freeze.

(Jan. 28, 2025).[18] The email warned those employees who elected not to resign that OPM could not "give [them] full assurance regarding the certainty of [their] position or agency." *Id.*

77.    On February 11, 2025, President Trump issued an Executive Order titled "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative." Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 14, 2025). The order directed agency heads to "promptly undertake preparations to initiate large-scale reductions in force (RIFs)," *id.* § 3(c), and to submit a report to OPM within 30 days that "discuss[es] whether the agency or any of its subcomponents should be eliminated or consolidated," *id.* § 3(e).

78.    Just over one month later, on March 27, 2025, HHS announced a "dramatic restructuring" that would involve reducing its workforce by approximately 10,000 full-time employees. HHS, *HHS Announces Transformation to Make America Healthy Again* (Mar. 27, 2025).[19] When taken together with the resignations prompted by the deferred resignation program, HHS estimated that the restructuring would reduce its workforce from 82,000 to 62,000 full-time employees—in other words, by nearly 25 percent. *Id.* As part of the restructuring plan, HHS planned to combine NIOSH with several other HHS agencies into a "new, unified entity" called the Administration for a Healthy America. *Id.*

79.    HHS soon began issuing notices that it would be undertaking massive RIFs at NIOSH—"in accordance with" the February 11 executive order and "HHS's broader strategy to improve its efficiency and effectiveness to make America healthier." Early in the morning on April 1, 2025, more than 400 (out of just over 1,000) of NIOSH's employees received notice, dated March 31, 2025, that their positions would be eliminated in June. Hundreds of NIOSH contractors

---

[18] https://www.opm.gov/fork/original-email-to-employees.

[19] https://www.hhs.gov/press-room/hhs-restructuring-doge.html.

who work side-by-side with other NIOSH staff to carry out and support NIOSH programs also received notice of termination. Many other NIOSH employees received notice on April 1, 2025, that the agency intended to implement a RIF, effective June 30, 2025, but did not receive their termination notices at that time.

80.    Most, if not all, of the employees in this initial wave of April 1, 2025, RIF notices were immediately placed on administrative leave with pay pending the anticipated June 2, 2025, elimination of their positions. They were given only until the end of the day to vacate their offices—maximizing the disruption to NIOSH's programs. *Cf.* 5 C.F.R. § 351.806 (requiring that, where possible, agencies conducting RIFs "retain . . . employee[s] on active duty status" between the issuance of a RIF notice and the employees' eventual termination). In some cases, employees' departures were so abrupt that laboratory animals had to be euthanized because they would otherwise be left without staff to care for them. *See* Mark Olalde, *Trump Laid Off Nearly All the Federal Workers Who Investigate Firefighter Deaths*, ProPublica (Apr. 21, 2025).[20]

81.    On May 2, 2025, nearly 400 additional NIOSH employees received their RIF notices with a separation date of July 2, 2025. Most, if not all, of the employees in this second wave also were immediately placed on paid administrative leave—leaving NIOSH effectively decimated. *See* Alexander Tin, *Worker safety agency NIOSH lays off most remaining staff*, CBS News (May 3, 2025).[21]

82.    The April and May RIFs did not include NIOSH staff who are members of the Commissioned Corps of the U.S. Public Health Service, who are subject to different employment terms than those that govern civil service employees.

---

[20] https://www.propublica.org/article/trump-cuts-firefighter-deaths.

[21] https://www.cbsnews.com/news/worker-safety-agency-niosh-lays-off-most-remaining-staff.

83.    All told, between these RIFs, the February 2025 terminations of NIOSH probationary employees, and the departures of NIOSH employees who took early retirements or voluntary buyouts, about 900 employees, or approximately 85 percent, of NIOSH's pre-inauguration staff were slated to separate by early July. The RIFs and other terminations, combined with employees' early departures and Defendants' actions in immediately placing recipients of RIF notices on administrative leave, virtually eliminated almost every NIOSH division altogether. For example, the RIFs essentially closed down the NPPTL facilities in Morgantown, West Virginia, and Pittsburgh, Pennsylvania. *See* Ian Karbal, *Federal Cuts Threaten to Close Pennsylvania Lab that Certifies N95s and Other Respirators in June*, Penn. Capital Star (Apr. 17, 2015).[22] Meanwhile, nearly every NIOSH employee responsible for investigating firefighter fatalities or working on the National Firefighter Registry for Cancer was placed on administrative leave and faced termination. *See Trump Laid Off Nearly All the Federal Workers Who Investigate Firefighter Deaths*, *supra* n.20.

84.    The effects of Defendants' actions in shutting down NIOSH, including by gutting its workforce, have been palpable. Citing the RIFs, NIOSH has indicated that "no new health hazard evaluation requests can be accepted,"[23] that "no new respirator approval applications can be accepted,"[24] that "the NIOSH Coal Workers' Health Surveillance Program . . . is not providing any new medical screenings to coal miners or accepting any new requests for review of medical information to determine coal miners' rights for transfer to low-dust jobs,"[25] that "the NIOSH B

---

[22] https://penncapital-star.com/health-care/federal-cuts-threaten-to-close-pennsylvania-lab-that-certifies-n95s-and-other-respirators-in-june.

[23] https://www.cdc.gov/niosh/hhe/default.html.

[24] https://www.cdc.gov/niosh/rap.

