# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL NURSES UNITED,
   8455 Colesville Road
   Suite 1100
   Silver Spring, MD 20910,

NEW YORK STATE NURSES
ASSOCIATION,
   131 West 33rd Street
   4th Floor
   New York, NY 10001,

CALIFORNIA NURSES
ASSOCIATION/NATIONAL NURSES
ORGANIZING COMMITTEE,
   155 Grand Avenue,
   Oakland, CA 94612,

AMERICAN FEDERATION OF
TEACHERS,
   555 New Jersey Avenue, NW
   Washington, DC 20001,

UNITED MINE WORKERS OF
AMERICA,
   18354 Quantico Gateway Drive
   Suite 200
   Triangle, VA 22172,

UNITED STEEL, PAPER AND
FORESTRY, RUBBER,
MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL, AND
SERVICE WORKERS
INTERNATIONAL UNION, AFL-CIO,
   60 Boulevard of the Allies
   Pittsburgh, PA 15222,

INTERNATIONAL ASSOCIATION
OF MACHINISTS AND AEROSPACE
WORKERS, AFL-CIO,
   9000 Machinists Place
   Upper Marlboro, MD 20772,

Civil Action No. 1:25-cv-01538-TNM

NATIONAL FEDERATION OF
FEDERAL EMPLOYEES, IAM,
    1225 New York Avenue, NW
    Suite 450
    Washington, DC 20005,

INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA,
    8000 E. Jefferson Avenue
    Detroit, MI 48214,

ASSOCIATION OF OCCUPATIONAL
AND ENVIRONMENTAL CLINICS,
    P.O. Box 91096
    Washington, DC 20090,

DENTEC SAFETY SPECIALISTS,
    8101 Lenexa Drive
    Lenexa, KS 66214,

LOCAL 983, DISTRICT COUNCIL 37,
AFSCME,
    125 Barclay Street
    New York, NY 10007, and

AMERICAN FEDERATION OF
LABOR AND CONGRESS OF
INDUSTRIAL ORGANIZATIONS,
    815 Black Lives Matter Plaza, NW
    Washington, DC 20006,

        *Plaintiffs*,

        v.

ROBERT F. KENNEDY, JR., in his
official capacity as Secretary of Health
and Human Services,
    200 Independence Avenue, SW
    Washington, DC 20201, and

U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES,
   200 Independence Avenue, SW
Washington, DC 20201,

     *Defendants*.

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1. Congress created the National Institute for Occupational Safety and Health (NIOSH) in 1970 as an agency within the U.S. Department of Health and Human Services (HHS) and tasked NIOSH with conducting research and investigations aimed at protecting workers' safety and health. Over the years, Congress has assigned NIOSH statutory responsibility for administering numerous specific programs, and HHS has by regulation and established practice delegated responsibility to NIOSH for administering many more. Pursuant to its statutory and regulatory mandates, NIOSH oversees a vast portfolio of research, medical, and investigatory programs and services that protect the safety and health of workers every day in some of the highest-risk industries—including mining, firefighting, agriculture, commercial fishing, construction, and healthcare—while providing essential support to American businesses.

2. Notwithstanding the substantial, cost-effective, and well-recognized benefits that NIOSH, as directed by statute, confers on the nation, Defendants have made massive staff cuts that have resulted in the closure of multiple critical NIOSH divisions and the degradation of the agency's ability to perform its legally mandated functions. Among other offices, Defendants have shut down (1) NIOSH's Mining Research Divisions; (2) NIOSH's Division of Science Integration; (3) the Field Research Branch, Health Informatics Branch, and Engineering and Physical Hazards Branch of NIOSH's Division of Field Studies and Engineering; (4) NIOSH's Health Effects Laboratory Division; and (5) NIOSH's Office of Extramural Coordination and Special Projects.

3.      Defendants' actions in shutting down these critical NIOSH components are contrary to law and arbitrary and capricious. NIOSH is required by statute to carry out specified functions, and Congress has appropriated funds for such purposes. By eliminating the NIOSH divisions that carry out certain statutorily mandated functions—without transferring those functions elsewhere—Defendants have violated these express directives from Congress. And even where Defendants have nominally retained the portions of NIOSH that perform certain statutory functions, these functions require interdivisional support and cannot be effectively accomplished absent the eliminated divisions. At any rate, Defendants' actions flout principles of sound decision-making by failing to account for the enormous public benefits of the work performed by the eliminated components and the disruption to NIOSH's operations that will result from the closure of divisions that provide support and expertise necessary for the work of the divisions that remain.

4.      Moreover, while each discrete divisional shutdown should be set aside as a final agency action that is contrary to law and arbitrary and capricious in itself, the cumulative effect of these individual actions—when taken together with staff cuts and the shutdown of functions elsewhere in the agency—is to render NIOSH functionally incapable of carrying out its core research mission, in contravention of the statutory directive that NIOSH should fulfill its role as the federal agency responsible for occupational safety and health research. Defendants' actions in flouting this legislative command are likewise contrary to law and arbitrary and capricious.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States.

6.      Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1)(A) because defendants are officers and agencies of the United States and because at least one defendant resides in Washington, DC.

## PARTIES

7.      Plaintiff National Nurses United (NNU) is a national labor organization and unincorporated federation, the country's largest union and professional association of registered nurses. NNU and its affiliate unions represent approximately 245,000 registered nurses in dozens of states across the United States. NNU provides information to its affiliates and members about workplace safety and health for nurses, and it relies on NIOSH in order to do so.

8.      Plaintiff New York State Nurses Association (NYSNA), an affiliate of NNU, is a labor union of 42,000 frontline nurses and healthcare professionals. NYSNA is New York's largest union and professional association for registered nurses. NYSNA's members face a wide range of hazards on the job, including needles and other sharp objects, infectious diseases, toxic chemicals and drugs, musculoskeletal hazards, violence, and stress. Healthcare settings have some of the highest workplace injury rates of any industry, and NYSNA has a robust safety and health program to educate members and advocate for better workplace conditions.

9.      Plaintiff California Nurses Association/National Nurses Organizing Committee (CNA/NNOC), another affiliate of NNU, is a nonprofit corporation that represents approximately 150,000 registered nurses who work in hospitals, clinics, and home health agencies in California and other states across the United States. CNA/NNOC's mission is to improve working conditions for registered nurses. Its members provide direct bedside patient care, including to patients who are or may be infectious. Its staff also includes industrial hygienists who provide critical

information, training, and guidance to nurses about workplace safety and health issues, including infectious disease transmission and workplace violence.

10.    Plaintiff American Federation of Teachers (AFT) is a labor organization representing 1.8 million members, who reside in every U.S. state, the District of Columbia, Puerto Rico, Guam, and the U.S. Virgin Islands and who are employed as pre-K through 12th-grade teachers, early childhood educators, paraprofessionals, and other school-related personnel; higher education faculty and professional staff; federal, state, and local government employees; and nurses and other healthcare professionals. AFT represents more than 250,000 healthcare professionals. The organization's purpose is to promote fairness; democracy; economic opportunity; and high-quality public education, healthcare, and public services for the students, families, and communities that AFT members serve. AFT fulfills this purpose by ensuring that its members receive fair pay and benefits for their critical work, and by fighting for safe working conditions that benefit students, patients and all those who use public services.

11.    Plaintiff United Mine Workers of America (UMWA) is the largest labor union of coal miners in the United States, representing thousands of working miners. The UMWA's membership is comprised of miners who work in the nation's coal, metal, and non-metal mines. During their working lives, the UMWA's members are routinely exposed to the environmental and physical hazards inherent in the mining industry. These members suffer from injuries, occupational disease, and death as a result of these hazards, including death from black lung disease and silicosis from exposure to coal and silica dust.

