UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL NURSES UNITED, et al.,

               Plaintiffs,

    v.

ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of Health and Human
Services, et al.,

               Defendants.

Civil Action No. 25-1538 (TNM)

**DEFENDANTS' MOTION TO DISMISS AND MOTION FOR RELIEF FROM LOCAL
RULE 7(N)(1)'S REQUIREMENTS AND MEMORANDUM IN SUPPORT THEREOF**

**TABLE OF CONTENTS**

Table of Contents ................................................................................................................. i

Table of Authorities ......................................................................................................... iii

Introduction ....................................................................................................................... 1

Background ......................................................................................................................... 2

    I.      Statutory Background ..................................................................................... 2

    II.     Factual Background ......................................................................................... 3

         A.      Executive Order 14210 ....................................................................... 3

         B.      February 26, 2025, Workforce Memorandum ............................................. 4

         C.      The Department's Implementation of Executive Order 14210 and the Workforce Memorandum ................................................................... 6

    III.    Procedural Background ................................................................................... 8

Legal Standards .................................................................................................................. 9

    I.      Rule 12(b)(1) ..................................................................................................... 9

    II.     Rule 12(b)(6) ................................................................................................... 10

Argument .......................................................................................................................... 12

    I.      Plaintiffs Lack Standing ................................................................................ 12

         A.      Plaintiffs Fail to Demonstrate Informational Standing. ......................... 13

         B.      Plaintiffs Fail to Demonstrate Organizational Standing. ........................ 15

         C.      Plaintiffs Fail to Demonstrate Associational Standing. .......................... 18

         D.      The Court Should Decline to Find Standing to Allow Plaintiffs to Micromanage Federal Personnel Policies. ...................................... 20

    II.     The Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Claims Arising from Federal Employment. .......................................................... 21

    III.    The Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Challenge to the Termination of the Institute's Grants. ............................................ 27

    IV.    Plaintiffs Cannot Bring a Claim under the Impoundment Control Act. ............... 28

V.     Plaintiffs Fail to Sufficiently Allege Claims Under the APA. .............................. 30

     A.     Plaintiffs Do Not Seek Judicial Review of a Discrete Agency Action. ..... 30

     B.     Plaintiffs Do Not Identify a Final Agency Action. .................................... 34

     C.     There Are Adequate Alternative Remedies Available. ............................. 37

     D.     The Department's Staffing and Other Programmatic Implementation Decisions Are Committed to Agency Discretion. ...................................... 38

     E.     The Department's Funding Decisions Are Committed to the Agency's Discretion by Law. .................................................................................... 40

     F.     Plaintiffs Fail to Allege that the RIFs and Restructuring are Contrary to Law and Exceed Defendants' Statutory Authority. ................................... 42

VI.     Defendants Should Be Relieved of Their Obligation to File a Certified List of the Administrative Record and Serve the Administrative Record Simultaneously with this Motion. ........................................................................................................... 44

Conclusion ............................................................................................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Action All. of Senior Citizens of Greater Philadelphia v. Heckler*,
  789 F.2d 931 (D.C. Cir. 1986) ................................................. 17

*Alabama-Coushatta Tribe of Tex. v. United States*,
  757 F.3d 484 (5th Cir. 2014) ................................................. 31

*Albrecht v. Comm. on Emp. Benefits of Fed. Reserve Emp. Benefits Sys.*,
  357 F.3d 62 (D.C. Cir. 2004) ................................................. 28

*Am. Chemistry Council v. Dep't of Transp.*,
  468 F.3d 810 (D.C. Cir. 2006) ................................................. 18

*Am. Farm Bureau v. EPA*,
  121 F. Supp. 2d 84 (D.D.C. 2000) ................................................. 10

*Am. Fed. of Gov't Emps., AFL-CIO v. Trump*,
  --- F. Supp. 3d ---, 2025 WL 1482511 (N.D. Cal. May 22, 2025) ......................... 8, 9

* *Am. Fed'n of Gov't Emps., AFL-CIO* v. *Trump ("AFGE")*,
  929 F.3d 748 (D.C. Cir. 2019) ................................................. 21, 22, 23, 26

*Am. Foreign Serv. Ass'n v. Trump*,
  Civ. A. No. 25-352 (CJN), 2025 WL 573762 (D.D.C. Feb. 21, 2025) ....................... 26

* *Architects & Eng'rs for 9/11 Truth v. Raimondo*,
  Civ. A. No. 21-2365 (TNM), 2022 WL 3042181 (D.D.C. Aug. 2, 2022) ....................... 13

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................. 10, 11

*Ass'n of Battery Recyclers, Inc. v. EPA*,
  716 F.3d 667 (D.C. Cir. 2013) ................................................. 45

* *Association for Education Finance & Policy ("AEFP") v. McMahon*,
  --- F. Supp. 3d ---, 2025 WL 1568301 (D.D.C. June 3, 2025) ............ 15, 30, 32, 33, 34, 35, 36

*Attias v. Carefirst, Inc.*,
  865 F.3d 620 (D.C. Cir. 2017) ................................................. 9

*Axon Enterprise, Inc. v. FTC*,
  598 U.S. 175 (2023) ................................................. 23

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................ 10, 11

\* *Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................................ 34, 35

\* *Block v. Cmty. Nutrition Inst.*,
   467 U.S. 340 (1984) ................................................................................ 24, 25

*Bowen v. Massachusetts,*,
   487 U.S. 879 (1988) ................................................................................ 37

*Cal. Cmtys. Against Toxics v. EPA*,
   934 F.3d 627 (D.C. Cir. 2019) ................................................................ 36

*Cannon v. District of Columbia*,
   717 F.3d 200 (D.C. Cir. 2013) ................................................................ 11

*Carroll v. Office of Fed. Contract Compliance Programs, U.S. Dep't of Labor*,
   235 F. Supp. 3d 79 (D.D.C. 2017) .......................................................... 44

*Chamber of Com. of U.S. v. EPA*,
   642 F.3d 192 (D.C. Cir. 2011) ................................................................ 18

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
   333 U.S. 103 (1948) ................................................................................ 36

*City of L.A. v. Lyons*,
   461 U.S. 95 (1983) .................................................................................. 30

*City of New Haven v. United States*,
   809 F.2d 900 (D.C. Cir. 1987) ................................................................ 30

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ................................................................................ 19, 20

\* *Coal. for Humane Immigrant Rts. v. Dep't of Homeland Sec.*,
   Civ. A. No. 25-0943 (TNM), 2025 WL 1078776 (D.D.C. Apr. 10, 2025) ................... 12, 16, 18

*Cobell v. Kempthorne*,
   455 F.3d 301 (D.C. Cir. 2006) ................................................................ 31, 32

*Conf. of State Bank Supervisors v. Off. of Comptroller of Currency*,
   313 F. Supp. 3d 285 (D.D.C. 2018) ........................................................ 19

*Connecticut v. U.S. Dep't of Interior*,
   344 F. Supp. 3d 279 (D.D.C. 2018) ........................................................ 44

*Ctr. for Biological Diversity v. Nishida*,
Civ. A. No. 21-119 (RDM), 2021 WL 827189 (D.D.C. Mar. 4, 2021) ................................... 18

*Ctr. for Law & Educ. v. Dep't of Educ.*,
396 F.3d 1152 (D.C. Cir. 2005) ........................................................................................ 17

*Dabney v. Reagan*,
542 F. Supp. 756 (S.D.N.Y. 1982) .................................................................................... 29

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) ......................................................................................................... 21

\* *Dep't of Educ. v. California*,
145 S. Ct. 966 (2025) .................................................................................................. 27, 28

*Drake v. FAA*,
291 F.3d 59 (D.C. Cir. 2002) .......................................................................................... 38

*Elec. Priv. Info. Ctr. v. FAA*,
892 F.3d 1249 (D.C. Cir. 2018) ...................................................................................... 14

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
878 F.3d 371 (D.C. Cir. 2017) ........................................................................... 14, 16, 18

*Elgin v. Dep't of Treasury*,
567 U.S. 1 (2012) ....................................................................................................... 23, 26

*Env't Working Grp. v. United States Food & Drug Admin.*,
301 F. Supp. 3d 165 (D.D.C. 2018) ................................................................................ 17

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ......................................................................................................... 38

*FEC v. Akins*,
524 U.S. 11 (1998) ..................................................................................................... 12, 13

*Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*,
423 U.S. 326 (1976) ......................................................................................................... 39

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985) ......................................................................................................... 40

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ................................................................................................... 12, 21

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015) ........................................................................................ 16

*Fornaro v. James*,
   416 F.3d 63 (D.C. Cir. 2005) ............................................................... 23, 24, 26

*Friends of Animals v. Jewell*,
   828 F.3d 989 (D.C. Cir. 2016) ............................................................... 12, 13

*Garcia v. Vilsack*,
   563 F.3d 519 (D.C. Cir. 2009) ............................................................... 37

*Gen. Land Off. v. Biden*,
   722 F. Supp. 3d 710 (S.D. Tex. 2024) ............................................................... 29

*Gill v. Whitford*,
   585 U.S. 48 (2018) ............................................................... 21

\* *Glob. Health Council v. Trump*,
   --- F.4th---, No. 25-5097, 2025 WL 2326021 (D.C. Cir. Aug. 13, 2025) ............................... 29

*Graham v. Ashcroft*,
   358 F.3d 931 (D.C. Cir. 2004) ............................................................... 22

*Grosdidier v. Chairman, Broad. Bd. of,*
   *Govs.,* 560 F.3d 495 (D.C. Cir. 2009) ............................................................... 23, 24

\* *Heckler v. Chaney*,
   470 U.S. 821 (1985) ............................................................... 21, 39, 40, 41

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ............................................................... 13

*Hurd v. District of Columbia*,
   864 F.3d 671 (D.C. Cir. 2017) ............................................................... 11

\* *Ingersoll-Rand Co. v. United States*,
   780 F.2d 74 (D.C. Cir. 1985) ............................................................... 28

*Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*,
   937 F. Supp. 2d 18 (D.D.C. 2013) ............................................................... 11

*Jerome Stevens Pharm., Inc. v. FDA*,
   402 F.3d 1249 (D.C. Cir. 2005) ............................................................... 10

*Lacson v. Dep't of Homeland Sec.*,
   726 F.3d 170 (D.C. Cir. 2013) ............................................................... 26

\* *Lincoln v. Vigil*,
   508 U.S. 182 (1993) ............................................................... 38, 39, 41

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ................................................................................ 12

\*   *Lujan v. Nat'l Wildlife Fed.*,
   497 U.S. 871 (1990) ................................................ 15, 30, 31, 32, 33

*Mahoney v. Donovan*,
   721 F.3d 633 (D.C. Cir. 2013) ............................................................ 23

*Markland v. OPM*,
   140 F.3d 1031 (Fed. Cir. 1998) .......................................................... 38

*Markowicz v. Johnson*,
   206 F. Supp. 3d 158 (D.D.C. 2016) .................................................... 11

*McCarthy v. United States*,
   850 F.2d 558 (9th Cir. 1988) ................................................................ 9

*McKenna v. Dep't of Interior*,
   996 F.2d 1235 (Fed. Cir. 1993) .......................................................... 15

*Mdewakanton Sioux Indians of Minn. v. Zinke*,
   264 F. Supp. 3d 116 (D.D.C. 2017) .................................................... 44

*Megapulse, Inc. v. Lewis*,
   672 F.2d 959 (D.C. Cir. 1982) ...................................................... 27, 28

*Milk Train, Inc. v. Veneman*,
   310 F.3d 747 (D.C. Cir. 2002) ............................................................ 41

\*   *Nat'l Treasury Emps. Union v. Vought ("NTEU")*,
   --- F.4th ---, No. 25-5091, 2025 WL 2371608 (D.C. Cir. Aug. 15, 2025) ............. 24, 31, 35, 36

*New York v. Kennedy*,
   --- F. Supp. 3d ---, 2025 WL 1803260 (D.R.I. July 1, 2025) ...................................... 8

\*   *Norton v. S. Utah Wilderness All.*,
   542 U.S. 55, 62 (2004) ...................................................................15, 30, 31, 32