[25] https://www.cdc.gov/niosh/cwhsp/about/index.html.

Reader program is paused" and that NIOSH is "not administering B Reader examinations and [is] unable to support any requests about the program at this time,"[26] that "no new NIOSH Fire Fighter Fatality Investigation and Prevention Program . . . requests can be accepted,"[27] and that "firefighters can no longer enroll in the National Firefighter Registry for Cancer."[28]

85.     The WTC Health Program, too, saw substantial cuts to its staff and to that of other NIOSH divisions that support its operations. In February, Defendants terminated more than a dozen WTC probationary employees, although they were reinstated after a public outcry from the September 11 responder community and members of Congress. On April 1, 2025, despite assurances from the Administration that the WTC Health Program would be fully maintained, NIOSH Director Dr. John Howard received a notice terminating his employment, effective June 2, 2025, and placing him on administrative leave. *See* Eduardo Cuevas, *"Delay and Deny Care" to 9/11 Survivors*, USA Today (Apr. 2, 2025).[29] Because, by statute, the NIOSH Director serves as the program's Administrator, 42 U.S.C. § 300mm-5, the termination of Dr Howard left the WTC Health Program without an Administrator. On May 2, 2025, 16 employees of the Program received RIF notices with a separation date of July 2, and were immediately placed on administrative leave, but following a renewed public outcry, Defendants reinstated 15 of them (and one retired). *See* Alexander Tin, *HHS revokes some layoff notices, including to 9/11 program*, CBS News (May 6, 2025).[30] On May 13, 2025, Dr. Howard was reinstated as NIOSH Director, including his role as

---

[26] https://www.cdc.gov/niosh/chestradiography/php/breader/index.html.

[27] https://www.cdc.gov/niosh/firefighters/fffipp/about.html.

[28] https://www.cdc.gov/niosh/firefighters/registry/index.html.

[29] https://eu.usatoday.com/story/news/nation/2025/04/02/hhs-layoffs-world-trade-center-program-staff/82775014007.

[30] https://www.cbsnews.com/news/hhs-revokes-some-layoff-notices-including-to-911-program.

WTC Administrator. Alexander Tin, *Head of worker safety agency NIOSH restored, ahead of RFK Jr. hearing*, CBS News (May 13, 2025).[31] The disruption and uncertainty occasioned by these events, however, has  broken the continuity of the Program's operations and cast doubt over the Program's future.

86.    Adding to the uncertainty, Defendants have not released information regarding whether they have reinstated the many NIOSH employees who work outside the WTC Health Program but nevertheless provide critical services to support it. Defendants' actions in announcing the termination of key staff both within and outside the Program, and in placing that staff on administrative leave, has significantly undermined critical program functions. In April, the Program suspended processing and approving applications for new enrollments—a function that is necessary for September 11 victims to become eligible to receive services and care—and halted approval of certifications of new WTC-health conditions for medical treatment for existing program members. Review of and final determinations on pending petitions to add autoimmune and cardiac conditions to the list of recognized WTC-Related Health Conditions—which require input from NIOSH medical personnel and scientists who were terminated—ceased. Given the cuts in administrative staff, the Program likewise failed to issue scheduled requests for funding for new research and renewals of current research.

87.    Although the WTC Health Program has now resumed processing the backlog of enrollments and certifications, the continuation of other WTC Health Program services remains uncertain—such as adding new conditions to the WTC-Related Health Conditions list, issuing new requests for proposals or contracts for funding new planned research and renewals of current research, approving treatment plans, and managing contracts with service providers. *See* Kevin

---

[31] https://www.cbsnews.com/news/john-howard-niosh-restored-ahead-of-rfk-jr-hearing.

Frey, *'Chaos': Latest cuts at World Trade Center Health Program spark new fears patient care will suffer*, Spectrum News NY1 (May 5, 2025)[32]; Dave Goldiner, *9/11 health program hobbled by cuts despite Trump vow to restore funds*, Daily News (Apr. 30, 2025).[33]

88.    DCAS, which carries out NIOSH's responsibilities under the Energy Employees Occupational Illness Compensation Program, also suffered major staff cuts. Initially, HHS stated that the Program was being maintained as part of the new Administration for a Healthy America, and DCAS staff were not included in the initial round of RIFs. But on May 2, 2025, 21 of the 27 employees in the Division received written notification that their positions were being terminated effective July 2, 2025, and were placed immediately on administrative leave, leaving only six employees to carry out NIOSH's designated responsibilities under the Program.

89.    Although Defendants on May 13, 2025, reinstated at least some of the employees who had received RIF notices, DCAS is not able to conduct the required dose reconstructions for certain claims, on which determinations for compensation depend, without a full complement of staff. According to NIOSH, as of December 2024 there were 1,273 active claims requiring dose reconstruction under review at DCAS.[34] NIOSH has not posted any updates since then. In addition to impacts on dose reconstruction, DCAS has been unable to meet its responsibility to conduct technical reviews of petitions for the addition of new classes of employees to the Special Exposure Cohort. Review of the five pending petitions has ground to a halt.

90.    On information and belief, Defendants plan to terminate funding for all Education and Research Centers—including those with time remaining in their five-year grant terms—by the

---

[32]    https://ny1.com/nyc/all-boroughs/politics/2025/05/06/latest-cuts-at-world-trade-center-health-program-spark-new-fears-patient-care-will-suffer.