12.    Plaintiff United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial, and Service Workers International Union, AFL-CIO (USW) is the largest industrial union in North America, representing 500,000 workers in manufacturing and processing steel,

aluminum, other metals, paper, rubber, glass, and cement; and in mining, chemicals, refining, energy, and utility facilities; as well as in healthcare, education, service, and other sectors. The USW is the predominant labor union in North American metal and non-metal mining, representing approximately 20,000 miners in the United States and an equal number in Canada. These miners work in underground and surface mines and quarries, using many different mining methods and mining almost every commodity.

13.     Plaintiff International Association of Machinists and Aerospace Workers, AFL-CIO (IAM) represents 600,000 workers in nearly 1,000 local unions. IAM members work in the aerospace, defense, airline, transportation, manufacturing, automotive, defense, woodworking, and healthcare industries, among others, as well as in the federal government.

14.     Plaintiff National Federation of Federal Employees (NFFE), an affiliate of IAM, is an unincorporated association and the oldest federal labor union. NFFE represents approximately 110,000 professional and non-professional federal government workers and federal contractors across the United States. NFFE members include nurses, psychologists, doctors, and physical therapists caring for our nation's veterans in the Department of Veterans Affairs (VA); civilian employees in the Department of Defense (DoD), including structural firefighters, who support our military personnel and their families; healthcare workers serving on military bases; wildland firefighters, rangers, and land management specialists preserving and managing our public lands in the U.S. Forest Service, National Park Service, U.S. Fish and Wildlife Service, Bureau of Land Management (BLM), and Bureau of Reclamation; veterinarians ensuring the humane treatment of animals across the country; and scientists conducting critical research across multiple agencies.[1]

---

[1] Because Executive Order 14251 excludes several agencies from collective bargaining, NFFE's representation, as relevant here, is currently in contention as to DoD, VA, and BLM.

15.     Plaintiff International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) is one of the largest and most diverse unions in North America, with members in virtually every sector of the economy. UAW-represented workplaces range from multinational corporations, small manufacturers, and state and local governments to colleges and universities, hospitals, and private non-profit organizations. The UAW has more than 400,000 active members and more than 580,000 retired members in the United States, Canada and Puerto Rico. There are more than 600 local unions in the UAW. The UAW currently has 1,750 contracts with some 1,050 employers. UAW represents workers at each of the "Big Three" automakers in the United States—General Motors, Ford Motor Company, and Stellantis (formerly known as Chrysler LLC). The UAW is committed to improving the lives of all working people, which includes ensuring that all workplaces are healthy and safe.

16.     Plaintiff Association of Occupational and Environmental Clinics (AOEC), a nonprofit organization established in 1987, is a professional association made up of member clinics and individual members who provide care to workers who are injured or become ill on the job and to people who are exposed to environmental hazards. AOEC has approximately 150 members; more than 40 of these members are clinics consisting of specialists in the field of occupational health. These specialists include occupational and environmental medicine physicians, occupational health nurses, industrial hygienists, injury prevention specialists, ergonomists, audiologists, pulmonologists, and more. AOEC's members diagnose, treat, and care for Americans who have dedicated their working lives to serving and providing for others—firefighters; first responders; coal miners; farmworkers; healthcare workers; teachers; workers in the transportation sector; and workers in the oil, gas, and other industries.

17.     Plaintiff Dentec Safety Specialists (Dentec) is a company, headquartered in Kansas, that is dedicated to making high-quality respirators and other personal protective equipment (PPE), all manufactured in the United States. The company supplies a wide range of PPE, including safety glasses, N95 filters, advanced reusable respirators, and air-supplied products, which are used in such industries as healthcare, construction, metalwork, refining, and food service. Dentec manufactures multiple types of respirators, each in several sizes and with dozens of combinations of cartridges, filters, and other parts. Every permutation must be approved by NIOSH. Dentec has received approximately 150 approvals from NIOSH. Each approval represents a significant investment for Dentec—for product development, the fees Dentec pays to NIOSH when it submits a product for approval, annual licensing and recordkeeping fees, and biannual onsite audits. Dentec also relies on NIOSH's rigorous product-certification and evaluation work to protect it from unfair and potentially ruinous competition from counterfeit products.

18.     Plaintiff Local 983, District Council 37, AFSCME (Local 983) is one of the earliest-established locals of District Council 37, New York City's largest labor union. Local 983 represents more than 3,000 people who work in 18 different municipal and public employee job titles across all five boroughs of New York City. Local 983's members include asbestos handlers, motor vehicle operators, members of New York City's Police and Fire Departments, and members of the New York City Parks Enforcement Patrol. Many Local 983 members were among the individuals who responded to the September 11, 2001, terrorist attacks or who assisted with the recovery efforts.

19.     Plaintiff American Federation of Labor and Congress of Industrial Organizations (AFL-CIO) is a federation of 63 national and international labor organizations collectively

representing 15 million working people in nearly every type of workplace in the United States, from hospitals and mines to factories and offices. The AFL-CIO, through its Safety and Health staff, relies on research and data provided by NIOSH to update and inform affiliated unions about key new findings and recommendations on workplace hazards and to advocate with lawmakers and negotiate with employers for the formulation of new safety standards and the protection of existing ones.

20.    Defendant Robert F. Kennedy, Jr., is the Secretary of Health and Human Services and is sued in his official capacity.

21.    Defendant U.S. Department of Health and Human Services is an agency of the United States, headquartered in Washington, DC.

## FACTS

**NIOSH and the statutory functions it performs**

22.    The Occupational Safety and Health Act of 1970 (OSH Act), Pub. L. No. 91-596, 84 Stat. 1590, declares a national policy of "assur[ing] so far as possible every working man and woman in the Nation safe and healthful working conditions," 29 U.S.C. § 651(b), and establishes NIOSH as an agency within HHS to further that purpose, *see id.* § 671(a). Since 1973, NIOSH has been housed within the HHS component that is known today as the Centers for Disease Control and Prevention (CDC).

23.    The OSH Act requires NIOSH to perform a core set of research, education, training, and grantmaking functions on behalf of the HHS Secretary. *Id.* § 671(c)(2); *see id.* §§ 669–670. Among other things, the Act provides that NIOSH "shall conduct (directly or by grants or contracts) research, experiments, and demonstrations relating to occupational safety and health,"

*id.* § 669(a)(1), and "shall conduct, directly or by grants or contracts … education programs to provide an adequate supply of qualified personnel to carry out the [Act's] purposes." *Id.* § 670(a).

24.     Based on the research NIOSH conducts, it is statutorily empowered to "develop and establish recommended occupational safety and health standards," *id.* § 671(c)(1), which inform "mandatory occupational safety and health standards" promulgated by the Secretary of Labor, acting through the Occupational Safety and Health Administration (OSHA), *id.* § 651(b)(3); *see id.* § 655. This division of labor enables NIOSH to generate neutral research and recommendations that are free from the policy-based considerations that necessarily influence OSHA's regulatory work of setting legally binding safety and health rules for workplaces.

25.     In addition to establishing NIOSH's overarching research, education, training, and grantmaking functions, the OSH Act, the Federal Mine Safety and Health Amendments Act of 1977, Pub. L. No. 95-164, 91 Stat. 1290, and subsequent legislation have assigned numerous other specific responsibilities to NIOSH directly or to HHS, which has, in turn, assigned them to NIOSH. *See* 36 Fed. Reg. 12320, 12320–21 (June 30, 1971) (HHS's designation of NIOSH as the agency that "[p]lans, directs, and coordinates the national program effort to develop and establish recommended occupational safety and health standards and to conduct research, training, and related activities to assure safe and healthful working conditions for every man and woman").