*Nyunt v. Chairman, Broad. Bd. of,*
   *Govs.*, 589 F.3d 445 (D.C. Cir. 2009) .......................................... 23, 26

*Payne v. Biden*,
   62 F.4th 598 (D.C. Cir. 2023) ............................................................ 26

*People for Ethical Treatment of Animals v. U.S. Dep't of Agric. (PETA)*,
   797 F.3d 1087 (D.C. Cir. 2015) .................................................... 12, 16

*Perry Cap. LLC v. Mnuchin,*
  864 F.3d 591 (D.C. Cir. 2017) ................................................................. 37

*PETA v. U.S. Fish & Wildlife Serv.,*
  59 F. Supp. 3d 91 (D.D.C. 2014) ............................................................. 44

*Pharm. Rsch. & Manufacturers of Am. v. Dep't of Health & Hum. Servs.,*
  656 F. Supp. 3d 137 (D.D.C. 2023) ......................................................... 18

*Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Human Servs.,*
  43 F. Supp. 3d 28 (D.D.C. 2014) ............................................................ 11

*Pub. Citizen v. Stockman,*
  528 F. Supp. 824 (D.D.C. 1981) ............................................................. 29

*Pub. Citizen v. U.S. Dist. Court for the Dist. of Columbia,*
  486 F.3d 1342 (D.C. Cir. 2007) .............................................................. 45

*Sierra Club v. EPA,*
  292 F.3d 895 (D.C. Cir. 2002) ................................................................ 18

*Spectrum Leasing Corp. v. United States,*
  764 F.2d 891 (D.C. Cir. 1985) ................................................................ 28

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998) .................................................................................. 44

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ........................................................................... 18, 20

*Talal Al-Zahrani v. Rodriguez,*
  669 F.3d 315 (D.C. Cir. 2012) ................................................................ 45

*Thunder Basin Coal Co. v. Reich,*
  510 U.S. 200 (1994) ........................................................................... 23, 25

*Travelers United, Inc. v. Hyatt Hotels Corp.,*
  761 F. Supp. 3d 97 (D.D.C. 2025) ............................................................ 9

*Trudeau v. FTC,*
  456 F.3d 178 (D.C. Cir. 2006) ........................................................... 10, 36

*Turlock Irrigation Dist. v. FERC,*
  786 F.3d 18 (D.C. Cir. 2015) .................................................................. 16

\* *U.S. Conf. of Catholic Bishops v. Dep't of State,*
  Civ. A. No. 25-465 (TNM), 2025 WL 763738 (D.D.C. Mar. 11, 2025) .......................... 27, 28

*United States v. Fausto,*
    484 U.S. 439 (1988) ................................................................................ 22, 23, 24, 25, 27

*United States v. Texas,*
    599 U.S. 670 (2023) ........................................................................................ 12, 20, 21

*Veg-Mix, Inc. v. U.S. Dep't of Agric.,*
    832 F.2d 601 (D.C. Cir. 1987) ..................................................................................... 11

*Versata Dev. Corp. v. Rea,*
    959 F. Supp. 2d 912 (E.D. Va. 2013) .......................................................................... 37

*Vico Prods. Co. v. Nat'l Lab. Rels. Bd.,*
    333 F.3d 198 (D.C. Cir. 2003) ..................................................................................... 10

*Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs,*
    714 F.3d 186 (4th Cir. 2013) ....................................................................................... 31

\*   *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
    435 U.S. 519 (1978) .................................................................................................... 39

*Wardrick v. Fed. Bureau of Prisons,*
    Civ. A. No. 19-0184, 2020 WL 1821133 (D.D.C. Apr. 10, 2020) ........................... 11

*Weaver v. Info. Agency,*
    87 F.3d 1429 (D.C. Cir. 1996) ..................................................................................... 22

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990) .................................................................................................... 20

*Wright v. Foreign Serv. Griev. Bd.,*
    503 F. Supp. 2d 163 (D.D.C. 2007) ............................................................................ 10

*Yee v. Jewell,*
    228 F. Supp. 3d 48 (D.D.C. 2017) ................................................................................ 9

**Statutes**

2 U.S.C. § 683 ................................................................................................................... 29

2 U.S.C. § 684 ................................................................................................................... 30

2 U.S.C. § 687 ............................................................................................................. 28, 29

5 U.S.C. § 701 ............................................................................................................. 38, 40

5 U.S.C. § 704 ....................................................................................................... 34, 36, 37

5 U.S.C. § 706 ................................................................................................................... 42

5 U.S.C. § 7703 ................................................................................................ 22

7 U.S.C. § 608c ............................................................................................... 25

15 U.S.C. § 2603 ............................................................................................. 43

28 U.S.C. § 1331 ............................................................................................. 21

28 U.S.C. § 1491 ............................................................................................. 27

29 U.S.C. § 669 ............................................................................... 13, 14, 27, 43

29 U.S.C. § 670 ............................................................................................... 42

29 U.S.C. § 671 ............................................................................................ 2, 14

29 U.S.C. § 673 ............................................................................................... 43

30 U.S.C. § 937 ............................................................................................. 3, 14

30 U.S.C. § 951 ............................................................................................ 2, 14

42 U.S.C. § 280e-5 ........................................................................................... 14

Further Consolidated Appropriations Act, 2024, Pub. Law 118-47, div. D,tit. II, 138 Stat. 460, 654 (Mar. 23, 2024) ........................................................................... 40, 41

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. Law 119-4 (Mar. 15,2025) ........................................................................................................... 40, 42

Impoundment Control Act of 1974, Pub. L. No. 93-344, tit. X,88 Stat. 297, 333 (1974).......... 28

**Rules**

Fed. R. Civ. P. 12 ......................................................................................... 10, 11

**Other Authorities**

Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11,2025) ....................................... 3, 4

Explanatory Statement, 170 Cong. Rec. H1501, H1889 (Mar. 22, 2024) ............................ 40, 42

Explanatory Statement, 170Cong. Rec. H1501, H1889 (Mar. 22, 2024) .............................. 40, 42

*Fact Sheet: HHS' Transformation to Make America Healthy Again*, Dep't of Health & Human Servs., https://www.hhs.gov/press-room/hhs-restructuring-doge-fact-sheet.html ..................35

*HHS Announces Transformation to Make America Healthy Again* (Mar. 27, 2025), Dep't of Health & Human Servs., https://www.hhs.gov/press-room/hhs-restructuring-doge.html ................................................................................. 7, 14, 15, 35, 36, 37, 43

John Roberts, *Article III Limits on Statutory Standi*ng, 42 Duke L. J. 1219 (1993) .................... 12

Off. of Personnel Mgm't, *Memorandum re: Guidance on Agency RIF & Reorganization Plans Requested* by Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative, https://www.opm.gov/policy-data-oversight/latest-me … ............................................................................................................................ 4, 5, 6

S. Rep. No. 118-84, at 82–84 (2023) ........................................................................... 40

Defendants Robert F. Kennedy, Jr. in his official capacity as Secretary of Health and Human Services (the "Secretary") and the Department of Health and Human Services ("HHS" or the "Department") respectfully move to dismiss Plaintiffs' Amended Complaint (ECF No. 26) in full pursuant to Federal Rules of Civil Procedure ("Rules") 12(b)(1) and 12(b)(6).

## INTRODUCTION

Plaintiffs are membership-based associations seeking to micromanage the Department's National Institute for Occupation Safety and Health ("NIOSH" or the "Institute"). Plaintiffs bring claims under the Administrative Procedure Act ("APA") challenging the Department's prerogatives and day-to-day operations, under the guise that those decisions may impact among other things, the data and information upon which Plaintiffs' members rely for research and advocacy activities.

Such micromanagement would be judicial overreach—there is no legal basis for Plaintiffs' APA claims. If these claims were otherwise allowed to proceed, the Court would be engaged in judicial review that would eliminate the discretion entrusted to the Secretary to run the Department's day-to-day operations as they relate to the Institute. Instead of the Executive Branch faithfully executing the laws of Congress, substantial aspects of a cabinet-level agency's operations would instead be put under the control of this Court.

This Court should dismiss the Amended Complaint in full. As an initial matter, the Court lacks jurisdiction over Plaintiffs' claims. Plaintiffs lack Article III standing, and any claims challenging federal employment actions or termination of grant funding do not belong in this Court. Even if this Court had subject matter jurisdiction, Plaintiffs also fail to challenge any discrete agency action or any agency action that is final. Ultimately, the Department's choices are within the discretion of the Executive, and Plaintiffs fail to demonstrate that many of the actions are contrary to law.

**BACKGROUND**

I.    **Statutory Background**

HHS is the federal agency charged with enhancing the health and well-being of Americans, including by fostering advances in the sciences underlying medicine, public health, and social services. *See* 42 U.S.C. §§ 3501 *et seq.* The Department currently consists of twenty-eight distinct staff and operating divisions. *See* HHS Organizational Charts Off. of Sec. & Divisions, Dep't of Health & Human Servs., https://www.hhs.gov/about/agencies/orgchart/index.html (last visited Aug. 19, 2025). One of these operating divisions is the Centers for Disease Control and Prevention ("CDC"), which includes NIOSH. *See id.*; CDC Organization and Leadership, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/about/organization/ (last visited Aug. 19, 2025).

The Occupational Safety and Health Act of 1970 (the "OSH Act") established NIOSH within HHS. 29 U.S.C. § 671(a). Under the OSH Act, the Institute is "authorized to (1) develop and establish recommended occupational safety and health standards; and (2) perform all functions of the Secretary of Health and Human Services under sections 669 and 670 of [the Act]." *Id.* § 671(c). Sections 669 and 670 delineate the Secretary's duties to conduct research, provide services, and make recommendations for the prevention of work-related injury and illness. *Id.* §§ 669-670.

The OSH Act, as amended by the Mine Improvement and New Emergency Response ("MINER") Act (29 U.S.C. § 671(h)), further requires there to be "permanently established within the Institute an Office of Mine Safety and Health," whose purpose is to "enhance the development of new mine safety technology and technological applications and to expedite the commercial availability and implementation of such technology in mining environments." 29 U.S.C. § 671(h)(1)-(2). The Federal Mine Safety and Health Act (the "Mine Act"), 30 U.S.C. § 951(a), furthermore states the Secretary is to conduct studies and research on mine (coal and other) worker

health and safety. Additionally, 30 U.S.C. § 937(b), requires the Secretary to "initiate research within [the Institute] . . . for the purpose of devising simple and effective tests to measure, detect, and treat respiratory and pulmonary impairments in active and inactive coal miners."

## II.    Factual Background

### A.    Executive Order 14210

On February 11, 2025, President Trump issued Executive Order 14210, "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative" (Workforce Executive Order). Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025). As relevant here, subpart c of Section 3—titled "Reductions in Force"—directs "Agency Heads [to] promptly undertake preparations to initiate large-scale reductions in force ("RIFs"), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs." *Id.* § 3(c). Further, it directs that "[a]ll offices that perform functions not mandated by statute or other law shall be prioritized in the RIFs, including all agency diversity, equity, and inclusion initiatives; all agency initiatives, components, or operations that my Administration suspends or closes; and all components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations as provided in the Agency Contingency Plans on the Office of Management and Budget website." *Id*. Finally, it directs that "[t]his subsection shall not apply to functions related to public safety, immigration enforcement, or law enforcement." *Id*.

The Workforce Executive Order further provides that, within thirty days of its issuance (*i.e.*, by March 13, 2025), "Agency Heads shall submit to" the Office of Management and Budget ("OMB") and U.S. Office of Personnel Management ("OPM") "a report that identifies any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities." *Id.* §

3(e). That report "shall discuss whether the agency or any of its subcomponents should be eliminated or consolidated." *Id.* The Executive Order also allows agency heads to "exempt from this order any position they deem necessary to meet national security, homeland security, or public safety responsibilities." *Id*. § 4(b). And it provides that it "shall be implemented consistent with applicable law and subject to the availability of appropriations." *Id*. § 5(b).