[33] https://www.nydailynews.com/2025/04/30/911-health-program-cuts-still-in-place.

[34] https://www.cdc.gov/niosh/ocas/pdfs/abrwh/pres/2024/dc-programupdate-120524-508.pdf.

end of June. The fiscal year for the Centers runs until June 30, 2025. NIOSH has not taken the actions that it typically would have taken by now to continue funding them for their next fiscal year. The result will be to eviscerate the primary training pipeline for occupational and environmental medicine physicians, occupational health nurses, industrial hygienists, ergonomists, and other occupational health specialists—in violation of NIOSH's statutory mandate. *See* 29 U.S.C. § 670(a). NIOSH also has not taken the actions it typically would take to support the Occupational Health Internship Program, which is scheduled to start June 16, 2025. On information and belief, NIOSH funding for other extramural research programs is expected to end this summer.

91.    The effective shutdown of NIOSH programs has had significant adverse effects. For example, an MSHA rule requiring mine operators to update their respiratory protection programs and lower miners' exposure to respirable crystalline silica was scheduled to go into effect on April 14, 2025. On April 8, however, MSHA announced that it would pause enforcement of the rule for four months because mine operators needed additional time to "secure necessary equipment" due, in part, to "the unforeseen NIOSH restructuring." MSHA, *Notice to Stakeholders: Temporary Enforcement Pause: Silica Rule* (Apr. 8, 2025).[35] At the same time, NIOSH halted health hazard evaluations that already were underway, informing the organizations that had requested them that, "[d]ue to the implementation of a reduction in force across NIOSH," these projects were "now closed." And 20 pending investigations into firefighter deaths are now unlikely to be completed. *See Trump Laid Off Nearly All the Federal Workers Who Investigate Firefighter Deaths*, *supra* n.20.

---

[35] https://www.msha.gov/notice-stakeholders.

92.    Testing of respirators and other PPE, too, came to a end. The NPPTL typically completes review of approximately 400 respirator applications and 250 quality audits annually. Around 100 applications for respirator certification or recertification were pending at the time that Defendants began dismantling NIOSH, and no action has or apparently will be taken on these applications, or on requests for extensions of existing approvals. Additionally, the NPPTL stopped monitoring existing respirator certifications, which leaves the door open for bad actors to enter the market and for existing manufacturers to cut corners and lower the quality of their products. NIOSH further halted policing counterfeit products—of which it identified hundreds in Fiscal Year 2024—or testing other forms of PPE, such as protective clothing or goggles. Unsurprisingly, then, the virtual elimination of the NPPTL led to an "outcry from unions and industry," with the director of one manufacturers' association stating that the shutdown "punish[es] American companies that have built their reputations on producing reliable, high-quality protective equipment." Assoc. Press, *Government Layoffs Threaten US Firefighter Cancer Registry, Mine Research and Mask Lab*, N.Y. Post (Apr. 5, 2025).[36] This outcry led to the reinstatement of certain NPPTL staff on May 13, 2025, but the NPPTL's operations have not restarted and their future remains uncertain.

93.    On information and belief, Defendants' hasty May 13 reinstatement of certain NIOSH employees in response to public outcry has restored less than 30 percent of the approximately 1,000 employees who worked full-time at NIOSH prior to January 20, 2025. That band-aid does not cure the problems Defendants have created by steadily dismantling the agency's programs since early April. Defendants have not resumed the many NIOSH training programs, investigations, research, and other essential NIOSH services they have halted. Even where

---

[36]    https://nypost.com/2025/04/05/us-news/layoffs-threaten-us-firefighter-cancer-registry-mine-research-and-mask-lab.

Defendants have reinstated NIOSH employees assigned to particular programs, the agency's critical worker safety and health programs, investigations, and research are interdivisional and cannot be accomplished unless the whole of NIOSH is restored and functional. In the meantime, the continued disruption to NIOSH programs and services will cause more disabling injuries, illnesses, and premature deaths to American workers.

**Harms to Plaintiffs**

94.     While Defendants' actions in dismantling NIOSH will cause grave and mounting harm across the nation, they directly and immediately injure Plaintiffs, in a number of ways.

95.     *First*, in shutting down operations at NIOSH's NPPTL, Defendants have harmed Plaintiffs NNU, NYSNA, CNA/NNOC, UMWA, AFT, USW, IAM, NFFE, UAW, and AFL-CIO (collectively, Plaintiff unions), Plaintiff AOEC, and Plaintiff unions' and AOEC's members. Plaintiff unions and AOEC represent members whose safety and health—indeed, their very lives—depend on the NPPTL to approve respirators that meet the agency's high safety and quality standards and to monitor the market for, and take action to remove, counterfeit and substandard products. The failure to hold manufacturers and importers to NIOSH's standards will lead to injury, illness, and premature death of these unions' members and other workers.

96.     Plaintiff unions themselves are also directly injured. When operational, the NPPTL makes it easy for the unions to check whether particular respirators that employers provide their members are legitimate and meet NIOSH safety performance and quality standards, or whether they are defective or counterfeit, thereby failing to perform as required, while giving their members a false sense of protection. Armed with the highly technical and practical information the NPPTL was providing on an ongoing basis, Plaintiff unions have been well positioned to train their members and demand that employers are providing their workers with safe, legitimate equipment.