26.     For example, NIOSH is responsible among other things for:

> a.  Developing and publishing criteria for identifying and dealing with toxic materials and other harmful substances, including by identifying exposure levels that are safe for various periods of employment. 29 U.S.C. §§ 669(a)(2)–(3).

b.  Conducting research into "new problems, including those created by new technology in occupational safety and health," *id.* § 669(a)(4), and into "the effect of chronic or low-level exposure to industrial materials, processes, and stresses on the potential for illness, disease, or loss of functional capacity in aging adults," *id.* § 669(a)(7).

c.  Performing worksite investigations pursuant to written requests from employers or employee representatives to determine whether potentially toxic conditions are present. *Id.* § 669(a)(6).

d.  Conducting and funding studies, research, and experiments into mine safety, 30 U.S.C. §§ 951(a)–(c); making research-based recommendations for mandatory mining-sector safety and health standards to the Mine Safety and Health Administration (MSHA) within the Department of Labor, *id.* § 811(a)(1); researching, developing and testing new mine-safety technology and equipment, 29 U.S.C. §§ 671(h)(2)–(3); and researching and investigating toxic materials or other harmful substances and conditions found generally in mines or in specific mining worksites, 30 U.S.C. §§ 811(a)(6)(B), 951(a)(11).

e.  Consulting with the U.S. Environmental Protection Agency (EPA) pursuant to the Toxic Substances Control Act of 1976, Pub. L. No. 94-469, 90 Stat. 2003, to prescribe epidemiological studies to assess the effects of potentially hazardous chemical substances and mixtures, 15 U.S.C. § 2603(b)(2)(A), and serving on a committee to recommend chemical substances for priority consideration, *id.* § 2603(e)(2)(A)(iv).

12

f.  Developing and maintaining a registry of firefighters for purposes of collecting health and occupational information and studying cancer incidence. 42 U.S.C. § 280e-5(a).

g.  Working with the Department of Labor to "develop and maintain an effective program of collection, compilation, and analysis of occupational safety and health statistics," 29 U.S.C. § 673(a), including by awarding grants and contracts for this purpose, *id.* § 673(b).

27.  Congress regularly appropriates funds to enable NIOSH to carry out these and other designated functions. For Fiscal Year 2024, Congress set NIOSH's funding at $362.8 million. *See* Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. D, tit. II, 138 Stat. 460, 654. That amount includes $119.5 million for the National Occupational Research Agenda; $32 million for Education and Research Centers; $23 million for personal protective technology; $66.5 million for mining research; $5.5 million for the National Firefighter Registry for Cancer; and $115.1 million for other occupational safety and health research, including $11.8 million for Total Worker Health research, which works to build an integrated approach to occupational safety and health. *See* Explanatory Statement, 170 Cong. Rec. H1501, H1889 (Mar. 22, 2024) (incorporated into law by Pub. L. No. 118-47, § 4, 138 Stat. at 461); *see also* S. Rep. No. 118-84, at 82–84 (2023) (incorporated by Explanatory Statement, 170 Cong. Rec. at H1886).

28.  Congress's continuing appropriations legislation for Fiscal Year 2025 left these funding levels in place. *See* Full-Year Continuing Appropriations and Extensions Act of 2025, Pub. L. No. 119-4, §§ 1101(a)(8), (c), 139 Stat. 9, 1012.

29.  Over the 50-plus years since Congress created NIOSH and began assigning it critical functions in protecting workers, NIOSH has developed unparalleled expertise in the area

of occupational safety and health and has invested in the resources and staff necessary to perform cutting-edge research and otherwise fulfill its statutory duties. Employers and employees throughout America, as well as businesses, nonprofit organizations, educators, and governments, rely on the ongoing programs operated by NIOSH's staff of highly trained scientific experts.

**The Trump Administration's elimination of vital NIOSH divisions and functions**

30.    Immediately after being sworn into office on January 20, 2025, President Trump began taking measures to cut federal operations and reduce the size of the federal workforce. On the day of his inauguration, he signed a presidential memorandum barring agencies from filling any vacant federal civilian position and from creating new positions, unless otherwise authorized. *See Hiring Freeze*, Presidential Mem. (Jan. 20, 2025).[2] The memorandum further directed that the Office of Management and Budget and Office of Personnel Management (OPM), in consultation with the United States DOGE Service, should "submit a plan to reduce the size of the Federal Government's workforce" within 90 days. *Id.*

31.    One week later, OPM sent an email to federal employees announcing a voluntary deferred resignation program. *See* OPM, *Deferred Resignation Email to Federal Employees* (Jan. 28, 2025).[3] The email warned those employees who elected not to resign that OPM could not "give [them] full assurance regarding the certainty of [their] position or agency." *Id.*

32.    On February 11, 2025, President Trump issued an Executive Order titled "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative." Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 14, 2025). The order directed agency heads to "promptly undertake preparations to initiate large-scale reductions in force (RIFs)," *id.*

---

[2] https://www.whitehouse.gov/presidential-actions/2025/01/hiring-freeze.

[3] https://www.opm.gov/fork/original-email-to-employees.

§ 3(c), and to submit a report to OPM within 30 days that "discuss[es] whether the agency or any of its subcomponents should be eliminated or consolidated," *id.* § 3(e).

33.    On March 27, 2025, HHS announced a "dramatic restructuring" that would involve reducing its workforce by approximately 10,000 full-time employees. HHS, *HHS Announces Transformation to Make America Healthy Again* (Mar. 27, 2025).[4] Together with the resignations prompted by the deferred resignation program, HHS estimated that the restructuring would reduce its workforce from 82,000 to 62,000 full-time employees—in other words, by nearly 25 percent. *Id.* As part of the restructuring plan, HHS planned to combine NIOSH with several other HHS agencies into a "new, unified entity" called the Administration for a Healthy America. *Id.*

34.    HHS soon began issuing notices that it would be undertaking massive RIFs at NIOSH—"in accordance with" the February 11 executive order and "HHS's broader strategy to improve its efficiency and effectiveness to make America healthier." Early on April 1, 2025, more than 400 (out of just over 1,000) of NIOSH's civil service employees received notice that their positions would be eliminated in June. Hundreds of NIOSH contractors who work side-by-side with other NIOSH staff to carry out and support NIOSH programs also received notice of their termination. Many other NIOSH employees received notice on April 1, 2025, that the agency later intended to implement a second RIF but did not receive their termination notices at that time.

35.    Most, if not all, of the employees in this initial wave of April 1, 2025, RIF notices were immediately placed on paid administrative leave pending the anticipated June 2, 2025, elimination of their positions, despite regulations requiring that, where possible, agencies conducting RIFs should "retain … employee[s] on active duty status" between the issuance of a RIF notice and the eventual terminations in order to ensure a smooth transition. 5 C.F.R. § 351.806.

---

[4] https://www.hhs.gov/press-room/hhs-restructuring-doge.html.

36.    On May 2, 2025, nearly 400 additional NIOSH civil service employees received their RIF notices, with a separation date of July 2, 2025. Most, if not all, of the employees in this second wave also were immediately placed on paid administrative leave. *See* Alexander Tin, *Worker safety agency NIOSH lays off most remaining staff*, CBS News (May 3, 2025).[5]

37.    All told, between these RIFs, terminations of NIOSH probationary employees, and the departures of NIOSH employees who took early retirements or voluntary buyouts, nearly 900 civil service employees, or approximately 85 percent of NIOSH's pre-inauguration staff, were slated to separate by early July.

38.    The RIFs and other terminations, combined with employees' early departures and Defendants' actions in immediately placing recipients of RIF notices on administrative leave, meant that by the beginning of May, almost every NIOSH division had been virtually shut down altogether. A handful of NIOSH staff who are members of the Commissioned Corps of the U.S. Public Health Service, and who are therefore subject to different employment terms than those that govern civil service employees, were not subject to the April and May RIF notices and continued to work at the agency. Even though a small number of Corps members continued to staff some of the agency's divisions, however, NIOSH's operations almost entirely ceased. Citing the RIFs, NIOSH's website indicated that a wide range of the agency's programs and services had ended.

39.    Following public outcry and pressure from Congress, NIOSH partially reversed course in mid-May, rescinding the RIF notices for 328 of the nearly 900 NIOSH employees who left or were scheduled to leave. The restored employees represent just over 30 percent of NIOSH's pre-inauguration workforce, and the restored offices generally administer smaller programs

---

[5] https://www.cbsnews.com/news/worker-safety-agency-niosh-lays-off-most-remaining-staff.

focused on providing specific services, rather than performing NIOSH's core occupational safety and health research, education, training, and grantmaking functions.