### B.    February 26, 2025, Workforce Memorandum

On February 26, 2025, OPM and OMB jointly issued a memorandum ("Workforce Memorandum") to agencies providing guidance for complying with the Workforce Executive Order. Off. of Personnel Mgm't, *Memorandum re: Guidance on Agency RIF & Reorganization Plans Requested by* Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative, [https://www.opm.gov/policy-data-oversight/latest-memos/guidance-on-agency-rif-and-reorganization-plans-requested-by-implementing-the-president-s-department-of-government-efficiency-workforce-optimization-initiative.pdf](https://www.opm.gov/policy-data-oversight/latest-memos/guidance-on-agency-rif-and-reorganization-plans-requested-by-implementing-the-president-s-department-of-government-efficiency-workforce-optimization-initiative.pdf).

The Workforce Memorandum noted that the Workforce Executive Order required agencies to submit reports by March 13, 2025, and that the Workforce Memorandum provides "guidance on these Agency RIF and Reorganization Plans ('ARRP'), along with the instruction that such plans be submitted to OMB and OPM." *Id.* at 1. Pursuant to this guidance, ARRPs were to seek to achieve five principles: (1) "Better service for the American people"; (2) "Increased productivity"; (3) "A significant reduction in the number of full-time equivalent (FTE) positions by eliminating positions that are not required"; (4) "A reduced real property footprint"; and (5) "Reduced budget topline." *Id.* at 1-2. "Pursuant to the President's direction, agencies should focus on the maximum elimination of functions that are not statutorily mandated while driving the highest-quality, most efficient delivery of their statutorily required functions." *Id.* at 2.

The Workforce Memorandum also identifies, in broad terms, "principles" agencies should consider in undertaking reorganization and reduction actions. Specifically, agencies should:

> seek to consolidate areas of the agency organization chart that are duplicative; consolidate management layers where unnecessary layers exist; seek reductions in components and positions that are non-critical; implement technological solutions that automate routine tasks while enabling staff to focus on higher-value activities; close and/or consolidate regional field offices to the extent consistent with efficient service delivery; and maximally reduce the use of outside consultants and contractors.

*Id.* at 2. In addition, the Workforce Memorandum directs agencies to "review their statutory authority and ensure that their plans and actions are consistent with such authority." *Id.*

The Workforce Memorandum states that agencies should submit ARRPs in two phases: Phase 1 ARRPs, to be submitted by March 13, 2025, which "shall focus on initial agency cuts and reductions," *id.* at 3; and Phase 2 ARRPs, to be submitted by April 14, 2025, which "shall outline a positive vision for more productive, efficient agency operations going forward," *id.* at 4.

Phase 1 ARRPs were to provide, among other things: a list of agency subcomponents or offices that provide direct services to citizens, any statutes that establish the agency or subcomponents thereof, any agency components and employees performing functions not mandated by statute or regulation who are not typically designated as essential during a lapse in appropriations, "[w]hether the agency or any of its subcomponents should be eliminated or consolidated; and which specific subcomponents or functions, if any, should be expanded to deliver on the President's priorities[,]" "[a] list by job position of all positions categorized as essential for purposes of exclusion from largescale RIFs," "[t]he agency's suggested plan for congressional engagement to gather input and agreement on major restructuring efforts and the movement of fundings between accounts," and the agency's timetable for implementation of each part of the Phase 1 ARRP. *Id.*

Phase 2 ARRPs were to provide, among other things:

- Confirmation that the agency has reviewed all its personnel data and plans to ensure that employees are grouped based on like duties and functions to the maximum extent possible;

- "The competitive areas for subsequent large-scale RIFs";

- All reductions (of FTE positions and otherwise);

- The agency's plan to ensure new career appointment hires are in highest-need areas;

- An explanation of how the ARRP will improve services for Americans and advance the President's priorities;

- "For agencies that provide direct services to citizens (such as Social Security, Medicare, and veterans' health care), the agency's certification that implementation of the ARRPs will have a positive effect on the delivery of such services" (a certification that "should include a written explanation from the Agency Head");

- Plans to improve efficiency and reduce costs through improved technology;

- "Any changes to regulations and agency policies, including changes that must be pursued through notice-and-comment rulemaking"; as well as the agency's timetable and plan for implementing the ARRP.

*Id.* at 5-6.

The Workforce Memorandum also delineates timing: it states that Phase 2 Plans should be planned for implementation by September 30, 2025. *Id.* at 4. With respect to RIFs, the Workforce Memorandum states that, before a RIF is implemented and an employee separated from service, there must be a formal RIF notice period of sixty days (or thirty days if the agency obtains an OPM waiver), in which affected employees are issued formal RIF notices, as well as provided appeal rights, career transition assistance, and priority placement options. *Id.* at 7.

### C.    The Department's Implementation of Executive Order 14210 and the Workforce Memorandum

In accordance with the Workforce Executive Order and the Workforce Memorandum, on March 27, 2025, as a step in the ARRP process, the Secretary publicly announced the planned reorganization of certain components of the Department. *HHS Announces Transformation to Make*

*America Healthy Again* (Mar. 27, 2025), Dep't of Health & Human Servs., https://www.hhs.gov/press-room/hhs-restructuring-doge.html ("March 27, 2025, Press Release"); Am. Compl. ¶ 33. The Secretary's announcement does not contemplate the elimination of any statutorily mandated Department programs or divisions. *See* March 27, 2025, Press Release. Instead, the focus of the planned reorganization and consolidation is the reduction of wasteful spending, increased efficiency, and increased responsiveness to the Americans' needs. *Id.*

Specifically, regarding the restructuring of programs and divisions, the Department plans to consolidate its existing twenty-eight divisions; centralize shared services including information technology, external affairs, human resources, and procurement; create a new Administration for a Healthy America to coordinate chronic care and disease prevention programs and harmonize health resources to low-income Americans more efficiently; appoint a new Assistant Secretary for Enforcement to combat waste, fraud, and abuse in federal health programs; and consolidate ten regional offices into five. *See* March 27, 2025, Press Release. The goal of the consolidation and streamlining of agency functions is to reduce redundancy and allow the Department to perform its core functions more efficiently. *Id.* As the announcement explained, the Department intends to accomplish its goals "without impacting critical services." *Id.*

As the ARRP process continues, the Department has in some instances determined that employees who had initially received RIF notices should be returned to work. For example, on April 1 and May 2, 2025, the Department issued RIF notices to certain NIOSH personnel. Am. Compl. ¶¶ 34, 36. However, the Department subsequently determined that the RIF notices of more than three hundred Institute employees should be rescinded and those employees returned to work. *Id.* ¶ 39. Accordingly, the impacted employees were provided notice in mid-May 2025, that they were no longer subject to the RIFs. *Id.*

As of now, further implementation of the RIFs has been enjoined with respect to NIOSH. *See New York v. Kennedy*, --- F. Supp. 3d ---, 2025 WL 1803260 (D.R.I. July 1, 2025). On July 8, 2025, the Supreme Court stayed the district court's order preliminarily enjoining the RIFs and reorganization at NIOSH in *Am. Fed. of Gov't Emps., AFL-CIO v. Trump*, --- F. Supp. 3d ---, 2025 WL 1482511 (N.D. Cal. May 22, 2025), pending further appeal. *See Trump v. Am. Fed. of Gov't Emps., AFL-CIO*, No. 24A1174 (application filed July 8, 2025).

### III.    Procedural Background

On May 14, 2025, Plaintiffs National Nurses United ("NNU"), New York State Nurses Association ("NYSNA"), California Nurses Association/National Nurses Organizing Committee ("CNA/NNOC"), American Federation of Teachers ("AFT"), United Mine Workers of America ("UMWA"), United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial, and Service Workers International Union, AFL-CIO ("USW"), International Association of Machinists and Aerospace Workers, AFL-CIO ("IAM"), National Federation of Federal Employees ("NFFE"), International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), Association of Occupational and Environmental Clinics ("AOEC"), Dentec Safety Specialists ("Dentec"), Local 983 District Council 37, AFSCME ("Local 983"), and American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO") filed suit bringing APA claims. ECF No. 1.

On July 2, 2025, Plaintiffs filed an Amended Complaint. ECF No. 26. Plaintiffs' Amended Complaint challenges the Department's (1) alleged "shutdown" of the Mining Research Divisions, the Division of Science Integration ("DSI"), Division of Field Studies and Engineering ("DFSE") branches, Health Effects Laboratory Division ("HELD"), and the Office of Extramural Coordination and Special Projects ("OECSP") within NIOSH; (2) alleged "termination" of the

Institute's research functions; and the (3) "cumulative shutdown" of the Institute. *See* Am. Compl. ¶¶ 85-157, ECF No. 26.

Plaintiffs' Amended Complaint raises seventeen claims under the APA. *Id.* First, Plaintiffs allege the shutdown of the NIOSH Mining Research Divisions and OECSP, as well as the termination of the Institute's research functions is contrary to law, contrary to the Impoundment Control Act, and arbitrary and capricious (Counts I-III, X-XV). Am. Compl. ¶¶ 85-97, 123-50. Second, Plaintiffs allege that the shutdown of the Institute's DSI, DFSE branches, HELD, and the "cumulative" shutdown of the Institute is contrary to law and arbitrary and capricious (Counts IV-IX, XVI-XVII). *Id.* ¶¶ 98-122, 151-57. Accordingly, Plaintiffs request the Court restore all these divisions and functions within the Institute and enjoin any further RIFs and restructuring. Am. Compl., Prayer for Relief.

## LEGAL STANDARDS

### I.    Rule 12(b)(1)

"One necessary condition for a case to come within this Court's limited subject-matter jurisdiction is that the plaintiff must have standing to pursue the case in federal court." *Travelers United, Inc. v. Hyatt Hotels Corp.*, 761 F. Supp. 3d 97, 109 (D.D.C. 2025) (citing *Attias v. Carefirst, Inc.*, 865 F.3d 620, 624 (D.C. Cir. 2017)). Additionally, "[t]he question of whether the United States has waived its sovereign immunity against suit[] . . . is, in the first instance, a question of subject matter jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988); *Yee v. Jewell*, 228 F. Supp. 3d 48, 53 (D.D.C. 2017) (subject matter jurisdiction turns on whether "Congress has waived the United States' immunity to suit").

A court must dismiss a case when it lacks subject matter jurisdiction pursuant to Rule 12(b)(1). To determine whether there is jurisdiction, the Court may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by

undisputed facts plus the court's resolution of disputed facts." *Vico Prods. Co. v. Nat'l Lab. Rels. Bd.*, 333 F.3d 198, 198 (D.C. Cir. 2003) (citations omitted); *see also Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) ("[T]he district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction.").

It is the plaintiff's burden to prove subject matter jurisdiction by a preponderance of the evidence. *Am. Farm Bureau v. EPA*, 121 F. Supp. 2d 84, 90 (D.D.C. 2000). "Although a court must accept as true all factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1), [a] plaintiff['s] factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Wright v. Foreign Serv. Griev. Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007) (internal citations and quotation marks omitted). A court need not accept as true "a legal conclusion couched as a factual allegation" or an inference "unsupported by the facts set out in the complaint." *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (cleaned up).

## II.    Rule 12(b)(6)

A motion under Rule 12(b)(6) tests whether a complaint has successfully "state[d] a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). While detailed factual allegations are not necessary to withstand a Rule 12(b)(6) challenge, a plaintiff must nonetheless provide "more than labels or conclusions" or "a formulaic" recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

A claim is facially plausible only when a plaintiff pleads factual content that enables the Court to "draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. While the Court must assume that any "well-pleaded factual allegations"

- 10 -

in a complaint are accurate, conclusory allegations "are not entitled to the assumption of truth." *Id.* at 679. Furthermore, the Court "need not accept inferences drawn by the plaintiff if such inferences are unsupported by the facts set out in the complaint. Moreover, the court is not bound to accept as true a legal conclusion couched as a factual allegation." *Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*, 937 F. Supp. 2d 18, 27 (D.D.C. 2013) (internal quotation marks and citations omitted). A complaint that "pleads facts that are merely consistent with a defendant's liability, [] stops short of the line between possibility and plausibility of entitlement to relief," and is insufficient to withstand a Rule 12(b)(6) motion to dismiss. *Iqbal*, 556 U.S. at 679 (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

In considering a Rule 12(b)(6) motion, a court may consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." *Wardrick v. Fed. Bureau of Prisons*, Civ. A. No. 19-0184, 2020 WL 1821133, at *4 (D.D.C. Apr. 10, 2020) (quoting *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017)). In particular, the Court may take judicial notice of information posted on official public websites of government agencies, *see, e.g., Markowicz v. Johnson*, 206 F. Supp. 3d 158, 161 n.2 (D.D.C. 2016) (Contreras, J.) (citing *Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Human Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) (Contreras, J.) ("Courts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies.") (citing *Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013) (taking judicial notice of document posted on D.C. public website)))), as well as court records, *Veg-Mix, Inc. v. U.S. Dep't of Agric.*, 832 F.2d 601, 607 (D.C. Cir. 1987) (holding that "[c]ourts may take judicial notice of official court records").