The unions also rely on NIOSH's ongoing health research on PPE, which enables them to train and offer guidance to members, correct misinformation the unions encounter, and negotiate with employers and advocate to lawmakers for improvements. Likewise, the unions depend on the NPPTL's participation in workshops, conferences, and trainings relating to respirators and other PPE—again, with the aim of using the information provided by NIOSH to educate member workers, negotiate with employers, and advocate to lawmakers. NIOSH also adapts to emergencies, as Plaintiffs saw during the COVID-19 pandemic, and by conducting research and initiating pilot programs, NIOSH helps Plaintiff unions convince employers to incorporate new, safer products into their workplaces. There is no substitute resource for the NPPTL to which Plaintiff unions can now turn.

97.    AOEC, its member clinics, and individual members of AOEC all rely on NIOSH for certification and testing of respirators that will protect both AOEC members and their patients from lung and other occupational diseases. AOEC relies on NIOSH to recommend respirators and protocols to ensure that respirators fit properly.

98.    In providing patient-facing treatment, AOEC clinics and individual members, in turn, advise their patients and their patients' employers about using respirators that fit correctly with the correct types of filters. Without NIOSH-certified respirators that fit correctly and have the appropriate filters, AOEC members that recommend respirators have no assurance that the respirators will protect workers from toxic chemicals, dust, and fumes. Additionally, with the shutdown of the NPPTL's operations, AOEC clinics and individual members have lost a critical resource on which they daily rely. For example, AOEC members conduct respirator-fit testing for their patients. NIOSH provides the protocols for respirator fit testing to verify that a respirator is comfortable and provides expected protection. NIOSH staff provide technical assistance when

AOEC clinics or individual members have questions regarding the fit for specific patients. Performing these tests reliably is imperative because a false negative creates the false impression that the respirator is functioning as required to protect the patient, and a false positive means that the patient will not be permitted to work, even though he or she could safely do so. With no NPPTL, however, AOEC's members have no resource to call to ensure the tests' accuracy.

99.     If AOEC's members cannot guarantee patients that they are wearing properly fitting NIOSH-certified respirators, then thousands of workers with toxic exposures who are treated by AOEC clinics and individual members will be exposed to harmful chemicals that cause both immediate and long-term health damage, including asthma, silicosis, liver and kidney injury, and blood cancers.

100.     Plaintiff Dentec faces the destruction of its PPE business if NIOSH's Respirator Approval Program is not restored. Without NIOSH and its NPPTL, Dentec cannot obtain approval for new respirators. Dentec has invested hundreds of thousands of dollars in new respirators that are in development and in building up Dentec's manufacturing of new products. With the NPPTL's operations at a standstill, those new products and investments are now on hold.

101.     As to Dentec's respirators that previously received NPPTL approval, the company must obtain an extension of approval if the company makes a change to one of the parts of the respirators or to its supplier of component parts. The NPPTL also performs site audits every two years that provide important guarantees as to the continuing safety of Dentec's products. None of these certifications, extensions, and audits can happen without NIOSH, which means that Dentec will face obstacles in continuing to sell even its previously approved products and will lose the quality check and reputation enhancement that NIOSH's audits and approvals provide.

102.    Worse still, the shutdown of NIOSH's Respirator Approval Program will open the door for untested, uncertified, and often foreign-made respirators to flood American markets and workplaces. That consequence will endanger the health and safety of American workers, including the members of Plaintiff unions, and it will harm Dentec competitively by forcing the company to compete with other businesses producing cheaper, low-quality respirators that do not meet NIOSH safety and quality standards. Without the NPPTL, Dentec's 150 NIOSH respirator approvals will not remain the valuable commodity that they now are, and the company will not be able to continue operating its business in its current form.

103.    *Second*, the safety and health research NIOSH conducts across a range of industries and NIOSH's publications conveying that information are indispensable to the Plaintiff unions and their members, and to AOEC and its members. For example, Plaintiff unions and their members make regular use of the *NIOSH Pocket Guide to Chemical Hazards*, a go-to resource for safety staff at these unions and their members. NIOSH regularly updates the *Pocket Guide*, which tells workers in the field and their unions which kind of respirator is needed for each type of job and exposure level and makes it possible for unions to assess hazards, train and provide guidance to their members, and negotiate with employers to mitigate potential workplace hazards more effectively.

104.    To offer further examples, NIOSH publishes and regularly updates the *NIOSH Manual of Analytical Methods*, which describes best practices for monitoring workplace exposure to potentially toxic substances. Plaintiffs USW and UAW regularly rely on this publication. NNU, NYSNA, CNA/NNOC, and AFT, and their members, in turn, count on the regularly updated *NIOSH List of Hazardous Drugs in Healthcare Settings* to enable their nurses to take appropriate safety precautions when handling these hazardous drugs, again with the benefit of guidance and

44

advocacy by the unions. The publication on which Plaintiff UMWA relies most heavily is NIOSH's *Best Practices for Dust Control in Coal Mining*. Plaintiff IAM, which represents many baggage handlers who work for airline carriers and are at risk for work-related musculoskeletal disorders, also relies on NIOSH continuing its research. For example, NIOSH has conducted critical safety research on equipment that can assist in moving and handling bags and identified two devices that were proven to reduce the risk of injury and that have been adopted in some locations with support from IAM members.[37]

105.    All Plaintiff unions depend on NIOSH's findings through its Fatality Assessment and Control Evaluation (FACE) Program, which investigates selected workplace fatalities to identify occupational hazards and make recommendations about how to prevent similar deaths in the future.