40.    Although NIOSH is currently subject to two preliminary injunctions barring it from effectuating the RIF notices that have not been rescinded, *see New York v. Kennedy*, 2025 WL 1803260 (D.R.I. July 1, 2025); *Am. Fed. of Gov't Emps., AFL-CIO v. Trump*, 2025 WL 1482511 (N.D. Cal. May 22, 2025), an application to stay one of the injunctions is pending with the Supreme Court, *see Trump v. Am. Fed. of Gov't Emps., AFL-CIO*, No. 24A1174 (application filed June 2, 2025), and the vast majority of employees who are subject to the unrescinded notices remain on administrative leave and are not performing their usual work functions.

41.    Ultimately, the NIOSH offices primarily responsible for core functions remain entirely closed, and their functions have not been reallocated elsewhere.

42.    For example, as explained above, NIOSH has a range of statutory duties to conduct research, investigations, and other functions specific to the mining sector. *See, e.g.*, 29 U.S.C. § 671(h) (creating the Office of Mine Safety and Health within NIOSH); 30 U.S.C. §§ 937(b), 951(a)–(b) (requiring NIOSH to conduct research on mine worker health and mine safety); *id.* § 811(a)(1) (tasking NIOSH with recommending safety standards to MSHA). All or nearly all civil service employees at the **Pittsburgh and Spokane Mining Research Divisions**, through which NIOSH conducts these functions, are scheduled for termination under the RIFs, and many of these employees are already on administrative leave. As a result, work at both Divisions has stopped and is not expected to resume. The Divisions' functions have not been transferred elsewhere.

43.    Specifically, the Mining Research Divisions have stopped testing mine-safety equipment aimed at preventing cave-ins, despite a significant backlog of requests from manufacturers. They have stopped testing and monitoring wearable devices that continuously

monitor miners' dust exposure, even though the only existing NIOSH-approved continuous personal dust monitor on the market is soon to be discontinued. They have stopped collecting and analyzing field data from sensors installed at mines across the country to identify conditions where there may be unacceptably high dust levels. They have ended ongoing research into topics such as mine collapses, safety concerns associated with open-pit and surface mines, fires caused by the lithium-ion batteries that power mining equipment, and the safe design of mines located near oil and gas wells. And they have stopped training mine operators in the use of virtual reality tools that teach users how to respond to mine emergencies.

44.    All civil service employees at the **Division of Science Integration (DSI)**, which synthesizes NIOSH's scientific research into practical guidance and recommendations, are scheduled for termination under the RIFs, and nearly all have been placed on administrative leave. The work of DSI has accordingly ceased and is not expected to resume. DSI's functions have not been transferred elsewhere.

45.    Prior to its shutdown, DSI was responsible for fulfilling NIOSH's statutory duty to develop and publish criteria for identifying and dealing with toxic materials and other harmful substances, including by identifying exposure levels that are safe for various periods of employment. *See* 29 U.S.C. §§ 669(a)(2)–(3). It did so by, among other things, creating "criteria" documents and other publications, such as the *NIOSH Pocket Guide to Chemical Hazards*— NIOSH's most widely-used publication—and the *NIOSH List of Hazardous Drugs in Healthcare Settings*.[6] DSI would regularly update these publications as new potential hazards entered the

---

[6] *See* NIOSH, *NIOSH Pocket Guide to Chemical Hazards*, https://www.cdc.gov/niosh/npg/default.html; NIOSH, *NIOSH List of Hazardous Drugs in Healthcare Settings, 2024*, https://www.cdc.gov/niosh/docs/2025-103/default.html.

marketplace. *See, e.g.*, 30 U.S.C. § 811(a)(6)(B) (directing HHS to assess on an ongoing basis the toxicity of chemical substances that occur in the mining industry).

46.    DSI was also responsible for fulfilling NIOSH's statutory duty to publish, update, and conduct research on safety and health risks associated with emerging technologies, 29 U.S.C. § 669(a)(4), and to consult with the EPA to review the EPA's chemical exposure limits pursuant to the Toxic Substances Control Act, *see* 15 U.S.C. § 2603(b)(2)(A). DSI also recommended exposure limits when necessary for NIOSH to complete statutorily required investigations into hazards at specific worksites, *see* 29 U.S.C. § 669(a)(6), and it otherwise conducted or supported statutorily required occupational safety and health research, *see id.* § 669(a)(1).

47.    DSI has now stopped producing and publishing Recommended Exposure Limits for hazardous substances, including by stopping an ongoing update of the currently outdated Recommended Exposure Limit for lead. DSI has stopped determining and announcing the exposure levels at which certain chemicals are immediately dangerous to life or health (IDLH values), including by stopping work on five IDLH values that were in the midst of development. DSI has canceled planned updates to the *NIOSH Pocket Guide to Chemical Hazards* and the *NIOSH List of Hazardous Drugs in Healthcare Settings*. DSI has stopped work on planned reports addressing the risks associated with emerging nanotechnologies and exposure to wildland fire smoke. DSI has stopped updating a heat-safety mobile application that is widely used by unions, workers, and employers across industries. And DSI has canceled a wide range of planned research projects across a vast array of subjects.

48.    All civil service employees within the Field Research Branch, Health Informatics Branch, and Engineering and Physical Hazards Branch of the **Division of Field Studies and Engineering (DFSE)**, which conducts field-based exposure assessments and epidemiological

studies to identify and control workplace hazards, are scheduled for termination under the RIFs, and nearly all have been placed on administrative leave. The work of the eliminated DFSE branches has thus stopped. The functions of these branches have not been transferred elsewhere.

49.     Prior to being eliminated, the three DFSE branches provided epidemiological, statistical, and engineering expertise that was necessary for NIOSH to successfully complete statutorily required investigations into hazards at specific worksites. *See* 29 U.S.C. § 669(a)(6).

50.     These investigations, known as Health Hazard Evaluations, are provided free of charge when an employer or authorized employee representative requests a field investigation of a workplace where a potential health hazard is suspected. If NIOSH decides that an investigation is necessary, it evaluates workplace conditions and employee health concerns and makes public recommendations in a written report on how to eliminate or reduce any identified hazards.

51.     Between January 2023 and March 2024, NIOSH conducted at least 132 Health Hazard Evaluations across 37 states to address the occupational health concerns of thousands of employees and managers, and its reports were downloaded 14,397 times. *See* HHS, CDC, *Fiscal Year 2025 Justification of Estimates for Appropriation Committees* 252, 258 (Mar. 2024).[7] These evaluations are vital to worker safety because they identify hazards and recommend mitigation measures, and because they provide information that unions can use to offer training and guidance to their members and to negotiate with employers and advocate to lawmakers for improvements to workplace health.

52.     For example, following the Maui wildfires, NIOSH performed a Health Hazard Evaluation that investigated the respiratory hazards faced by emergency responders, identified serious airborne risks, and recommended critical improvements in the use of PPE and in health

---

[7] https://stacks.cdc.gov/view/cdc/177367.

monitoring. *See* NIOSH, *Evaluation of First Responders' Biological Monitoring Results After Maui County Hawaii Wildfires* (July 2024).[8] Another of NIOSH's Health Hazard Evaluations addressed the risk to police officers of hazardous exposure to fentanyl and other opioids while carrying out their duties. *See* NIOSH, *Evaluation of Occupational Exposure to Opioids in a City Police Department* (Aug. 2021).[9]

53.    The lessons that NIOSH learns in conducting a Health Hazard Evaluation of a particular workplace are often transferable to similar workplaces in other industries. Accordingly, NIOSH and other groups that strive to improve workplace safety and health conditions can and do use the findings and recommendations from NIOSH's Health Hazard Evaluations to advocate for workplace improvements across sectors.

54.    Without the scientific expertise of the eliminated DFSE components, NIOSH cannot successfully conduct Health Hazard Evaluations.