**ARGUMENT**

**I.**    **Plaintiffs Lack Standing.**

Plaintiffs lack Article III standing. Standing is a "bedrock constitutional requirement." *United States v. Texas*, 599 U.S. 670, 675 (2023). It requires that a plaintiff "possess a personal stake" in the outcome, which "helps ensure that courts decide litigants' legal rights in specific cases, as Article III requires." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024). Standing doctrine thus "serves to protect the 'autonomy' of those who are most directly affected so that they can decide whether and how to challenge the defendant's action." *Id.* at 379–80. The standing doctrine further ensures that "'the Framers' concept of the proper—and properly limited—role of the courts in a democratic society' is vindicated, by ensuring decisions meant for the political process are left to the political process." *Coal. for Humane Immigrant Rts. v. Dep't of Homeland Sec.*, Civ. A. No. 25-0943 (TNM), 2025 WL 1078776, at *4 (D.D.C. Apr. 10, 2025) (quoting John Roberts, *Article III Limits on Statutory Standing*, 42 Duke L. J. 1219, 1220 (1993)).

Under any theory of standing, "the irreducible constitutional minimum" requires, (1) the plaintiff must have suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) there must exist "a causal connection between the injury and the conduct complained of"; and (3) it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of Animals v. Jewell*, 828 F.3d 989, 991–92 (D.C. Cir. 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Plaintiffs can demonstrate standing through informational standing. *FEC v. Akins*, 524 U.S. 11, 25 (1998). Membership-based associations like Plaintiffs can also establish standing through "organizational standing" to sue on behalf of themselves, *see People for Ethical Treatment of Animals v. U.S. Dep't of Agric. (PETA)*, 797 F.3d 1087, 1093 (D.C. Cir. 2015), or "associational

standing" to sue on behalf of their members, *see Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Plaintiffs here fail to sufficiently allege any kind of standing.

### A.    Plaintiffs Fail to Demonstrate Informational Standing.

To show informational standing, Plaintiffs have the burden of proving two elements: "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals*, 828 F.3d at 992 (cleaned up). Nonetheless, "[a]ny informational injury still must meet the traceability and redressability prongs of the traditional standing analysis." *Architects & Eng'rs for 9/11 Truth v. Raimondo*, Civ. A. No. 21-2365 (TNM), 2022 WL 3042181, at *3 (D.D.C. Aug. 2, 2022) (citing *Akins*, 524 U.S. at 25), *aff'd*, No. 22-5267, 2023 WL 6439491 (D.C. Cir. Oct. 3, 2023).

To a significant extent, many of the Plaintiffs' allegations do not make it past the first element of informational standing. In many instances, they show no current or imminent deprivation of information to which they are legally entitled.

Many of the Plaintiffs complain of an injury based on some allegedly unavailable information that is not required to be provided by a particular division or on a particular timeline. For example, the union Plaintiffs allege harm from them and their members not having access to an updated *NIOSH Pocket Guide to Chemical Hazards.* Am. Compl. ¶ 69. But the applicable statute requires the Secretary to update a list of toxic substances only "as needed but at least annually." 29 U.S.C. § 669(a)(3), (6). The same is true for the *NIOSH Manual of Analytical Methods* that Plaintiffs USW and UAW allege that they and their members "rely on." Am. Compl. ¶ 69. The applicable statute only requires the Secretary to "develop and publish at least annually" "criteria for identifying toxic substances." 29 U.S.C. § 669(a)(2). Other Plaintiffs, such as AOEC and AFL-CIO, generally claim that they and their members rely on Institute "publications,"

"research," and "recommendations," to which they no longer have access. *See* Am. Compl. ¶¶ 70-71, 84. None of these Plaintiffs specify a time since the March 27, 2025, Press Release that any of these publications, research, and recommendations "needed" to be updated, published, or released, and were not. In this way, these Plaintiffs' allegations are grounded in mere speculation that they or their members will not have access to the same or similar data or information in the future, which does not constitute cognizable harm. *See* Am. Compl. ¶¶ 72, 84; *Elec. Priv. Info. Ctr. v. FAA,* 892 F.3d 1249, 1255 (D.C. Cir. 2018) (requiring "nature of the injury alleged" not to be "speculative"); *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 379 (D.C. Cir. 2017) ("Speculation is ordinarily fatal to standing").

In some instances, Plaintiffs identify information that statutes do require the Department to collect or provide and that they allege is not presently being provided. The research and information from the Pittsburg and Spokane Mining Research Divisions, *see* 30 U.S.C. § 937(b); *id.* § 951(a)-(b); *id.* § 811(a)(1); 29 U.S.C. § 671(h); the data analysis provided in the National Firefighter Registry for Cancer, 42 U.S.C. § 280e-5(a)-(h); Institute research on the occupational safety and health of firefighters, *see* 29 U.S.C. § 669(a)(2), (a)(4), (a)(7), and Health Hazard Evaluation determinations, *see id.* § 669(a)(6), arguably fall in this category.

As an initial matter, the Plaintiffs UMWA, USW, NFFE (who allege they rely on such research and data to support and advocate for the miners or firefighters they represent), and the union Plaintiffs (including AFT, USW, and IAM) that rely on Health Hazard Evaluation determinations, do not show that this information is being intentionally withheld or indefinitely suspended, and it is not clear that it has been allegedly unavailable long enough to violate any statutory requirement. *See* Am. Compl. ¶¶ 73-80. Indeed, Plaintiff USW does not even claim that NIOSH has refused to complete two of its Health Hazard Evaluation requests. Rather, Plaintiff

USW acknowledges that the Institute "reopened or offered to open [its] first two evaluations" after some Institute RIF notices were rescinded. *See id.* ¶ 74. Instead, USW only complains the Institute will not be able to "adequately" complete the requests based on the Institute's restructuring and staffing choices. *See id.* ¶ 74. But given the Workforce Executive Order's direction to implement ARRPs consistent with applicable law and the Department's stated intention to proceed "without impacting critical services," the reasonable interpretation is that there may be a temporary lapse in providing the information or research rather than a refusal to provide statutorily mandated services. *See* March 27, 2025, Press Release.

Nonetheless, even if Plaintiffs and their members could show an informational injury— only one part of the chain they must show for standing—in many cases they cannot connect it to a statutory violation rather than an exercise of proper discretion. "The decision to undertake a reorganization necessitating a [reduction in force] is within the discretion of the agency," *McKenna v. Dep't of Interior*, 996 F.2d 1235 (Fed. Cir. 1993). Any programmatic decisions regarding the Institute's handling of its statutorily required duties or responsibilities are likewise committed to agency discretion. *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 891 (1990); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). Yet Plaintiffs ask this Court to insert itself into this process, and, in the name of equity, issue a sweeping injunction freezing in place the Institute's programmatic structure. And Plaintiffs ask this Court to do so notwithstanding the Secretary's differing judgment about how the Institute should operate. Having crossed—in Plaintiffs' mind— some threshold for programmatic change that is as unarticulated as it is inarticulable, Plaintiffs ask this Court to step in and manage the Department's day-to-day operations. That is not the law.

### B.    Plaintiffs Fail to Demonstrate Organizational Standing.

To establish organizational standing based on alleged lack of services or grant funding, a plaintiff must demonstrate "that the defendant's actions cause a 'concrete and demonstrable injury

to the organization's activities' that is 'more than simply a setback to the organization's abstract social interests.'" *Elec. Priv. Info. Ctr.*, 878 F.3d at 378 (cleaned up). "For an organizational plaintiff to demonstrate that it has suffered an injury in fact, it must show 'more than a frustration of its purpose,' since mere hindrance to a nonprofit's mission 'is the type of abstract concern that does not impart standing.'" *Coal. for Humane Immigrant Rts.*, 2025 WL 1078776, at *4 (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (cleaned up)). Thus, to determine whether a plaintiff's allegations are sufficient to convey organizational standing, a court must find that the plaintiff satisfied two prongs: (1) the defendants' "action or omission . . . injured [the plaintiff's] interest;" and (2) that the plaintiff "used its resources to counteract that harm." *Elec. Priv. Info. Ctr.*, 878 F.3d at 378 (quoting *PETA*, 797 F.3d at 1094).

First, "[t]o allege an injury to its interest, an organization must allege that the defendant's conduct perceptibly impaired the organization's ability to provide services in order to establish injury in fact." *Food & Water Watch*, 808 F.3d at 919 (quoting *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015)) (cleaned up). "An organization's ability to provide services has been perceptibly impaired when the defendant's conduct causes an inhibition of [the organization's] daily operations." *Id.* (cleaned up).

As an initial matter, neither Plaintiff Dentec nor Local 983 allege what if any, organizational injury, it has suffered from the alleged restructuring at the Department. *See* Am. Compl. ¶¶ 68-84.

Other union Plaintiffs, including AFT, USW, and IAM, allege organizational harm by pointing to the alleged cessation of Health Hazard Evaluations requests, which generally affect their missions to provide advocacy and education services on behalf of its members. *See* Am. Compl. ¶¶ 73-76. Many of the Plaintiffs merely allege that it will be harder to perform their

advocacy and education efforts given the Department's restructuring and RIFs. *See* Am. Compl. ¶¶ 69-72, 77-78, 80. But, as this Court has noted, "It will not suffice if the plaintiff can only assert an injury that arises from the effect . . . on the organizations' lobbying activities, or the service impaired is pure issue-advocacy." *Env't Working Grp. v. United States Food & Drug Admin.*, 301 F. Supp. 3d 165, 171 (D.D.C. 2018) (McFadden, J.) (cleaned up) (quoting *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161-62 (D.C. Cir. 2005)).

Nor can these union Plaintiffs establish organizational injury in other ways. The union Plaintiffs allege that the Institute's cessation of consideration of their Health Hazard Evaluation requests deny them "critical, often life-saving information and recommendations to address safety hazards in the workplace." Am. Compl. ¶ 76. In another instance, Plaintiff AOEC speculates that it will not receive upcoming Education and Research Centers and Training Project grants, and its Occupational Health Internship Program will be shut down. *See id.* ¶¶ 81-83. As an initial matter, this is mere speculation. Plaintiff AOEC itself acknowledges that the Institute "has informally indicated it intends to continue funding OECSP-supported centers, grants, and programs in the fiscal year that begins on July 1, 2025," but merely expresses frustration that the Institute has not yet taken actions to do so. *See id.* ¶ 66. But even so, Plaintiff AOEC only alleges that the purported impending lack of grant funding will not enable it to pay its executive officers' salaries, require it to "reorganize its operations," close its summer program, and cause it some reputational harm. *See id.* ¶ 82. Ultimately, none of the organizational Plaintiffs allege that the lack of such services will "inhibit[] [their] daily operations." *Action All. of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931, 937–38 (D.C. Cir. 1986). And the mere fact that the Department's ongoing restructuring and RIF plans may make it "more difficult" to carry out some but not necessarily all these Plaintiffs' operations does not meet any of the Plaintiffs' burden to establish organizational

standing. *See Coal. for Humane Immigrant Rts.*, 2025 WL 1078776, at *6 (organizational standing not satisfied where challenged government action merely "has made [] advocacy efforts more difficult to achieve" (cleaned up)).