106.    Unless its functions are restored, NIOSH will not be able to update its publications and conduct the research and investigations through which it produces many other resources, findings, and recommendations that it provides to reflect changes in best practices and new insights about an untold number of existing and new workplace hazards. As a result, Plaintiff unions and their members will not have up-to-date information about these hazards and how to mitigate them.

107.    NIOSH is often the sole federal research source on the toxic effects of physical, biological, radiological, and chemical hazards. NIOSH's research (whether conducted or funded by NIOSH) and its recommendations about the best ways to prevent, mitigate, and treat those effects, are essential to AOEC's clinics and individual members in making correct diagnoses of work-related injuries and diseases. For example, a 1997 NIOSH publication was the first

---

[37] NIOSH, *Workplace Solutions, Reducing Musculoskeletal Disorders among Airport Baggage Screeners and Handlers*, https://www.cdc.gov/niosh/docs/wp-solutions/2015-201/default.html.

authoritative scientific research study to link repetitive and forceful work to musculoskeletal disorders (such as carpal tunnel syndrome).[38] The publication is the foundation for current American Medical Association guidelines for occupational medicine specialists, such as AOEC's members, to treat patients with work-related musculoskeletal disorders. NIOSH also funded a more recent, large study of work-related injuries that now informs occupational medicine specialists like AOEC's in making recommendations to patients and employers regarding limits on forceful and repetitive work.[39]

108.    NIOSH publications (such as its criteria documents, monographs, alerts, and science blogs) are the only federal source of immediate authoritative information for AOEC and its members about the latest research and health effects of toxic, physical and chemical hazards. The shutdown of NIOSH's operations deprives AOEC and its members of timely knowledge about how to prevent, mitigate, and treat these hazards from the only authoritative agency in the United States. The lost insights include both evolving knowledge about old hazards (such as heat and acclimatization) and critical medical and scientific knowledge about new hazards (such as the risk of contracting rapidly progressive silicosis from performing job tasks related to the fabrication of artificial stone).

109.    AOEC, its clinics, and its individual members routinely use NIOSH's websites and other written materials as sources of information. Relying on NIOSH resources, AOEC provides up-to-date, evidence-based information for its members. NIOSH web pages already have been

---

[38] Bruce P. Bernard, *Musculoskeletal disorders and workplace factors: a critical review of epidemiologic evidence for work-related musculoskeletal disorders of the neck, upper extremity, and low back* (July 1997), https://stacks.cdc.gov/view/cdc/21745 https://stacks.cdc.gov/view/cdc/21745.

[39] *See* Carisa Harris-Adamson *et al.*, *Biomechanical risk factors for carpal tunnel syndrome: a pooled study of 2474 workers*, Occup. Environ. Med. 2015 Jan; 72(1):33-41.

stripped of considerable information, or the information has been moved to CDC Archives without providing guidance or explanation for occupational health and safety professionals, including AOEC's members.

110.    NIOSH's research and recommendations on key safety and health issues and hazards are particularly critical to Plaintiff AFL-CIO's work. The AFL-CIO plays a unique role in the community of workplace safety and health professionals as the leader and coordinator of labor union involvement in major cross-cutting OSHA and MSHA regulatory activity. The AFL-CIO develops the consensus labor position on the content of needed and proposed occupational safety and health standards, as well as guidance and directives, and on the implementation of final standards—all of which directly affects its members. Without NIOSH research, the AFL-CIO cannot effectively carry out its occupational safety and health work.

111.    To provide just three examples:

(1) The AFL-CIO is currently coordinating the involvement of Plaintiffs AFT, IAM, USW, and UAW, and many other AFL-CIO affiliated unions, in an OSHA rulemaking to develop a new standard to prevent occupational heat exposures. NIOSH's research, recommendations, and approved monitoring technologies are integral to developing that standard, as are its criteria for a recommended heat standard.[40] Without input from NIOSH, including the expert views and evidence NIOSH has always provided throughout OSHA rulemaking processes, the AFL-CIO will lose a critical resource that it would have relied on during the public OSHA hearings, slated to start in mid-June, and on additional occasions to provide public comment and expertise as the rulemaking proceeds.

---

[40] *See, e.g.*, *Occupational Exposure to Heat and Hot Environments*, *Revised Criteria 2016*, https://www.cdc.gov/niosh/docs/2016-106/default.html.

(2) The AFL-CIO has coordinated unions in relation to the implementation of occupational exposure limits and controls under the Toxic Substances Control Act (TSCA), as amended in 2016. In that effort, the AFL-CIO has relied on several key NIOSH resources, including its Roadmap for Research on Asbestos Fibers, its expertise on respiratory protection and control measures, its national occupational health surveys, and its recommended exposure limits, as well as on informal consultation with the agency. The AFL-CIO will continue to need to rely on updated NIOSH information on occupational exposures, engineering control measures and respiratory protection for other chemicals in the workplace required to be evaluated by the U.S. Environmental Protection Agency as the implementation of TSCA continues.