55.    Similarly, the eliminated DFSE components were essential for NIOSH to fulfill its statutory duty to maintain a registry of firefighters for purposes of studying cancer incidence. *See* 42 U.S.C. § 280e-5(a); *id.* § 280e-5(h) (authorizing appropriations for the registry through Fiscal Year 2028). This National Firefighter Registry for Cancer is the largest effort ever undertaken to understand and reduce the risk of cancer among U.S. firefighters. By enrolling and gathering information on a large population of firefighters with and without cancer throughout the country— including firefighters of different ages, races, and genders—NIOSH can regularly monitor and assess the data to determine whether firefighters' occupational exposure to particular chemicals

---

[8] https://www.cdc.gov/niosh/hhe/reports/pdfs/2023-0136-0142-3400.pdf.

[9] https://www.cdc.gov/niosh/hhe/reports/pdfs/2018-0015-3383.pdf.

poses an increased risk of developing cancer. The findings from these ongoing assessments can then be used to develop recommendations to reduce firefighters' exposures and cancer risks.

56.     Without the scientific expertise of the eliminated DFSE components, however, NIOSH cannot formulate and analyze the data collected in the registry.

57.     The eliminated DFSE branches have also canceled planned or ongoing research projects on subjects such as effective design for PPE used by firefighters, risks associated with flame retardants (called PFAS) widely used in firefighting supplies and consumer goods, and hazards associated with occupational exposure to peracetic acid, a chemical often found in disinfectants used by healthcare workers. And the eliminated DFSE branches have stopped conducting industrywide studies into exposure risks, as required by 29 U.S.C. § 669(a)(7); analyzing data to address reproductive health hazards in the workplace; and running the NIOSH cancer cohort program, which manages more than 70 occupational cohorts that support landmark studies to identify hazardous exposures that may may pose the risk of various occupational cancers.

58.     DFSE's eliminated Health Informatics Branch also developed and maintained surveillance systems to track, analyze, and disseminate data that can support research into and policymaking related to occupational illnesses and exposures. *See* 29 U.S.C. § 673(a) (requiring HHS to consult with the Secretary of Labor in developing a program for the collection, compilation, and analysis of occupational safety and health statistics); 84 Fed. Reg. 14379, 14381 (Apr. 10, 2019) (assigning this function to DFSE). Through this surveillance program, the Health Informatics Branch had long helped states, researchers, public health professionals, and others track illnesses and identify risk factors by developing data sets that link information about industry and occupation to health and death records. With all or nearly all staff terminated or set to be terminated, the process of compiling and analyzing this critical data has stopped.

59.     The **Health Effects Laboratory Division (HELD)**, which conducts laboratory-based research to determine how workplace exposures can cause disease and injury, has also entirely closed, and its functions have ceased. Prior to the shutdown, HELD developed analytical methods used by both private- and public-sector occupational health professionals to sample and measure chemical exposure hazards, and it published and regularly updated the *NIOSH Manual of Analytical Methods*, which describes best practices for monitoring workplace exposure to potentially toxic substances, including methods for testing air, surfaces, blood, and urine.[10] Among HELD's other functions, it performed toxicological animal laboratory studies that were essential to DSI's work in developing Recommended Exposure Limits and to supporting the analysis of the data collected through the National Firefighter Registry for Cancer; it conducted research over a range of topics, including ergonomic interventions; and it provided the analytical methods and expertise necessary to perform the sampling required for other NIOSH divisions to conduct requested Health Hazard Evaluations, recommend exposure limits for harmful substances, and evaluate exposures experienced by workers in high-risk occupations such as firefighting and mining. Those functions have ceased and have not been transferred elsewhere.

60.     The **Office of Extramural Coordination and Special Projects (OECSP)** has also closed, and its functions have ceased and have not been transferred elsewhere. This office was responsible for fulfilling NIOSH's statutory responsibility to conduct "education programs to provide an adequate supply of qualified personnel to carry out the purposes" of the OSH Act and "informational programs on the importance of and proper use of adequate safety and health equipment." 29 U.S.C. § 670(a); *see id.* § 671(c)(2).

---

[10] NIOSH, *NIOSH Manual of Analytical Methods (NMAM) 5th Edition*, https://www.cdc.gov/niosh/nmam/default.html.

61.     OECSP funds and coordinates 18 Education and Research Centers at universities throughout the country. The Centers provide interdisciplinary graduate and post-graduate training in occupational safety and health disciplines such as industrial hygiene, occupational medicine, occupational health psychology, mining safety, and ergonomics. Since the program's inception, it has been the primary source of advanced training for occupational safety and health doctors and other professionals in the United States, training more than 20,000 safety and health professionals.

62.     OECSP also awards academic and non-academic Training Project Grants. The academic Training Project Grants provide funds for academic institutions to use to help selected students in specific undergraduate, graduate, and post-graduate programs cover expenses, tuition, and fees. These grants also support the Occupational Health Internship Program, which is housed within Plaintiff AOEC. With training sites across the country, this internship program provides undergraduate and graduate students the opportunity for real-world field experience through summer internship placements in labor unions and other organizations. Twenty students participate each summer and over 400 students have participated since the program's inception in 2004.

63.     The non-academic Training Project Grants, meanwhile, help meet specific training needs of workers in particular industries, such as firefighting or commercial fishing.

64.     OECSP also supports and funds targeted research and outreach activities through multidisciplinary centers that focus on high-risk industries that contribute disproportionately to work-related injury and illness in the United States. For example, OECSP supports twelve Centers for Agricultural Safety and Health, which conduct research, education, and prevention projects in agriculture, forestry, and fishing. The National Construction Center, meanwhile, focuses on applied research on the safety and health hazards in construction. And ten Centers of Excellence

for Total Worker Health conduct multidisciplinary research, intervention, and outreach in a range of industries with the aim of improving the safety, health, and well-being of the nation's workers.

65.    Furthermore, OECSP provides grant funding to support states in conducting critical safety and health surveillance activities. Through the State Occupational Safety and Health Surveillance Program, OECSP provides 23 states funding to collect, analyze, and interpret occupational safety and health data and sometimes to perform additional follow-up investigations and develop policy or other interventions. During the COVID-19 pandemic, this program led to critical insights that helped states develop safe return-to-work policies and mitigation measures.

66.    Although NIOSH has informally indicated that it intends to continue funding OECSP-supported centers, grants, and programs in the fiscal year that begins on July 1, 2025, it has taken none of the actions that it typically would take to ensure continued funding.

***

67.    Altogether, by eliminating several critical components of NIOSH, Defendants have caused NIOSH to stop performing the statutory functions for which those components are responsible—including virtually all of NIOSH's core research functions. And because the eliminated components provide critical interdivisional support for the components that remain, the elimination of the divisions discussed above—particularly when combined with staff cuts and reorganizations elsewhere in the agency—have fatally degraded NIOSH's ability to fulfill its statutory functions altogether. The result of this disruption to NIOSH programs and services will be more disabling injuries, illnesses, and premature deaths to American workers.

**Harms to Plaintiffs**

68.    While Defendants' actions in shutting down critical NIOSH components and their corresponding research functions will cause grave and mounting harm across the nation, they directly and immediately injure Plaintiffs in a number of ways.

69.    *First*, the ongoing safety and health research that NIOSH conducts across a range of industries are indispensable to Plaintiffs NNU, NYSNA, CNA/NNOC, UMWA, AFT, USW, IAM, NFFE, UAW, and AFL-CIO (collectively, Plaintiff unions) and their members, and to AOEC and its members. In addition, Plaintiff unions regularly utilize specific NIOSH publications and rely on those publications being kept up to date. For example, Plaintiff unions regularly use the *NIOSH Pocket Guide to Chemical Hazards* to train and provide guidance to their members on assessing dangerous substances encountered on the job, and to negotiate with employers to mitigate potential workplace hazards more effectively. Plaintiffs USW and UAW, meanwhile, regularly rely on the *NIOSH Manual of Analytical Methods*.