Second, and critically, here, none of the Plaintiffs posit any allegations in support of the second prong of the test. *See* Am. Compl. Specifically, Plaintiffs do not allege that they "used [their] resources to counteract" their identified harm, the purported loss of access to Institute data, research, information, or services. *See id.* And Plaintiffs may not rely on "'self-inflicted budgetary choices,'" such as "litigation costs or extra advocacy efforts" to establish the second prong. *See Pharm. Rsch. & Manufacturers of Am. v. Dep't of Health & Hum. Servs.*, 656 F. Supp. 3d 137, 157 (D.D.C. 2023) (quoting *Elec. Priv. Info. Ctr.*, 878 F.3d at 379).

Thus, for these reasons, Plaintiffs fail to allege organizational standing.

### C.    Plaintiffs Fail to Demonstrate Associational Standing.

Plaintiffs fail to demonstrate associational standing. To show associational standing, an organization must demonstrate that "(1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).

"When a petitioner claims associational standing, it is not enough to aver that unidentified members have been injured." *Chamber of Com. of U.S. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011). "Rather, the petitioner must specifically 'identify members who have suffered the requisite harm.'" *Id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)); *see also Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 815, 820 (D.C. Cir. 2006); *Ctr. for Biological Diversity v. Nishida*, Civ. A. No. 21-119 (RDM), 2021 WL 827189, at *2 (D.D.C. Mar. 4, 2021) (finding "[t]he associational-standing doctrine demands more" where organizational plaintiff

failed to identify "who specifically will suffer harm–and when, how, or why they will suffer it"); *Conf. of State Bank Supervisors v. Off. of Comptroller of Currency*, 313 F. Supp. 3d 285, 299 (D.D.C. 2018) ("[Plaintiff] fails to identify in its complaint which particular member of the organization has been harmed. . . . In this way, the complaint runs afoul of the baseline requirement to identify a particular member of the organization that was injured."). Indeed, "at least three courts in this district have required an associational plaintiff to identify an injured member *by name* at the motion to dismiss stage." *Conf. of State Bank Supervisors*, 313 F. Supp. 3d at 298–99 (citing cases) (emphasis in original).

Here, Plaintiffs have not identified in their Amended Complaint any specific members who have been allegedly harmed by Defendants' actions. *See* Am. Compl.

But even if the Court were to evaluate the standing of the unidentified members, for the reasons stated above that doom their informational and organizational standing, Plaintiffs have failed to show that their members have suffered any concrete redressable injury from the alleged lack of information, research, data, services, or grant funding from the RIFs and reorganizational efforts at the Department. *See supra* §§ I.A-B.

For instance, the union Plaintiffs allege the lack of responses to their Health Hazard Evaluation requests will lead to their members' "injury, illness, and premature death." *Id.* ¶ 76. Such injury though relies on a chain of inferences that there is actually a health hazard in the locations that are the subject of their requests, that NIOSH will not complete a Health Hazard Evaluation, that had it completed an evaluation, it would have determined  a hazard is present, and that the health hazard would indeed be as deleterious as Plaintiffs suggest. Such a chain of possibilities is far too speculative to satisfy any injury requirement. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) (a "highly attenuated chain of possibilities" "does not satisfy the

requirement that threatened injury must be certainly impending"); *see also Summers*, 555 U.S. at 490-500 (rejecting a standing theory premised on a speculative chain of possibilities); *Whitmore v. Arkansas*, 495 U.S. 149, 157-60 (1990) (same).

Plaintiff AOEC further claims that its members will suffer from the loss of Institute funding of academic training programs by "limiting the availability" of such educated providers and experts. *See* Am. Compl. ¶ 83. As noted above, it is only speculation that Plaintiff AOEC will not receive the appropriate grant funding. *See supra* § I.B. Moreover, this conclusion relies on the presumption that these training facilities are the only avenue for making providers and experts available. In this way, Plaintiffs have not demonstrated that their members have suffered any harm yet, or that they certainly will. Rather, the harms they allege are precisely the sort of alleged injury and "attenuated chain of possibilities" that "do[] not satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410; *see also Summers*, 555 U.S. at 499-500; *Whitmore*, 495 U.S. at 157-60.

Thus, for this reason, Plaintiffs also fail to demonstrate associational standing.

**D.    The Court Should Decline to Find Standing to Allow Plaintiffs to Micromanage Federal Personnel Policies.**

Ultimately, Plaintiffs have failed to identify any "case or historical practice" offering precedent for the notion that courts can micromanage federal personnel policies to produce particular downstream effects. *Texas*, 599 U.S. at 677. On their theory of harm, any plaintiff purportedly aggrieved by deficient government services might even seek to compel terminations of underperforming employees and then compel the government to hire better workers in their place. Or a plaintiff might seek to require that the Executive Branch put in place an ARRP with different goals and directives. "[I]nterpos[ing] the federal courts as virtually continuing monitors of the wisdom and soundness of . . . administration," however, is "contrary to the more modest

role Article III envisions." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 346 (2006) (cleaned up); *see also Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985). In short, an injury based on information or services not being provided in the way Plaintiffs prefer is not one "traditionally thought to be capable of resolution through the judicial process." *Texas*, 599 U.S. at 676 (citation omitted).

At minimum, a handful of particularized allegations of some delay or disruption in a government services cannot justify sweeping relief reinstating hundreds of employees across an entire Department or freezing in place an entire restructuring effort. *Cf. All. for Hippocratic Med.*, 602 U.S. at 402 (Thomas, J., concurring) (reasoning that "no party should be permitted to obtain an injunction in favor of nonparties"). Were the Court to find that Plaintiffs are entitled to particular information or services that they did not receive within a required timeframe, they would at most have standing to seek provision of such information or services—not an order requiring the Department to provide it in a particular fashion or with particular staff. Courts may not grant relief for supposed injuries that goes far beyond redressing the injury itself. *See Gill v. Whitford*, 585 U.S. 48, 73 (2018).

## II.    The Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Claims Arising from Federal Employment.

Although district courts have jurisdiction over civil actions arising under federal law, *see* 28 U.S.C. § 1331, "Congress may preclude district court jurisdiction by establishing an alternative statutory scheme for administrative and judicial review." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump* ("*AFGE*"), 929 F.3d 748, 754 (D.C. Cir. 2019). As detailed below, Congress has precluded jurisdiction for the claims brought by Plaintiffs challenging the Department's RIFs.

The Civil Service Reform Act ("CSRA") and Federal Service Labor-Management Relations Statute ("FSL-MRS"), which is set forth within the CSRA, together provide a

comprehensive "scheme of administrative and judicial review" for resolving both disputes between employees and their federal employers and disputes brought by unions representing those employees. *AFGE*, 929 F.3d at 752 (regarding FSL-MRS); *see Graham v. Ashcroft*, 358 F.3d 931, 933 (D.C. Cir. 2004) (regarding CSRA more broadly). In these statutes, Congress provided that most federal labor and employment disputes must first be administratively exhausted before the employing agency and the applicable administrative review board—either the Merit Systems Protection Board for employment disputes, the Federal Labor Relations Authority for labor disputes, or the Office of Special Counsel for certain "prohibited personnel practices." Judicial review, if any, is generally available only following the exhaustion of administrative review. *See AFGE*, 929 F.3d at 752 (citing 5 U.S.C. §§ 7105, 7123(a), (c)); *United States v. Fausto*, 484 U.S. 439, 448–50 (1988)); *see also* 5 U.S.C. § 7703(b) (providing for judicial review in the Federal Circuit or other court of appeals).

"Personnel actions" that fall within the Office of Special Counsel's purview include "any. . . significant change[s] in duties, responsibilities, or working conditions." 5 U.S.C. § 2302(a)(2)(A)(xii). The CSRA enumerates thirteen circumstances under which personnel actions become "prohibited personnel practices," which must be brought before the Office of Special Counsel in the first instance. *Id*. § 2302(b). One of those thirteen "prohibited personnel practices" occurs when a "personnel action" violates "any law, rule, or regulation implementing, or directly concerning, the merit system principles" listed in the statute. *Id*. § 2302(b)(12). These principles require, in relevant part, "proper regard for [employees'] constitutional rights." *Id*. § 2301(b)(2). Consequently, personnel actions that implicate violations of constitutional rights are prohibited personnel practices that generally fall within the CSRA's exclusive remedial scheme. *See, e.g.*, *Weaver v. Info. Agency*, 87 F.3d 1429, 1432 (D.C. Cir. 1996).

In *AFGE*, the D.C. Circuit applied the "two-step framework set forth in" *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) to conclude that the union plaintiffs in that case could not challenge in district court three executive orders related to federal employment. *AFGE*, 929 F.3d at 754. Under that framework, district courts lack jurisdiction over suits like this one when the intent for exclusive review in the court of appeals is "(i) fairly discernible in the statutory scheme, and (ii) the litigant's claims are of the type Congress intended to be reviewed within [the] statutory structure." *See id.* at 755 (citations omitted).

The Supreme Court repeatedly has held that the CSRA provides the exclusive means of redressing employment disputes involving federal employees. *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 10–15 (2012); *Fausto*, 484 U.S. at 455. Likewise, the D.C. Circuit repeatedly has recognized that the FSL-MRS and the CSRA readily satisfy the first prong of the *Thunder Basin* framework. *See AFGE*, 929 F.3d at 755 (concluding that union plaintiffs could not challenge in district court three executive orders related to federal employment); *Fornaro v. James*, 416 F.3d 63, 66 (D.C. Cir. 2005); *but see Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023). In other words, Congress intended to make the FSL-MRS and CSRA the exclusive scheme, and they satisfy the first step of the two-step *Thunder Basin* framework.

As to covered actions, beyond restricting judicial review of covered constitutional claims, the CSRA prevents district courts from deciding the merits of APA claims challenging an agency's "'systemwide'. . . policy interpreting a statute," its "implementation of such a policy in a particular case," *Nyunt v. Chairman, Broad. Bd. of Govs.*, 589 F.3d 445, 449 (D.C. Cir. 2009) (quoting *Fornaro*, 416 F.3d at 67–69), or its decision to engage in "'a *type* of personnel action' the [CSRA] does not cover," *Mahoney v. Donovan*, 721 F.3d 633, 635–36 (D.C. Cir. 2013) (emphasis in original); *see generally Grosdidier v. Chairman, Broad. Bd. of Govs.*, 560 F.3d 495, 497 (D.C.

Cir. 2009) (holding that federal employees "may not circumvent the [CSRA's] requirements and limitations by resorting to the catchall APA to challenge agency employment actions"). As the D.C. Circuit put it bluntly: "what you get under the CSRA is what you get," even if what you get is nothing at all. *Fornaro*, 416 F.3d at 67.

The D.C. Circuit recently found the CSRA precluded two employee union organizations' suits over the loss of their members' employment related to actions taken at the Consumer Financial Protection Bureau ("CFPB" or "Bureau"). *See Nat'l Treasury Emps. Union v. Vought ("NTEU")*, --- F.4th ---, No. 25-5091, 2025 WL 2371608, **4-6 (D.C. Cir. Aug. 15, 2025).

Here, Plaintiffs seek among other things, to declare the Department's RIFs and reorganization unlawful and "enjoin Defendants to reverse these actions." Am. Compl., Prayer for Relief. But allowing a stranger to the federal-employment relationship such as Plaintiffs to raise claims in this Court that the affected federal employees themselves cannot raise would upend the entire reticulated process Congress set out in the exclusive statutory schemes of the CSRA and other employment statutes. The "exclusion" of Plaintiffs "from the provisions establishing administrative and judicial review for personnel action" of the type challenged here "prevents [Plaintiffs] from seeking review" under other provisions. *Fausto*, 484 U.S. at 455; *see also Grosdidier*, 560 F.3d at 497 ("[T]he CSRA is the exclusive avenue for suit even if the plaintiff cannot prevail[.]").

When a comprehensive scheme of the sort at issue here permits review at the behest of some types of plaintiffs but not others, it implicitly precludes review by plaintiffs who are not authorized to bring claims. For example, *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 347 (1984) considered a statute that permitted dairy handlers to obtain review of certain "market orders" after exhausting administrative remedies, but did not authorize review by anyone else. *See id.* at 346

(citing 7 U.S.C. § 608c). When a group of dairy consumers sought review of a marketing order, the Supreme Court explained that the statute omits a "provision for participation by consumers in any proceeding," and that "[i]n a complex scheme of this type, the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process." *Id.* at 347. Hence, the "structure of this Act indicates that Congress intended only producers and handlers, and not consumers, to ensure that the statutory objectives would be realized." *Id.* And the "restriction of the administrative remedy to handlers strongly suggests that Congress intended a similar restriction of judicial review of market orders." *Id.* Any other holding would facilitate circumvention of the comprehensive statutory scheme. *See id.* at 348.