(3) The AFL-CIO regularly uses NIOSH data, and data from state surveillance programs funded by NIOSH, in preparing its annual *Death on the Job* report, a national and state-by-state profile of worker safety and health in the United States.[41] Without a continuation of these NIOSH research programs, this invaluable data will no longer be available, harming AFL-CIO and other Plaintiff unions it supports.

112.    *Third*, NIOSH's closure of its statutorily required health hazard evaluations is harming several Plaintiff unions and their members. As indicated on the HHE website, because of the RIFs, NIOSH has stopped accepting new requests for HHEs. NIOSH has also closed pending HHEs, including those requested by Plaintiffs. For example, in 2024, AFT requested a health hazard evaluation for members at Highlands University in Las Vegas, New Mexico, to investigate improper storage of toxic chemicals in the science building, which had resulted in illness in at least

---

[41] AFL-CIO, *Death on the Job: The Toll of Neglect, 2025* (Apr. 23, 2025), https://aflcio.org/reports/dotj-2025.

10 individuals and the death of an AFT member. As part of the investigation, AFT requested medical evaluations for individuals who may have been exposed to the chemicals, an industrial hygiene exposure assessment to ensure there would be no future exposure to toxic chemicals, and behavioral health support to assist individuals with trauma because of the exposures. On April 22, 2025, NIOSH provided notice to AFT that, "[d]ue to the implementation of a reduction in force across NIOSH, we are not able to continue our health hazard evaluation of New Mexico Highlands University and the project is now closed."

113.    Plaintiff USW likewise received notice from NIOSH that two pending health hazard evaluations it requested had been canceled. First, USW's local union safety officers had requested a health hazard evaluation of dust and silica exposure and the adequacy of breathing zones at a Wyoming mine owned by WE Soda. Second, one of USW's locals requested a health hazard evaluation at the Radford Army Ammunition Plant in Virginia because the company reduced post-exposure shower time. NIOSH sent emails in late April notifying USW that, "[d]ue to the implementation of a reduction in force across NIOSH," the agency is "not able to continue" these pending HHEs and that the projects were "now closed." USW had requested another HHE in connection with ergonomic concerns at a water heater manufacturing facility in Johnson City, Tennessee. That request is in limbo.

114.    An IAM local union also had an open health hazard evaluation pending in Washington that NIOSH canceled in late April. That evaluation involved workers at a Boeing Company facility, who were experiencing occupational exposure to hexavalent chromium through contact with contaminated equipment, tools, and clothing. Hexavalent chromium can cause long-term adverse health effects.

115.    The conclusions NIOSH draws in conducting health hazard evaluations at a particular workplace are often transferable to other workplaces across industries. Thus, the closure of Plaintiffs' requested evaluations not only harms the Plaintiffs that requested them (and the Plaintiffs' members), but it injures all Plaintiff unions and their members by denying them critical, often life-saving information and recommendations that would enable the unions and their members to address safety hazards in the workplace. The result will be injury, illness, and premature death among these unions' members and other workers.

116.    *Fourth*, the cessation of NIOSH's critical role in protecting the safety and health of mine workers will cause severe injury to the miners represented by Plaintiffs UMWA and USW. Since placing its workforce on administrative leave, NIOSH has stopped providing new medical screenings to coal miners under the CWHSP, halted its certification of B Readers of miners' chest X-rays, and put an end to processing new requests for review of medical information to determine coal miners' rights to transfer to low-dust jobs under 30 U.S.C. § 843(b) and 30 C.F.R. pt. 90. Given that NIOSH is no longer administering B Reader examinations, new physicians will not be certified as B Readers, and existing certifications will lapse because B Readers must be retested every five years. Without NIOSH's critical services, miners who suffer from respiratory disease will unwittingly continue to perform their jobs without time-sensitive medical diagnosis and treatment and will be denied their rights to be transferred to a safer work environment. Again, the result will be injury, illness, and premature death.

117.    The NIOSH Mining Program conducts research and develops solutions to reduce miners' exposure to injuries, occupational diseases, and fatalities in the nation's coal, metal, and non-metal mines. The agency's work in these areas is essential for Plaintiffs UMWA and USW to continue their own work as effective advocates for improved safety and health in the nation's

mines. Equipped with NIOSH's research, these unions repeatedly have advocated for Congress and MSHA to adopt legislation and regulations, respectively, that safeguard the welfare of mine workers. For more than ten years, for example, UMWA publicly advocated for MSHA's April 2024 silica rule that relied on NIOSH research. Without NIOSH's mine-safety research, Plaintiffs UMWA and USW will be unable to advocate effectively for health and safety improvements.

118.    *Fifth*, firefighter safety programs such as the NIOSH Fire Fighter Fatality Investigation and Prevention Program have been canceled in the wake of the NIOSH staff cuts. The cessation of this program harms Plaintiff NFFE, which uses the ongoing reporting of results and recommendations from NIOSH investigations when advocating for safer work environments. The data generated from this program is useful for NFFE to demonstrate to lawmakers the need for new meaningful legislation that can save lives. NFFE also uses data from this program to formulate bargaining proposals for ensuring its members' safety. The information is invaluable to NFFE's firefighter members as well, who benefit directly from lessons NIOSH learns and reports from these investigations.