70.    NIOSH's publications are the only federal source of immediate authoritative information for AOEC and its members about the latest research into the health effects of physical, chemical, and other occupational hazards. NIOSH's research (whether conducted or funded by NIOSH), as well as its recommendations about the best ways to prevent, mitigate, and treat those effects, are essential to AOEC's clinics and individual members in making correct diagnoses of work-related injuries and diseases. Thus, the shutdown of critical NIOSH components deprives AOEC and its members of timely knowledge about how to prevent, mitigate, and treat work-related injuries and diseases stemming from exposure to hazards from the only authoritative agency in the United States. The lost insights include both evolving knowledge about old hazards and critical medical and scientific knowledge about new hazards.

26

71.     NIOSH's research and recommendations on key safety and health issues and hazards are particularly critical to Plaintiff AFL-CIO's work. The AFL-CIO plays a unique role in the community of workplace safety and health professionals as the leader and coordinator of labor union involvement in major cross-cutting OSHA and MSHA regulatory activity. The AFL-CIO develops the consensus labor position on the content of needed and proposed occupational safety and health standards, as well as guidance and directives, and on the implementation of final standards—all of which directly affects its members. Without NIOSH research, the AFL-CIO cannot effectively carry out its occupational safety and health work.

72.     Unless its critical components are restored, NIOSH will not be able to update its publications and conduct the research and investigations through which it produces many other resources, findings, and recommendations that it provides to reflect changes in best practices and new insights about an untold number of existing and new workplace hazards. As a result, Plaintiff unions and their members, as well as AOEC and its members, will not have up-to-date information about these hazards and how to mitigate them.

73.     *Second*, NIOSH's inability to effectively perform Health Hazard Evaluations as a result of the shutdown of critical NIOSH components, including DSI, HELD, and the eliminated branches of DFSE, is harming several Plaintiff unions and their members. NIOSH has closed pending evaluations, including those requested by Plaintiffs. For example, in 2024, AFT requested a health hazard evaluation for members at Highlands University in Las Vegas, New Mexico, to investigate improper storage of toxic chemicals in the science building, which had resulted in both short-term illness and long-term complications in several AFT members, as well as the death of at least one AFT member. As part of the investigation, AFT requested medical evaluations for individuals who may have been exposed to the chemicals, an industrial hygiene exposure

assessment to ensure there would be no future exposure, and behavioral health support to assist individuals with trauma because of the exposures. On April 22, 2025, NIOSH informed AFT that, "[d]ue to the implementation of a reduction in force across NIOSH, we are not able to continue our health hazard evaluation of New Mexico Highlands University and the project is now closed." It has not been reopened.

74.    Plaintiff USW has had multiple pending Health Hazard Evaluations affected by the shutdown of NIOSH components, including DSI, HELD, and the eliminated DFSE components. First, USW's local union safety officers had requested a Health Hazard Evaluation of dust and silica exposure and the adequacy of breathing zones at a Wyoming mine owned by WE Soda. Second, one of USW's locals requested a Health Hazard Evaluation at the Radford Army Ammunition Plant in Virginia because the company reduced post-exposure shower time. Third, a USW local requested a Health Hazard Evaluation to address repetitive-strain injuries at a water-heater manufacturing facility in Tennessee. Although NIOSH reopened or offered to reopen the first two evaluations following the reinstatement of some staff members, NIOSH will not be able to adequately complete them without support from DSI, the shuttered DFSE components, and HELD. NIOSH has not reopened the project in Tennessee.

75.    An IAM local union had an open Health Hazard Evaluation pending in Washington that NIOSH canceled in late April and has not reopened. That evaluation involved workers at a Boeing Company facility, who were experiencing occupational exposure to hazardous hexavalent chromium through contact with contaminated equipment, tools, and clothing.

76.    The conclusions that NIOSH draws in conducting Health Hazard Evaluations at a particular workplace are often transferable to other workplaces across industries. Thus, NIOSH's inability to perform evaluations effectually harms both the Plaintiffs that requested them (and the

Plaintiffs' members), and other Plaintiff unions and their members by denying them critical, often life-saving information and recommendations that would enable the unions and their members to address safety hazards in the workplace. The result will be injury, illness, and premature death among these unions' members and other workers.

77.     *Third*, the cessation of NIOSH's critical role in protecting the safety and health of mine workers will cause severe injury to the miners represented by Plaintiffs UMWA and USW.

78.     The shuttered Pittsburgh and Spokane Mining Research Divisions conduct research and develop solutions to reduce miners' exposure to injuries, occupational diseases, and fatalities in the nation's coal, metal, and non-metal mines. NIOSH's work in these areas is essential for Plaintiffs UMWA and USW to continue their own work as effective advocates for improved safety and health in the nation's mines. Equipped with NIOSH's research, these unions repeatedly have advocated for Congress and MSHA to adopt legislation and regulations, respectively, that safeguard the welfare of mine workers. For more than ten years, for example, UMWA relied on NIOSH research in publicly advocating for an MSHA rule regarding silica dust exposure. The rule was promulgated in April 2024. Without NIOSH's mine-safety research, Plaintiffs UMWA and USW will be unable to advocate effectively for health and safety improvements.

79.     *Fourth*, the cessation or degradation of NIOSH programs and studies that protect the occupational safety and health of firefighters harms Plaintiff NFFE, which uses NIOSH's ongoing research into workplace hazards faced by firefighters to advocate for safer work environments, both by making legislative proposals to lawmakers and formulating bargaining positions during negotiations with employers. In addition, the insights into workplace safety derived from NIOSH's research provides a direct benefit to NFFE's firefighter members.

80.    Furthermore, structure and wildland firefighters whom NFFE represents can enroll in the National Firefighter Registry for Cancer. Since the Registry was launched, NFFE has encouraged its firefighter members to enroll in the Registry to improve the validity of the data set and to ensure it includes data from NFFE's members. Around 500 NFFE members have done so. The Registry had promised to serve as an important tool for NFFE in future advocacy because, over time, it would have shown patterns and trends of how work-related exposure connects to cancer diagnoses. But without support from the shuttered components, NIOSH will not be able to effectively analyze the data it collects through this program, depriving NFFE of this advocacy tool.

81.    *Fifth*, the impending shutdown of the Education and Research Centers and Training Project Grants, including Plaintiff AOEC's Occupational Health Internship Program, will harm AOEC and its clinics and individual members. Through these Centers and Grants, NIOSH provides the primary source of funding for the recruitment and specialized training of occupational physicians, nurses, and industrial hygiene professionals in the United States. Additionally, as the recipient of a NIOSH Training Project Grant for the summer internship program, AOEC operates a program that trains upper-level undergraduate and early graduate students to enter advanced specialized training in these fields. Since 2004, over 400 students have been trained through AOEC's NIOSH-funded internship program, with over half entering a career in the occupational health professions.

82.    Unless NIOSH support is restored, AOEC will have to close its summer program beginning next year. The elimination of the Training Project Grant that funds this program will leave AOEC without funds to pay salaries for its executive officers, require AOEC to reorganize its operations, and cause AOEC to suffer the reputational harm of eliminating its flagship

program—the only nationally recognized program to recruit junior professionals into occupational safety and health careers.

83.     The loss of NIOSH support for academic training programs like AOEC's will injure AOEC's member clinics by limiting the availability of specialized occupational medicine providers and other specialized experts in the diagnosis and treatment of work-related injuries and illnesses—specialists recruited and employed by AOEC's clinics. Already, many Education and Research Centers have reduced the number of student traineeships for July 2025, including three occupational medicine training programs that accepted no trainees for this summer.

84.     Other NIOSH extramural programs formerly administered by the now-shuttered OECSP, such as the NIOSH-funded Agricultural Centers, Construction Center, and Centers of Excellence for Total Worker Health, are the only authoritative national sources of information for occupational health specialists about the hazards among agricultural, construction, and many other worker groups at high risk for work-related injuries and diseases. AOEC clinics and their individual members rely on research and practical information from these Centers about the causes of occupational injury and illness and recommendations for their prevention, which in turn informs AOEC members' patient care.