The principles described in *Block* fully apply to the CSRA and other employment statutory schemes. *See Fausto*, 484 U.S. at 448 (applying *Block* to conclude that certain employees who lack CSRA appeal rights "should not be able to demand judicial review for the type of personnel action covered by that chapter"); *see also Thunder Basin*, 510 U.S. at 207 (citing *Block* for governing standards in determining if review is precluded). Because Congress intentionally foreclosed judicial review by parties other than those whom it specifically authorized to seek relief, Plaintiffs, who are not employees of the Department, certainly cannot challenge the Department's employment actions either.

Furthermore, even setting aside Plaintiffs' lack of any role in the federal employment relationship, Plaintiffs' arguments for bypassing Congress's statutory procedures are unpersuasive. Plaintiffs' artful labeling of this suit as a challenge to the "cumulative effect" of the Department's actions that allegedly "render [the Institute] functionally incapable of carrying out its core research mission," Am. Compl. ¶ 4, is not dispositive. Even where challengers "frame their suit as a systemwide challenge to" agency "policy" rather than individual benefits determinations,

the exclusive review procedures for federal employees remain mandatory. *Fornaro*, 416 F.3d at 67–68 (Roberts, J., for the Court); *accord Nyunt*, 589 F.3d at 448–49 (rule that federal employees may not use APA challenge to "circumvent" CSRA process "applies to a 'systemwide challenge' to an agency policy interpreting a statute just as it does to the implementation of such a policy in a particular case") (Kavanaugh, J., for the Court); *see also Lacson v. Dep't of Homeland Sec.*, 726 F.3d 170, 175 (D.C. Cir. 2013) (describing *Elgin* as having "echoed and amplified the approach taken" in D.C. Circuit cases such as *Fornaro* and *Nyunt*). So should this Court accept Plaintiffs' characterization of their suit as a "systematic" challenge, that would not allow them to "bypass" the FSL-MRS and CSRA. *See Am. Foreign Serv. Ass'n v. Trump*, Civ. A. No. 25-352 (CJN), 2025 WL 573762, at *11 (D.D.C. Feb. 21, 2025).

Nor are Plaintiffs' challenges to the RIFs "wholly collateral" to the statutory review provisions at issue. "This consideration is related to whether meaningful judicial review is available," but focuses on "whether the plaintiffs aim[] to seek the same relief they could obtain in the agency proceeding." *AFGE*, 929 F.3d at 759–60 (quotation marks omitted). Surely they do—based on the relief the Amended Complaint seeks, Plaintiffs at this point seek to "[d]eclare that Defendants' execution of a comprehensive set of RIFs and reorganizations that so degrade [the Institute's] functionality as to render it incapable of performing its statutory is unlawful and enjoin Defendants to reverse these actions." Am. Compl., Prayer for Relief. Proceedings before the administrative agencies could culminate in that relief. *See, e.g.*, *Payne v. Biden*, 62 F.4th 598, 607 (D.C. Cir.), *judgment vacated as moot*, 144 S. Ct. 480 (2023) (MSPB can resolve "challenges to adverse employment actions").

Ultimately, allowing separate litigation by the instant Plaintiffs would "seriously undermine[]" "[t]he CSRA's objective of creating an integrated scheme of review," *Elgin*, 567

U.S. at 14, and harm "the development . . . of a unitary and consistent Executive Branch position on matters involving personnel action," *Fausto*, 484 U.S. at 449. Thus, the Court does not have jurisdiction to review any of Plaintiffs' claims challenging the Department's RIFs.

### III.    The Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Challenge to the Termination of the Institute's Grants.

Plaintiffs have not actually alleged that any of its grants have been terminated. *See* Am. Compl. ¶¶ 66, 81. Insofar as Plaintiffs seek reinstatement or continuation of any Institute grants, the proper course would be for the parties to those grants to seek appropriate recourse under the terms of the grants. Any challenges to the termination of the Institute's grants are not subject to this Court's jurisdiction.

Under the Tucker Act, any claim based on "an express or implied contract with the United States" must be brought in the Court of Federal Claims. 28 U.S.C. § 1491(a)(1). The Supreme Court recently reaffirmed this jurisdictional line in *Dep't of Educ. v. California*, 145 S. Ct. 966, 967 (2025)*,* which noted that " the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money'" along the lines of what the District Court ordered here. *See also U.S. Conf. of Catholic Bishops v. Dep't of State*, Civ. A. No. 25-465 (TNM), 2025 WL 763738, at *4 (D.D.C. Mar. 11, 2025), *appeal docketed* No. 25-5066 (D.C. Cir.).

To determine if an action is "at its essence a contract action," this Court looks at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (cleaned up).

Neither the OSH Act nor the APA can act as the sources of Plaintiffs' rights to the continuation of the cancelled contracts. The OSH Act does not require the Institute to maintain any particular grants that have already been rewarded. *See* 29 U.S.C. § 669(a)(1); *id.* § 670(1) (permitting NIOSH to perform its delineated functions "directly *or* by grants or contracts."

(emphasis added)). Given that Plaintiffs essentially seek maintenance of the status quo at the Institute, *see* Am. Compl., Prayer for Relief, they essentially seek to maintain the current grant funding as it is, meaning that the source of Plaintiffs' challenge lies within those specific grants themselves. Moreover, the APA is irrelevant, as the APA itself does not grant jurisdiction where another statutory scheme, here the Tucker Act, applies. *See Albrecht v. Comm. on Emp. Benefits of Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004).

In any event, the latter *Megapulse*, 672 F.2d at 968, factor is dispositive here. Plaintiffs "seek[] the classic contractual remedy of specific performance." *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985); *Conf. of Catholic Bishops*, 2025 WL 763738, at *7-8. But this Court cannot order the government to continue to perform under a contract. *Spectrum*, 764 F.2d at 894. Such a request for an order that the government "must perform" on its contract is one that "must be resolved by the Claims Court." *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 80 (D.C. Cir. 1985); *see also California*, 145 S. Ct. at 967. Indeed, this Court has already held that there was no jurisdiction to hear a claim by a federal grantee seeking specific performance on a federal grant agreement. *See Conf. of Catholic Bishops*, 2025 WL 763738, at *6 ("[t]he Court squints in vain to see any daylight. Like those plaintiffs, the [plaintiff] asks the Court to order the Government to cancel the termination, pay money due, and reinstate the contracts. That is something this Court lacks the power to do.").

In sum, this Court lacks jurisdiction over the claims challenging the Department's alleged impending cancellation of any grants.

## IV.    **Plaintiffs Cannot Bring a Claim under the Impoundment Control Act.**

Under the Impoundment Control Act of 1974, Pub. L. No. 93-344, tit. X, 88 Stat. 297, 333 (1974) (codified as amended at 2 U.S.C. §§ 681 et seq.), under 2 U.S.C. § 687, appropriated funds "shall be made available for obligation" unless the President transmits a special message to

Congress and Congress rescinds the appropriation. 2 U.S.C. § 683(b). But the Impoundment Control Act enforces Congress's power over the purse in relation to the Executive. *See Dabney v. Reagan*, 542 F. Supp. 756, 760 (S.D.N.Y. 1982). It provides for enforcement by the Comptroller General (an official in the Legislative Branch), not private parties under 2 U.S.C. § 687. Accordingly, courts have held that private plaintiffs cannot bring suit for alleged violations of the Impoundment Control Act. *See Gen. Land Off. v. Biden*, 722 F. Supp. 3d 710, 734 (S.D. Tex. 2024) (citing 2 U.S.C. § 687) ("In short, an alleged [Impoundment Control Act] violation has only one proper plaintiff: the Comptroller General."); *Pub. Citizen v. Stockman*, 528 F. Supp. 824, 830 & n.1 (D.D.C. 1981). So too should this Court. *Gen. Land Off.*, 722 F. Supp. 3d at 735 (finding such a claim "unreviewable").

Indeed, the D.C. Circuit recently affirmed that grantees suing over the freezing of their grant funding "have no cause of action to undergird their APA contrary-to-law claim" premised on violations of the Impoundment Control Act. *Glob. Health Council v. Trump*, --- F.4th ---, No. 25-5097, 2025 WL 2326021, at *11 (D.C. Cir. Aug. 13, 2025). The D.C. Circuit reasoned that the grantee's APA claims were precluded by the Impoundment Control Act's complex statutory scheme, which permits only the Comptroller General to bring suit related to any violations of the statute. *See id.* Thus, likewise, the Court should find that Plaintiffs here cannot ground their APA claims based on purported violations of the Impoundment Control Act or raise any separate claims under the Impoundment Control Act.

Even so, as noted above, the ARRP is ongoing, and the Department is currently enjoined from further implementation of the ARRP with respect to NIOSH. Congress has previously "acknowledged that 'the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year' and such delays may result from the 'normal and orderly

- 29 -

operation of the government.'" *See City of New Haven v. United States*, 809 F.2d 900, 901 (D.C. Cir. 1987) (quoting H.R. Rep. No. 93-658, 93d Cong., 1st Sess. 41 (1971)). As a result, at best, Plaintiffs' challenges under the Impoundment Control Act are not yet ripe. *See City of L.A. v. Lyons*, 461 U.S. 95, 105 (1983).

Even if Plaintiffs' Impoundment Control Act theory had merit, they still could not obtain the broad relief they seek here. At most, Plaintiffs allege that the Department's ongoing restructuring constituted a deferral of budget authority for which the requisite "special message" was not communicated to Congress. *See* 2 U.S.C. § 684. In that scenario, the remedy would be a directive to communicate the special message—not a broad injunction interfering with the Executive's lawful discretion to enact RIFs and restructuring of the Institute.

**V.    <u>Plaintiffs Fail to Sufficiently Allege Claims Under the APA.</u>**

Plaintiffs fail to sufficiently allege any claims under the APA. First, Plaintiffs fail to seek judicial review of a discrete agency action. Second, Plaintiffs fail to allege any final agency action. Third, there are adequate alternative remedies available as to any challenges to the Department's staffing and restructuring decisions, thus precluding Plaintiffs' APA challenges. Fourth, the Department's actions are committed to agency discretion. Finally, Plaintiffs fail to allege that the ongoing RIFs and organizational restructuring are contrary to law.

**A.    Plaintiffs Do Not Seek Judicial Review of a Discrete Agency Action.**

As a threshold matter, Plaintiffs' Amended Complaint still does not identify a discrete and circumscribed agency action that the Department has taken and that could specifically be redressed by a federal court. Plaintiffs must plead "an identifiable action or event" and "direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan*, 497 U.S. at 891, 899; *Norton*, 542 U.S. at 62. These final agency actions must be "circumscribed [and] discrete." *Norton*, 542 U.S. at 62. The APA does not provide for "general judicial review of [an agency's] day-to-

day operations," *Lujan*, 497 U.S. at 899, like "constructing a building, operating a program, or performing a contract," *Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013). The APA thus contains "a prohibition on programmatic challenges," meaning "challenges that seek 'wholesale improvement' of an agency's programs by court decree." *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 490 (5th Cir. 2014) (cleaned up). "Because 'an on-going program or policy is not, in itself, a final agency action under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted).

Indeed, the D.C. Circuit recently affirmed the application of *Lujan* and *Norton. See NTEU*, 2025 WL 2371608, **10-13. In a challenge to the alleged dismantling of the CFPB, the D.C. Circuit affirmed the "APA does not make federal courts 'roving commissions' assigned to pass on how well federal agencies are satisfying their statutory obligations." *Id.* at *10. Accordingly, the D.C. Circuit found the Plaintiffs' challenge to the purported shutdown of the CFPB was not agency action as there had been no formal pronouncement of such a shutdown and as a result, Plaintiffs were merely challenging "a constellation of then-ongoing actions—the February 10 email, firing employees, cancelling contracts, declining additional funding, and terminating the lease for the Bureau's current headquarters." *Id.* at **12, 13. The Court further noted that Plaintiffs' challenge was further prohibited by *Norton* given that it sought "an order compelling the CFPB to keep providing its mandatory services," even though the relevant statute "gives the agency 'a great deal of discretion in deciding *how*' to provide them." *Id.* at *13 (emphasis in original).