119.    Furthermore, both types of firefighters NFFE represents, structure and wildland, can now no longer enroll in the National Firefighter Registry for Cancer. Since the Registry was launched, NFFE has encouraged the firefighters it represents to enroll in the Registry to improve the validity of the data set and to ensure it includes data from NFFE's members. The Registry had promised to serve as an important tool for NFFE in future advocacy because, over time, it would have shown patterns and trends of how work-related exposure connects to cancer diagnoses. The shuttering of this program harms NFFE's access to recognized, valid data that it could have used in advocating for improved workplace safety both in collective bargaining agreements and legislation.

120. *Sixth*, the impending shutdown of the Education and Research Centers (ERCs) and Training Project Grants, including Plaintiff AOEC's Occupational Health Internship Program, will harm AOEC and its clinics and individual members. Through these Centers and programs, NIOSH provides the primary source of funding for the recruitment and specialized training of occupational physicians and nurses and industrial hygiene professionals in the United States. As the recipient of a NIOSH training project grant for the summer internship program, AOEC trains upper-level undergraduate and early graduate students to enter advanced specialized training in medicine, nursing, industrial hygiene, epidemiology, toxicology, and public health. Since 2004, over 400 students have been trained under this NIOSH-funded TPG, with over half entering a career in the occupational health professions.

121. The impending termination of NIOSH's support for these academic training programs will injure AOEC's member clinics by limiting the availability of specialized occupational medicine providers and other specialized experts in the diagnosis and treatment of work-related injuries and illnesses—specialists recruited and employed by AOEC's clinics. Already, many ERCs have reduced the number of student traineeships for July 2025, including three occupational medicine training programs that accepted no trainees for this summer.

122. With the shutdown of NIOSH's operations, AOEC expects to lose NIOSH's funding for the summer internship program. Because AOEC already had accepted 20 students, who are scheduled to begin their internships on June 16, 2025, it has had to obtain emergency stopgap funding from private donations for summer 2025, diverting AOEC resources from other activities. Unless NIOSH support is restored, AOEC will have no choice but to close its summer program for 2026.

123.    Other NIOSH extramural programs, such as the NIOSH-funded Agricultural Centers, Construction Center, and Centers of Excellence for Total Worker Health, are the only authoritative national sources of information for occupational health specialists about the hazards among agricultural, construction, and many other worker groups at high risk for work-related injuries and diseases. AOEC clinics and their individual members rely on research and practical information from these Centers about the causes of occupational injury and illness and recommendations for their prevention, which in turn informs AOEC members' patient care.

124.    *Seventh*, because of the staffing cuts, the World Trade Center Health Program has stopped performing critical functions, including adding new conditions to the WTC-Related Health Conditions list and issuing new requests for proposal or contracts for funding new planned research. Between them, Plaintiffs AFT and Local 983 have hundreds of members who are enrolled in this program and stand to be affected by its disruption. Additionally, the Program's continuing failure to issue new requests for proposal or contracts for funding new planned research injures Plaintiffs AFT and AFL-CIO by denying them critical information they need to advocate for the addition of new conditions for coverage under, and funding for, the WTC Health Program—so that September 11 victims are eligible to receive needed medical treatment for their conditions and so that Congress authorizes any funding necessary to cover the cost of such care.

125.    *Eighth*, Plaintiff USW's members include over 3,500 workers in the U.S. atomic sector, who are engaged in a variety of work including uranium enrichment, decommissioning and decontamination, and waste storage. Plaintiff IAM has members who were exposed to radiation at work; indeed, NIOSH approved Special Exposure Cohorts include approximately 1,000 IAM members who worked in at least three different locations during specified time periods. Over the years, these nuclear weapons workers have been exposed to hazardous and unsafe working

conditions, which have led to different types of cancers, respiratory diseases, and other serious ailments. They are covered by the Energy Employees Occupational Illness Compensation Program and depend on DCAS's Radiation Dose Reconstruction Program and other important support that NIOSH provides to the Program's implementation. The disruption to DCAS's operations will significantly hinder NIOSH's ability to provide the expertise needed to resolve claims brought by USW's energy workers suffering serious illness. USW also represents workers at the Hanford (WA) site, and IAM also represents workers at the Hanford (WA) and Los Alamos (NM) sites—the subject of two of the five pending petitions under review involving Special Exposure Cohorts.

## COUNT I
### (Non-statutory review of official and agency action)

126. Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

127. Article I of the U.S. Constitution vests "[a]ll legislative Powers" in Congress. U.S. Const. art. I, § 1. Members of the executive branch have no constitutional authority to amend or override statutes that have been lawfully enacted.

128. Members of the executive branch, including agencies and agency officials, may act only pursuant to authority conferred on them by Congress.

129. The OSH Act charges Defendants with maintaining NIOSH, and that statute and many others referenced herein require Defendants to assign NIOSH various roles in protecting occupational safety and health. Only Congress can amend or eliminate these responsibilities.

130. Defendants exceeded their authority and usurped legislative authority that the Constitution confers on Congress by effectively eliminating NIOSH and rendering it incapable of fulfilling its statutorily mandated functions.

**COUNT II**
**(APA – Contrary to the OSH Act and other substantive statutes)**

131.    The APA directs courts to hold unlawful and set aside agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

132.    The OSH Act charges Defendants with maintaining NIOSH, and that statute and many others referenced herein require Defendants to assign NIOSH various roles in protecting occupational safety and health.

133.    Defendants acted contrary to these statutes by effectively eliminating NIOSH, rendering it incapable of fulfilling its statutorily mandated functions, and causing NIOSH to end its performance of activities mandated by statute or regulation.