## COUNT I
### (Shutdown of Mining Research Divisions – Contrary to Law)

85.     The APA directs courts to hold unlawful and set aside agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

86.     NIOSH is statutorily required to conduct studies, research, and experiments into aspects of mine safety, 30 U.S.C. §§ 951(a)–(c), including by "research[ing], develop[ing], and testing … new technologies and equipment designed to enhance mine safety and health," 29 U.S.C. § 671(h)(3).

31

87.     Prior to the events of this case, the NIOSH's Mining Research Divisions performed this statutory function on behalf of NIOSH.

88.     Defendants acted contrary to law by closing the Mining Research Divisions without assigning their functions elsewhere, rendering NIOSH incapable of fulfilling its statutorily mandated functions.

**COUNT II**
**(Shutdown of Mining Research Divisions – Contrary to Impoundment Control Act)**

89.     The APA directs courts to hold unlawful and set aside agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

90.     Congress has appropriated funds to NIOSH earmarked for mining research.

91.     The Impoundment Control Act requires the executive to make appropriated funds "available for obligation" unless the President sends a special message to Congress detailing a request to rescind funds and Congress passes a bill rescinding the funding. 2 U.S.C. § 683.

92.     The President has not sent a special message to Congress requesting that these funds be rescinded, and Congress has not rescinded the appropriations.

93.     The Impoundment Control Act also requires the President to send a special message to Congress if the executive proposes to defer spending appropriated funds, and it prohibits deferral of any budget authority except to provide for contingencies, to achieve savings made possible by changed requirements or greater efficiency, or as otherwise specifically provided by law. 2 U.S.C. § 684. The President has not sent a special message to Congress requesting deferral of the budget authority for NIOSH's mining research, and none of the statutory circumstances that would permit such a deferral is applicable.

94.    Defendants' shutdown of the Mining Research Divisions, and corresponding suspension of NIOSH's mining research budget, is contrary to the Impoundment Control Act, in violation of the APA.

**COUNT III**
**(Shutdown of Mining Research Divisions – Arbitrary and Capricious)**

95.    The APA directs courts to hold unlawful and set aside agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

96.    Defendants have offered no reasoned explanation for shutting down NIOSH's Mining Research Divisions and have failed to account for the reliance interests that interested stakeholders, including Plaintiffs, hold in the Divisions' continued operation.

97.    Defendants acted arbitrarily and capriciously by eliminating the Mining Research Divisions.

**COUNT IV**
**(Shutdown of DSI – Contrary to Law)**

98.    The APA directs courts to hold unlawful and set aside agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

99.    NIOSH is statutorily required to "develop and publish … criteria" for "identifying toxic substances," 29 U.S.C. § 669(a)(2), "develop criteria dealing with toxic materials and harmful physical agents and substances which will describe exposure levels that are safe for various periods of employment," *id.* § 669(a)(3), conduct "research, experiments, and demonstrations relating to occupational safety and health as are necessary to explore new problems, including those created by new technology," *id.* § 669(a)(4), and consult with the EPA pursuant to the Toxic Substances Control Act, 15 U.S.C. §§ 2603(b)(2)(A), 2603(e)(2)(A)(iv).

100.    Prior to the events of this case, DSI performed these statutory functions on behalf of NIOSH.

101.    NIOSH is also statutorily required to "determine following a written request by any employer or authorized representative of employees[] … whether any substance normally found in the place of employment has potentially toxic effects in such concentrations as used or found." 29 U.S.C. § 669(a)(6).

102.    DSI provides scientific expertise that is necessary for NIOSH to fulfill this statutory function.

103.    Defendants acted contrary to law by closing DSI without assigning its functions elsewhere, rendering NIOSH incapable of fulfilling its statutorily mandated functions.

**COUNT V**
**(Shutdown of DSI – Arbitrary and Capricious)**

104.    The APA directs courts to hold unlawful and set aside agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

105.    Defendants have offered no reasoned explanation for shutting down NIOSH's DSI and have failed to account for the reliance interests that interested stakeholders, including Plaintiffs, hold in DSI's continued operation.

106.    Defendants acted arbitrarily and capriciously by eliminating DSI.

**COUNT VI**
**(Shutdown of DFSE branches – Contrary to Law)**

107.    The APA directs courts to hold unlawful and set aside agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

108.    NIOSH is statutorily required to "conduct and publish industrywide studies of the effect of chronic or low-level exposure to industrial materials, processes, and stresses on the potential for illness, disease, or loss of functional capacity in aging adults" on an annual basis, 29 U.S.C. § 669(a)(7), and HHS must consult with the Secretary of Labor to develop a program for the collection, compilation, and analysis of occupational safety and health statistics, *id.* § 673(a).

109.    Prior to the events of this case, DFSE branches that Defendants have eliminated performed these statutory functions on behalf of NIOSH and HHS.

110.    NIOSH is also statutorily required to "determine following a written request by any employer or authorized representative of employees[] … whether any substance normally found in the place of employment has potentially toxic effects in such concentrations as used or found," *id.* § 669(a)(6), and to develop and maintain a "voluntary registry of firefighters" compiled "to collect relevant health and occupational information of such firefighters for purposes of determining cancer incidence," 42 U.S.C. § 280e-5(a).

111.    The DFSE branches that Defendants have eliminated provide scientific expertise that is necessary for NIOSH to fulfill these statutory functions.

112.    Defendants acted contrary to law by eliminating vital DFSE branches without assigning their functions elsewhere, rendering NIOSH incapable of fulfilling its statutorily mandated functions.

## COUNT VII
### (Shutdown of DFSE branches – Arbitrary and Capricious)

113.    The APA directs courts to hold unlawful and set aside agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

114.    Defendants have offered no reasoned explanation for shutting down several branches of DFSE and have failed to account for the reliance interests that interested stakeholders, including Plaintiffs, hold in these branches' continued operation.

115.    Defendants acted arbitrarily and capriciously by eliminating the DFSE branches.

## COUNT VIII
### (Shutdown of HELD – Contrary to Law)

116.    The APA directs courts to hold unlawful and set aside agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

117.    NIOSH is statutorily required to "determine following a written request by any employer or authorized representative of employees[] … whether any substance normally found in the place of employment has potentially toxic effects in such concentrations as used or found," *id.* § 669(a)(6), and to develop and maintain a "voluntary registry of firefighters" compiled "to collect relevant health and occupational information of such firefighters for purposes of determining cancer incidence." 42 U.S.C. § 280e-5(a).

118.    Prior to the events of this case, HELD provided scientific expertise that is necessary for NIOSH to fulfill these statutory functions.

119.    Defendants acted contrary to law by eliminating HELD without assigning its functions elsewhere, rendering NIOSH incapable of fulfilling its statutorily mandated functions.

## COUNT IX
### (Shutdown of HELD – Arbitrary and Capricious)

120.    The APA directs courts to hold unlawful and set aside agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

121.    Defendants have offered no reasoned explanation for shutting down HELD and have failed to account for the reliance interests that interested stakeholders, including Plaintiffs, hold HELD's continued operation.

122.    Defendants acted arbitrarily and capriciously by eliminating HELD.

## COUNT X
### (Shutdown of OECSP – Contrary to Law)

123.    The APA directs courts to hold unlawful and set aside agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

124.    NIOSH is statutorily required to administer "grants or contracts" to fund third-party research into occupational safety and health, 29 U.S.C. § 669(a)(1), and to "conduct, directly or by grants or contracts (1) education programs to provide an adequate supply of qualified personnel

to carry out the purposes of [the OSH Act], and (2) informational programs on the importance of and proper use of adequate safety and health equipment," *id.* § 670(a); *see also id.* § 673(a) (requiring HHS to consult with the Secretary of Labor on collecting, compiling, and analyzing occupational safety and health statistics).