Plaintiffs' claims and requested relief present exactly the type of wholesale challenge that the APA forbids. Plaintiffs' allegations reveal that they do not seek judicial review of a discrete agency action. Rather, they seek wholesale judicial review of the Department's management and

restructuring of NIOSH and staffing decisions. Instead of presenting the court with a "narrow question to resolve," *Cobell*, 455 F.3d at 307, Plaintiffs challenge a host of individual actions—the purported shutting down of five of the Institute's divisions, the ongoing restructuring of the Institute, and the RIFs within the Institute, *see, e.g.*, Am. Compl. ¶ 2 (stating Plaintiffs bring suit because "Defendants have made massive staff cuts that have resulted in the closure of multiple critical [Institute] divisions and the degradation of the agency's ability to perform its legally mandated functions"); *id.*, Prayer for Relief (seeking wholesale reinstatement of NIOSH Divisions and the Institute's research functions, and enjoining any further restructuring or RIFs).

Addressing this type of claim would require the Court to supervise all the agency's activities and determine how the agency would accomplish each statutorily-mandated function—an even more extreme kind of supervisory claim than was at issue and rejected in *Lujan*. *See* 497 U.S. at 892-93. Such a claim would completely circumvent the purpose of the APA's discrete agency action requirement, which is to "protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Norton*, 542 U.S. at 66-67.

This Court has already found claims that are practically the same as the ones Plaintiffs raise here insufficient to garner APA review. As this Court has previously found in *Association for Education Finance & Policy ("AEFP") v. McMahon*, --- F. Supp. 3d ---, 2025 WL 1568301, at *1 (D.D.C. June 3, 2025) (McFadden, J.), "the APA was never meant to be a bureaucratic windbreak insulating agencies from political gales. It cannot comprehensively undo multifaceted agency transformations wrought by political decisions." This Court further observed "[i]t is not this Court's place to breathe life back into wide swathes of the Institute's cancelled programs and then monitor the agency's day-to-day statutory compliance; essentially what Plaintiffs seek." *Id.*; *see*

*also id.* at *7 ("Judges were never meant to be czars overseeing the day-to-day affairs of agencies."). As a result, in *AEFP*, the Court held that the membership-based associations could not bring APA claims based on a mere challenge to the "dismantling" of an institute within the Department of Education. *See id.* at *6. First, the Court found that "plaintiffs cannot get 'wholesale' improvement to agency operations under the APA by bundling together a collection of discrete actions, presenting them as facets of a single event, and then challenging that event instead of the individual actions." *AEFP*, 2025 WL 1568301, at *5 (citing *Lujan*, 497 U.S. at 893). Second, the Court determined that "plaintiffs cannot circumvent this restriction by purporting to challenge one or two discrete actions but then extrapolating the requested relief across the board so that it amounts to 'wholesale' improvement." *Id.*

This case is no different than *AEFP*. First, Plaintiffs make clear that they are simply bringing this case to "attempt to stop the wholesale 'dismantling' of the Institute," *AEFP*, 2025 WL 1568301, at *6. *See* Am. Compl. ¶¶ 2, 4. While they purportedly identify certain divisions that they alleged have been shut down, *id.* ¶ 2, they ultimately are attempting to bundle these events to challenge what they perceive as the overall dismantling of NIOSH. *See id.* (challenging "massive staff cuts that have resulted in the closure of multiple critical [Institute] divisions and the degradation of the agency's ability to perform its legally mandated functions."); *id.* ¶ 4 (alleging "the cumulative effect of these individual actions—when taken together with staff cuts and the shutdown of functions elsewhere in the agency—is to render [the Institute] functionally incapable of carrying out its core research mission").

Indeed, like in *AEFP*, the true nature of Plaintiffs' programmatic challenge is clear as Plaintiffs here also do not even challenge the decision to implement the RIFs, but rather the "diasporic *results* of the RIF." *See AEFP*, 2025 WL 1568301, at *8 (emphasis in original) (plaintiff

"warning the RIF will result in widespread statutory deficiencies."); Am. Compl. ¶ 38 ("The RIFs and other terminations, combined with employees' early departures and Defendants' actions in immediately placing recipients of RIF notices on administrative leave, meant that by the beginning of May, almost every NIOSH division had been virtually shut down altogether."); *id.* ¶ 67 (noting that the "elimination of the divisions []—particularly when combined with staff cuts and reorganizations elsewhere in the agency—have fatally degraded [the Institute's] ability to fulfill its statutory functions altogether."). But "[i]t is not the place of this Court to substitute its own judgment for that of the agency on staffing issues." *AEFP*, 2025 WL 1568301, at *8.

Second, like in *AEFP*, although Plaintiffs only allege speculative harms relating to some parts of the ongoing restructuring at NIOSH, *id.* ¶¶ 68-84, they seek essentially to restore all the Institute's research functions and enjoin the "execution of a comprehensive set of RIFs and reorganizations," in other words, "a remedy larger than the sum of the individual injuries it alleges." *AEFP*, 2025 WL 1568301, at *6. Moreover, as in *NTEU*, Plaintiffs request such relief despite the discretion afforded to the Department in how it implements any statutory requirement. *See infra* §§ V.D-E. Thus, the Court should reach the same resolution here as it did in *AEFP*, find the "programmatic nature of [Plaintiffs'] challenge dooms" its claims, *id.*, and dismiss Plaintiffs' Amended Complaint for failure to identify discrete agency actions that this Court can review.

### B.     Plaintiffs Do Not Identify a Final Agency Action.

Even assuming Plaintiffs have identified discrete agency actions, Plaintiffs have not sufficiently alleged any final agency action. "Final agency action" has two components. First, the action must "mark the 'consummation' of the agency's decisionmaking process[.]" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation omitted). It may not be a "preliminary, procedural, or intermediate agency action[.]" 5 U.S.C. § 704. Second, the action must "be one by which 'rights

or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 178 (citation omitted).

In *NTEU*, 2025 WL 2371608, at *13, the D.C. Circuit affirmed that a purported decision to shut down the CFPB was not a final agency action. The Court reasoned there was no formal decision to shut down the agency, and any such decision did not produce any legal consequences, since for instance, agency leadership still required the CFPB to remain open and perform statutorily required functions. *Id. NTEU* noted "an agency plan is unreviewable insofar as it reflects only a nonbinding statement of something the agency intends to do in the future." *Id.* at *8; *see id.* ("Because such a plan has no immediate effect, a plaintiff cannot challenge the plan itself but instead must await further agency actions implementing it."). Likewise, Plaintiffs fail to identify any final agency action.

First, Plaintiffs fail to allege that the Department's actions "mark the consummation" of its decision-making process regarding the RIFs and restructuring of the Institute. By the terms of the March 27, 2025, Press Release, the agency's "decisionmaking process" is ongoing and evolving. For example, the March 27, 2025, Press Release describes "specific contents of the restructuring plan that have been announced so far." *See* March 27, 2025, Press Release. And the accompanying Fact Sheet notes that while "[n]o additional cuts are currently planned" beyond those described in the sheet, the Department "will continue to look for further ways to streamline its operations and agencies." *See Fact Sheet: HHS' Transformation to Make America Healthy Again*, Dep't of Health & Human Servs., https://www.hhs.gov/press-room/hhs-restructuring-doge-fact-sheet.html ("Fact Sheet"). These statements underline the developing nature of the agency's actions. The Department's operating divisions have worked diligently toward completing their ARRP, as required by the Workforce Executive Order and the Workforce Memorandum, with the goal of

implementation by the September 30, 2025, deadline. An unfolding reorganization plan that remains subject to changes based on circumstances is quintessentially non-final. *See NTEU*, 2025 WL 2371608, at *8 ("an agency plan is unreviewable insofar as it reflects only a nonbinding statement of something the agency intends to do in the future."); *AEFP*, 2025 WL 1568301, at *6 ("To the extent that unilateral dismantlement (or large-scale reorganization) is underway, it is not challengeable as a final agency action[.]").

The actions taken so far reflect a decision by HHS leadership that agency functions need to be streamlined and reorganized. And the Department has begun taking steps to address that need. Those steps are "preliminary" in nature and "not directly reviewable." *See* 5 U.S.C. § 704. They "may be . . . step[s], which if erroneous will mature into a prejudicial result[.]" *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 112 (1948). But that does not make the individual programmatic actions themselves the "consummation of the administrative process" of reevaluating the agency's priorities to reorganize the Department. *Id*. at 113.

Second, Plaintiffs fail to allege any rights or obligations that have been determined as a result of the Department's announcement of RIFs and restructuring. Plaintiffs identify the press release as the source of a directive. *See* Am. Compl. ¶ 33. That press release, however, has "no direct and appreciable legal consequences." *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 638 (D.C. Cir. 2019); *cf. Trudeau*, 456 F.3d at 189 ("[W]e have never found a press release of the kind at issue here to constitute 'final agency action' under the APA"). Instead, they describe aspects of what the Department "will" do going forward. *See* March 27, 2025, Press Release. No one "action" is encompassed by the press release because the restructuring is still being planned and refined, and ultimately will be implemented. *See NTEU*, 2025 WL 2371608, at *8; *cf. Cal. Cmtys.*, 934 F.3d at 637–38 (holding that memorandum announcing agency's final interpretation of law was

not final for APA purposes, even though it "unequivocally declare[d]" the agency's "definitive" position and "forecast[]" "in no uncertain terms" how the agency would proceed). Although Plaintiffs allege dealing with some effects of the RIFs, those are downstream effects. *See* Am. Compl. ¶¶ 68-84. Not all Plaintiffs are the subjects of the restructuring, and to the extent the March 27, 2025, Press Release could be construed to "directly affect" anyone, Plaintiffs do not have standing to assert their interests. *See supra* § I.

> ### C.    There Are Adequate Alternative Remedies Available.

Review under the APA is available only where "there is no other adequate remedy in a court." 5 U.S.C. § 704. The requirement that a plaintiff have "no other adequate remedy in court," *id.*, reflects that "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action," *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). As the D.C. Circuit has observed, "the alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre.'" *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (citation omitted). If there exists an alternative adequate judicial remedy, a plaintiff lacks a cause of action under the APA. *See Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017); *see also Versata Dev. Corp. v. Rea*, 959 F. Supp. 2d 912, 927 (E.D. Va. 2013) (dismissing a putative APA claim under Federal Rule of Civil Procedure 12(b)(6) because the decision at issue was not a final agency action and an alternative adequate remedy existed by way of appeal to the Federal Circuit). As already described above, this is, in essence, an employment action, and there are CSRA and FSL-MRS remedies. To the extent this case rests on contract claims, then the Court of Federal Claims provides an adequate alternative remedy under the Tucker Act.

**D.    The Department's Staffing and Other Programmatic Implementation Decisions Are Committed to Agency Discretion.**

Plaintiffs also fail to allege an APA claim as the identified actions are committed to agency discretion by law. "Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). As described above, HHS is undergoing a reorganization pursuant to Workforce Executive Order and Workforce Memorandum by consolidating redundant personnel and functions to save costs. The Secretary has taken the first steps in right-sizing the Department through a reduction in force and other programmatic decisions.

Here, the reduction in force and reorganization of the Department incorporate the type of actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *Markland v. OPM*, 140 F.3d 1031, 1033 (Fed. Cir. 1998) ("We accord an agency wide discretion in conducting a reduction in force; absent a clear abuse of that discretion, a substantial departure from applicable procedures, a misconstruction of governing statutes, or the like, we do not upset a final agency decision.") (cleaned up). "In determining whether a matter has been committed solely to agency discretion, [courts] consider both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action." *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002). Here, each factor shows that Defendants' managerial decisions are committed to agency discretion.