**COUNT III**
**(APA – Contrary to appropriations statutes)**

134.    The APA directs courts to hold unlawful and set aside agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

135.    The Further Consolidated Appropriations Act of 2024, Full-Year Continuing Appropriations and Extensions Act of 2025, and other appropriations statutes referenced herein appropriate funding for NIOSH's continued existence and performance of its statutory functions.

136.    Defendants acted contrary to these statutes by effectively eliminating NIOSH and rendering it incapable of fulfilling its statutorily mandated functions.

**COUNT IV**
**(APA – Contrary to the Impoundment Control Act)**

137.    The APA directs courts to hold unlawful and set aside agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

138.    The Impoundment Control Act requires the executive to make appropriated funds "available for obligation" unless the President sends a special message to Congress detailing a request to rescind funds and Congress passes a bill rescinding the funding. 2 U.S.C. § 683.

139.    The President has not sent a special message to Congress requesting that the funds appropriated for NIOSH be rescinded, and Congress has not rescinded those appropriations.

140.    The Impoundment Control Act also requires the President to send a special message to Congress if the executive proposes to defer spending appropriated funds, and it prohibits deferral of any budget authority except to provide for contingencies, to achieve savings made possible by changed requirements or greater efficiency, or as otherwise specifically provided by law. *Id.* § 684.

141.    The President has not sent a special message to Congress requesting deferral of the budget authority for NIOSH's operations, and none of the statutory circumstances that would permit such a deferral is applicable.

142.    Defendants' effective shutdown of NIOSH and termination of its statutory functions is contrary to the Impoundment Control Act, in violation of the APA.

## COUNT V
### (APA – Contrary to the Anti-Deficiency Act)

143.    The APA directs courts to hold unlawful and set aside agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

144.    The Anti-Deficiency Act provides, in relevant part, that "[i]n apportioning or reapportioning an appropriation, a reserve may be established only—(A) to provide for contingencies; (B) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (C) as specifically provided by law." 31 U.S.C. § 1512(c)(1).

145.    By refusing to spend funds that Congress has appropriated for NIOSH, Defendants have acted contrary to the Anti-Deficiency Act, in violation of the APA, by creating a reserve that is not authorized by any of the Anti-Deficiency Act's three exceptions.

## COUNT VI
### (APA – Failure to engage in notice and comment rulemaking)

146.    The APA requires that agencies must provide notice and an opportunity for public comment prior to rescinding duly promulgated regulations. *See* 5 U.S.C. §§ 553(b)–(c).

147.    Multiple HHS regulations referenced herein direct NIOSH to carry out specified functions and implement agency programs.

148.    By effectively eliminating NIOSH and rendering it incapable of performing any of its regulatory functions, Defendants have effectively rescinded the regulations governing NIOSH's operation without providing notice and an opportunity for comment, in violation of the APA.

## COUNT VII
### (APA – Arbitrary and capricious)

149.    The APA directs courts to hold unlawful and set aside agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

150.    Defendants have offered no reasoned explanation for abruptly shutting down NIOSH and have failed to account for the reliance interests that interested stakeholders in the American economy, including Plaintiffs, hold in NIOSH's continued operation.

151.    Defendants acted arbitrarily and capriciously by effectively eliminating NIOSH and rendering it incapable of fulfilling its statutorily mandated functions without warning or justification.

152.    Defendants also acted arbitrarily and capriciously in placing a significant percentage of the NIOSH workforce on administrative leave after issuing RIF notices, thereby maximizing disruption of the agency's mandated functions. They did so without explanation and

in disregard of the regulatory requirement that agencies conducting RIFs must, where possible, "retain . . . employee[s] on active duty status" between the issuance of a RIF notice and the employees' eventual termination. 5 C.F.R. § 351.806.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

a. Declare that Defendants' effective shutdown of NIOSH is unlawful;

b. Enter a preliminary and permanent injunction enjoining Defendants from giving effect to the actions taken to effectuate the shutdown, including the placement of NIOSH employees on administrative leave, the RIFs of NIOSH employees, and the suspension of NIOSH's operations;

c. Order Defendants to resume immediately all activities that NIOSH performed before the unlawful shutdown of its operations;

d. Award Plaintiffs their costs and attorneys' fees for this action; and

e. Grant any other relief as this Court deems appropriate.


Dated: May 14, 2025

Respectfully submitted,

/s/ Nicolas Sansone

| | |
|---|---|
| Matthew Ginsburg (DC Bar No. 1001159) | Nicolas Sansone (DC Bar No. 1686810) |
| Craig Becker (DC Bar No. 371239) | Bonnie I. Robin-Vergeer |
| Maneesh Sharma (DC Bar No. 1033407) | (DC Bar No. 429717)* |
| Bart Sheard (DC Bar No. 1542094) | Allison M. Zieve (DC Bar No. 424786) |
| AFL-CIO | Public Citizen Litigation Group |
| 815 Black Lives Matter Plaza, NW | 1600 20th Street, NW |
| Washington, DC 20006 | Washington, DC 20009 |
| (202) 637-5310 | (202) 588-1000 |

*Attorneys for Plaintiff AFL-CIO*　　　　　　*Attorneys for All Plaintiffs*

*Application for D.D.C. admission pending