125.    Prior to the events of this case, OECSP performed these statutory functions on behalf of NIOSH.

126.    Defendants acted contrary to law by closing OECSP without assigning its functions elsewhere, rendering NIOSH incapable of fulfilling its statutorily mandated functions.

## COUNT XI
### (Shutdown of OECSP – Contrary to Impoundment Control Act)

127.    The APA directs courts to hold unlawful and set aside agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

128.    Congress has appropriated funds to NIOSH earmarked for Education and Research Centers and for the Centers of Excellence for Total Worker Health.

129.    The Impoundment Control Act requires the executive to make appropriated funds "available for obligation" unless the President sends a special message to Congress detailing a request to rescind funds and Congress passes a bill rescinding the funding. 2 U.S.C. § 683.

130.    The President has not sent a special message to Congress requesting that these funds be rescinded, and Congress has not rescinded the appropriations.

131.    The Impoundment Control Act also requires the President to send a special message to Congress if the executive proposes to defer spending appropriated funds, and it prohibits deferral of any budget authority except to provide for contingencies, to achieve savings made possible by changed requirements or greater efficiency, or as otherwise specifically provided by law. *Id.* § 684.

132.    The President has not sent a special message to Congress requesting deferral of the budget authority for NIOSH's Education and Research Centers or Centers of Excellence for Total Worker Health, and none of the statutory circumstances that would permit such a deferral is applicable.

133.    Defendants' shutdown of OECSP, and corresponding suspension of NIOSH's Education and Research Center and Total Worker Health budget, is contrary to the Impoundment Control Act, in violation of the APA.

## COUNT XII
### (Shutdown of OECSP – Arbitrary and Capricious)

134.    The APA directs courts to hold unlawful and set aside agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

135.    Defendants have offered no reasoned explanation for shutting down OECSP and have failed to account for the reliance interests that interested stakeholders, including Plaintiffs, hold in OECSP's continued operation.

136.    Defendants acted arbitrarily and capriciously by eliminating OECSP.

## COUNT XIII
### (Termination of NIOSH's research functions – Contrary to Law)

137.    The APA directs courts to hold unlawful and set aside agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

138.    NIOSH is statutorily required to conduct "research, experiments, and demonstrations relating to occupational safety and health." 29 U.S.C. § 669(a)(1).

139.    Defendants acted contrary to this requirement by eliminating the NIOSH components principally responsible for conducting occupational safety and health research without transferring their functions elsewhere.

**COUNT XIV**
**(Termination of NIOSH's research functions – Contrary to Impoundment Control Act)**

140.    The APA directs courts to hold unlawful and set aside agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

141.    Congress has appropriated funds to NIOSH earmarked for the National Occupational Research Agenda and for other occupational safety and health research.

142.    The Impoundment Control Act requires the executive to make appropriated funds "available for obligation" unless the President sends a special message to Congress detailing a request to rescind funds and Congress passes a bill rescinding the funding. 2 U.S.C. § 683.

143.    The President has not sent a special message to Congress requesting that these funds be rescinded, and Congress has not rescinded the appropriations.

144.    The Impoundment Control Act also requires the President to send a special message to Congress if the executive proposes to defer spending appropriated funds, and it prohibits deferral of any budget authority except to provide for contingencies, to achieve savings made possible by changed requirements or greater efficiency, or as otherwise specifically provided by law. *Id.* § 684.

145.    The President has not sent a special message to Congress requesting deferral of the budget authority for NIOSH's research activities, and none of the statutory circumstances that would permit such a deferral is applicable.

146.    Defendants' elimination of the NIOSH components principally responsible for conducting occupational safety and health research, and corresponding suspension of its research budget, is contrary to the Impoundment Control Act, in violation of the APA.

**COUNT XV**
**(Termination of NIOSH's research functions – Arbitrary and Capricious)**

147.    The APA directs courts to hold unlawful and set aside agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

148.    Defendants have offered no reasoned explanation for shutting down NIOSH's research functions and have failed to account for the reliance interests that interested stakeholders, including Plaintiffs, hold in NIOSH's ongoing research.

149.    Indeed, Defendants maximized the disruption to NIOSH's research functions by placing a significant percentage of the NIOSH workforce on administrative leave after issuing RIF notices in disregard of the regulatory requirement that agencies conducting RIFs must, where possible, "retain … employee[s] on active duty status" between the issuance of a RIF notice and the employees' eventual termination. 5 C.F.R. § 351.806. Defendants thus afforded no opportunity for NIOSH to complete or otherwise wind down ongoing research or transfer it elsewhere.

150.    Defendants acted arbitrarily and capriciously by terminating NIOSH's research functions.

## COUNT XVI
### (Cumulative shutdown of NIOSH – Contrary to Law)

151.    The APA directs courts to hold unlawful and set aside agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

152.    The OSH Act charges Defendants with maintaining NIOSH, and that statute and many others referenced herein require Defendants to assign NIOSH various roles in protecting occupational safety and health.

153.    Defendants acted contrary to these statutes by executing a comprehensive set of RIFs and reorganizations that so degrade NIOSH's functionality as to render it incapable of performing its statutory functions.

## COUNT XVII
### (Cumulative shutdown of NIOSH – Arbitrary and Capricious)

154.    The APA directs courts to hold unlawful and set aside agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

155.    Defendants have offered no reasoned explanation for executing a comprehensive set of RIFs and reorganizations that so degrade NIOSH's functionality as to render it incapable of performing its statutory functions, without accounting for the reliance interests that interested stakeholders in the American economy, including Plaintiffs, hold in NIOSH's continued operation.

156.    Indeed, Defendants maximized the disruption to NIOSH by placing a significant percentage of the NIOSH workforce on administrative leave after issuing RIF notices in disregard of the regulatory requirement that agencies conducting RIFs must, where possible, "retain … employee[s] on active duty status" between the issuance of a RIF notice and the employees' eventual termination. 5 C.F.R. § 351.806. Defendants thus afforded no opportunity for NIOSH to make preparations to function properly despite an abrupt and massive reduction in staffing.

157.    Defendants acted arbitrarily and capriciously by rendering NIOSH incapable of fulfilling its statutorily mandated functions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

a.  Declare that Defendants' shutdown of NIOSH's Mining Research Divisions is unlawful and enjoin Defendants to restore the Divisions and their functions;

b.  Declare that Defendants' shutdown of DSI is unlawful and enjoin Defendants to restore DSI and its functions;

c.  Declare that Defendants' shutdown of the eliminated DFSE branches is unlawful and enjoin Defendants to restore the branches and their functions;

d.  Declare that Defendants' shutdown of HELD is unlawful and enjoin Defendants to restore HELD and its functions;

e.  Declare that Defendants' shutdown of OECSP is unlawful and enjoin Defendants to restore OECSP and its functions;

f.   Declare that Defendants' shutdown of NIOSH's research functions is unlawful and enjoin Defendants to restore those functions;

g.   Declare that Defendants' execution of a comprehensive set of RIFs and reorganizations that so degrade NIOSH's functionality as to render it incapable of performing its statutory is unlawful and enjoin Defendants to reverse these actions;

h.   Award Plaintiffs their costs and attorneys' fees for this action; and

i.   Grant any other relief as this Court deems appropriate.

Dated: July 2, 2025                          Respectfully submitted,

                                             /s/ Nicolas Sansone
Matthew Ginsburg (DC Bar No. 1001159)        Nicolas Sansone (DC Bar No. 1686810)
Craig Becker (DC Bar No. 371239)             Stephanie Garlock (DC Bar No. 1779629)
Maneesh Sharma (DC Bar No. 1033407)          Allison M. Zieve (DC Bar No. 424786)
Bart Sheard (DC Bar No. 1542094)             Public Citizen Litigation Group
AFL-CIO                                      1600 20th Street NW
815 Black Lives Matter Plaza, NW             Washington, DC 20009
Washington, DC 20006                         (202) 588-1000
(202) 637-5310

*Attorneys for Plaintiff AFL-CIO*            *Attorneys for All Plaintiffs*