First, staffing decisions and other reorganization decisions fit neatly among those "categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln v. Vigil*, 508 U.S. 182, 191-92 (1993) (citation omitted). After all, the point of the Department's actions is to improve efficiency, which allows the Department to "meet its statutory responsibilities in what [the new administration] sees as the most effective or desirable

- 38 -

way." *Id.* at 192. Similarly, "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). The reduction in force and other decisions on reorganization reflect the Administration's effort to realign the Department to provide better service to the American people. "The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831-32.

Second, Plaintiffs cannot point to a particular statute limiting the Department's inherent discretion to reduce headcount or any requirement to have the exact same organizational structure that was previously in place. Again, agencies generally have broad discretion to determine how to implement a statute. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 543 (1978).

Plaintiffs' allegations contesting whether reorganizing NIOSH will bring savings, efficiency, or its policy objectives reflect a fundamental "lack of understanding" of "the nature" of the Department's actions, *see Vt. Yankee*, 435 U.S. at 553. Plaintiffs have not pointed to any Department decision to terminate the Institute or its functions. Indeed, that process is still ongoing. The ARRP is in progress. Any restructuring or reorganization at NIOSH is currently subject to an injunction, but if and when that injunction is lifted, the Department will be able to continue developing and implementing the ARRP. Moreover, the Department has stated its commitment to performing its statutory obligations. Ultimately, Courts lack the power to "dictat[e] to the agency the methods[] [and] procedures" it uses to complete its statutory obligations. *See Vt. Yankee*, 435 U.S. at 545 (quoting *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976)). To override these principles and enjoin agency leadership from exercising control over their own staffing would be an extraordinary violation of the separation of powers.

But even if this Court were to conclude that the Department's explanation for the RIFs or the reorganization of the Department is insufficient to withstand judicial review, that would in no way justify the injunctive relief that Plaintiffs seek. Rather, "the proper course" would be "to remand to the [Department] for additional . . . explanation," not any type of injunction. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

### E.    The Department's Funding Decisions Are Committed to the Agency's Discretion by Law.

Additionally, Plaintiffs' challenge to funding decisions by the Department are committed to the agency's discretion by law. *See* 5 U.S.C. § 701(a)(2). In appropriating funds for the Institute, Congress gave the Department broad discretion to decide when and how to spend funds consistent with the various purposes specified in the appropriations laws. Here, in 2024, Congress appropriated funds "[f]or carrying out titles II, III, and XVII of the [Public Health Service] Act, sections 101, 102, 103, 201, 202, 203, 301, and 501 of the Federal Mine Safety and Health Act, section 13 of the Mine Improvement and New Emergency Response Act, and sections 20, 21, and 22 of the Occupational Safety and Health Act, with respect to occupational safety and health." Further Consolidated Appropriations Act, 2024, Pub. Law 118-47, div. D, tit. II, 138 Stat. 460, 654 (Mar. 23, 2024); Explanatory Statement, 170 Cong. Rec. H1501, H1889 (Mar. 22, 2024) (incorporated into law by Pub. L. No. 118-47, § 4, 138 Stat. at 461); *see also* S. Rep. No. 118-84, at 82–84 (2023) (incorporated by Explanatory Statement, 170 Cong. Rec. at H1886). Congress continued funding at this level for 2025. Sec. 1101(a)(8), (c), Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. Law 119-4 (Mar. 15, 2025).

Those appropriations provide no standards "against which to judge the agency's exercise of discretion" in making the many choices the agency must make concerning how to spend those funds. *See Heckler*, 470 U.S. at 830. The agency has unreviewable discretion to make choices on

how the appropriations are spent. *Lincoln*, 508 U.S. at 192 ("the allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion."). The Department's decisions about how best to spend appropriated funds "requires 'a complicated balancing of a number of factors which are peculiarly within its expertise,'" and the "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Lincoln*, 508 U.S. at 193 (quoting *Heckler*, 470 U.S. at 831–32).

*Milk Train, Inc. v. Veneman*, 310 F.3d 747 (D.C. Cir. 2002), supports the Government's position regarding the Executive's discretion over appropriated funds. There, the D.C. Circuit considered a challenge to the Secretary of Agriculture's implementation of a subsidy program for milk producers, where the agency received an appropriation "to provide assistance directly to . . . dairy producers, in a manner determined appropriate by the Secretary" "to compensate dairy producers for economic losses incurred during 1999." *Id.* at 750, 751. Plaintiffs challenged the agency's method for calculating how much money a milk producer should receive, but the court held that the statutory appropriations language "left to the Secretary the decision about how the moneys for 1999 economic losses could best be distributed," and that decision was unreviewable. *Id.* at 751–52. The court also ruled that plaintiffs could challenge the Secretary's calculation insofar as it compensated dairy producers for the wrong year. But that was because Congress had specified that compensation must be for "economic losses incurred during 1999." 310 F.3d at 752. In that limited regard, "Congress limited the Secretary's authority to disburse funds." *Id.*

No similar limitation exists here: Congress merely appropriated funds for broad purposes, including for the expenses of Institute operations, and the further delineation of broad purposes does not require that the government provide specific amounts of funds to particular programs or to employee salaries. *See* Further Consolidated Appropriations Act, 2024, Pub. Law 118-47, div.

D, tit. II, 138 Stat. 460, 654 (Mar. 23, 2024); Explanatory Statement, 170 Cong. Rec. H1501, H1889 (Mar. 22, 2024) (incorporated into law by Pub. L. No. 118-47, § 4, 138 Stat. at 461); *see also* S. Rep. No. 118-84, at 82–84 (2023) (incorporated by Explanatory Statement, 170 Cong. Rec. at H1886); Sec. 1101(a)(8), (c), Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. Law 119-4 (Mar. 15, 2025). How those funds "could best be distributed" is not, as in *Milk Train*, a judicially reviewable question, but instead is left to agency discretion.

### F.    Plaintiffs Fail to Allege that the RIFs and Restructuring are Contrary to Law and Exceed Defendants' Statutory Authority.

Plaintiffs' Amended Complaint fails to demonstrate that the RIFs and restructuring are "not in accordance with law" and "in excess of statutory . . . authority." 5 U.S.C. § 706(2). Plaintiffs allege the Department's plans "have fatally degraded [the Institute's] ability to fulfill its statutory functions altogether." Am. Compl. ¶ 67. As noted above, the ARRP is still in progress, and meanwhile, some of Plaintiffs' complaints about alleged reduction of statutorily required services have already been resolved by the recalling of over three hundred Institute employees. *See id.* ¶ 39.

Moreover, some of Plaintiffs' allegations center on functions that are not, in fact, required by statute. For example, there is no statutory requirement for OECSP to fund and coordinate centers at universities that provide training on Occupational Safety Hazard disciplines. *See* Am. Compl. ¶ 61; 29 U.S.C. § 670(a) (no express statutory requirement to establish research centers at universities in order to conduct "education programs to provide an adequate supply of qualified personnel to carry out the purposes of this chapter, and (2) informational programs on the importance of and proper use of adequate safety and health equipment."). Nor is there a statutory requirement for OECSP to award academic and non-academic training project grants, support and fund targeted research and outreach activities through multidisciplinary centers, or provide grant

funding to support states through the State Occupational Safety and Health Surveillance Program. *See* Am. Compl. ¶¶ 62, 64-65; 29 U.S.C. § 669(a)(1).

There is also no statutory requirement for DSI to consult with the Environmental Protectin Agency to review Toxic Substances Control Act exposure limits, *see* Am. Compl. ¶ 46; 15 U.S.C. § 2603(b)(2)(A), or recommend exposure limits for Institute investigations into hazards at worksites, *see* Am. Compl. ¶ 56; 29 U.S.C. § 669(a)(6); *id.* § 669(a)(2). Also lacking is a statutory requirement that DFSE consult with the Department of Labor on collecting and analyzing statistics. *See* Am. Compl. ¶ 58; 29 U.S.C. § 673(a). And there is no requirement in the Firefighter Cancer Registry Act for NIOSH to perform toxicological animal laboratory studies in support of DSI's work on recommended exposure limits and data for the National Firefighter Registry. Am. Compl. ¶ 59.

Plaintiffs also allege that the planned restructuring violates the law because the Executive Branch must spend appropriated funds. Am. Compl. ¶¶ 89-94, 127-33, 140-46. The Department, however, has not said it will not spend appropriated funds on statutorily mandated programs, and saving taxpayer money by consolidating functions and reducing personnel redundancy is not inherently inconsistent with spending appropriated funds. *See* March 27, 2025, Press Release. The time that has elapsed since the March 27, 2025, press release is not, in the context of this case, enough time to diagnose a failure to spend prescribed money. The Department was continuing to refine and implement the components of the ARRP pertaining to NIOSH until it was temporarily enjoined. And the Workforce Executive Order requires that the ARRPs be implemented consistent with applicable law. That services may be provided by a different division or unit after the reorganization does not mean that they will cease being provided.

## VI.    Defendants Should Be Relieved of Their Obligation to File a Certified List of the Administrative Record and Serve the Administrative Record Simultaneously with this Motion.

Defendants should be excused from Local Civil Rule 7(n)(1)'s requirement that Defendants file a certified list of an administrative record and serve an administrative record simultaneously with this dispositive motion. Pursuant to Local Rule 7(m), counsel for Defendants conferred with counsel for Plaintiffs about this requested relief. Plaintiffs oppose.

An administrative record is not necessary to resolve this motion, which argues that judicial review is not available in this case—a threshold legal issue that does not require review of the administrative record. Moreover, even if judicial review were available, Defendants have moved to dismiss by relying entirely on the facts alleged in the Amended Complaint or facts upon which the Court may take judicial notice.

Indeed, courts in this district routinely grant the government's requests to defer the filing of a certified list of the contents of the administrative record when it is unnecessary in deciding a dispositive motion. *See, e.g.*, *Connecticut v. U.S. Dep't of Interior*, 344 F. Supp. 3d 279, 294 (D.D.C. 2018) (Court granted Federal Defendants' motion to waive compliance with Local Civil Rule 7(n) because the Court did not need to consider the administrative record in evaluating the motions before it); *Mdewakanton Sioux Indians of Minn. v. Zinke*, 264 F. Supp. 3d 116, 123 n.12 (D.D.C. 2017) (same); *Carroll v. Office of Fed. Contract Compliance Programs, U.S. Dep't of Labor*, 235 F. Supp. 3d 79, 81 n.1 (D.D.C. 2017); *PETA v. U.S. Fish & Wildlife Serv.*, 59 F. Supp. 3d 91, 94 n.2 (D.D.C. 2014) (waiving Local Civil Rule 7(n) compliance and dismissing complaint).

Further, this Court should determine whether it has jurisdiction over this case before requiring Defendants to compile and certify the administrative record. The Court must determine that it has jurisdiction before proceeding to the merits. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause.")

(citation omitted); *see also Talal Al-Zahrani v. Rodriguez*, 669 F.3d 315, 318 (D.C. Cir. 2012) ("Because a federal court without jurisdiction cannot perform a law-declaring function in a controversy, 'the Supreme Court [has] held "that Article III jurisdiction is always an antecedent question" to be answered prior to any merits inquiry.'") (quoting *Pub. Citizen v. U.S. Dist. Court for the Dist. of Columbia*, 486 F.3d 1342, 1346 (D.C. Cir. 2007)); *Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 674 (D.C. Cir. 2013) ("this Circuit treats prudential standing as a jurisdictional issue which cannot be waived or conceded" (citations and quotations omitted)). Thus, the Court must first determine whether it has jurisdiction given that Defendants have argued in the first instance that no judicial review is available here.

Thus, waiving the requirement to file a certified list of the administrative record and serve the administrative record at this juncture would promote judicial economy and conserve resources.

## CONCLUSION

For these reasons, Plaintiffs' Amended Complaint should be dismissed. Defendants should also be relieved of their obligation to file a certified list of the administrative record and serve the administrative record simultaneously with their Motion to Dismiss.

Dated: August 20, 2025                Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: _____ */s/ Erika Oblea* _____
    ERIKA OBLEA, D.C. Bar #1034393
    Assistant United States Attorney
    601 D Street, NW
    Washington, DC 20530
    (202) 252-2567
    Erika.Oblea@usdoj.gov

*Attorneys for the United States of America*

- 45 -