# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL NURSES UNITED, et al., *Plaintiffs*, v. ROBERT F. KENNEDY JR., in his official capacity as Secretary of Health and Human Services; and U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *Defendants*. | Civil Action No. 1:25-cv-1538-TNM |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
## MOTION TO DISMISS AND MOTION FOR RELIEF FROM LOCAL RULE 7(n)

Matthew Ginsburg (DC Bar No. 1001159)
Craig Becker (DC Bar No. 371239)
Maneesh Sharma (DC Bar No. 1033407)
Bart Sheard (DC Bar No. 1542094)
AFL-CIO
815 Black Lives Matter Plaza NW
Washington, DC 20006
(202) 637-5310

*Counsel for Plaintiff AFL-CIO*

Nicolas Sansone (DC Bar No. 1686810)
Allison M. Zieve (DC Bar No. 424786)
Stephanie Garlock (DC Bar No. 1779629)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

Statutory Background .................................................................................................... 3

The Challenged Agency Actions ................................................................................... 4

Procedural History ........................................................................................................ 8

LEGAL STANDARDS ................................................................................................... 9

ARGUMENT ................................................................................................................. 10

I.      This Court has subject-matter jurisdiction. ....................................................... 10

        A.  Plaintiffs have adequately alleged Article III standing. ............................. 10

             1.  The Union Plaintiffs and AOEC have organizational standing to challenge the division-by-division and cumulative termination of NIOSH's research functions. ................................................................................................ 11

             2.  Plaintiff AOEC has organizational and associational standing to challenge the termination of NIOSH's grantmaking functions. ................................... 18

             3.  Plaintiffs' requested relief is available and appropriate under the APA. ............... 21

        B.  Defendants' remaining jurisdictional arguments misconstrue Plaintiffs' claims. ...... 22

             1.  Plaintiffs do not raise federal employment claims. ............................... 22

             2.  Plaintiffs do not challenge grant terminations. .................................... 25

II.     Plaintiffs challenge final agency actions that are reviewable under the APA. ................. 27

        A.  Plaintiffs challenge discrete actions. .......................................................... 27

        B.  The challenged actions are final. ................................................................ 31

        C.  Plaintiffs lack adequate alternative remedies. ............................................ 33

        D.  The challenged actions are not committed to agency discretion by law. ................ 33

III.    Plaintiffs adequately allege that the challenged actions are arbitrary and capricious and contrary to law. .............................................................................................. 36

i

IV.    Defendants' request for relief from Local Civil Rule 7(n) should be denied. .................. 37

CONCLUSION .................................................................................................................. 38

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Air Excursions LLC v. Yellen,*
  66 F.4th 272 (D.C. Cir. 2023) ................................................................. 10

*Allina Health Services v. Sebelius,*
  746 F.3d 1102 (D.C. Cir. 2014) ............................................................... 35

*American Federation of Government Employees, AFL-CIO v. Trump,*
  929 F.3d 748 (D.C. Cir. 2019) ................................................................. 24

*American Foreign Service Association v. Trump,*
  768 F. Supp. 3d 6 (D.D.C. 2025) ............................................................ 24

*American Forest Resource Council v. United States,*
  77 F.4th 787 (D.C. Cir. 2023) ................................................................. 18

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ............................................................................ 9, 10

*Association for Education Finance & Policy, Inc. v. McMahon,*
  — F. Supp. 3d —, 2025 WL 1568301 (D.D.C. June 3, 2025) ................... 29, 30, 31

*Axon Enterprise, Inc. v. Federal Trade Commission,*
  598 U.S. 175 (2023) ............................................................................... 23

*Bennett v. Spear,*
  520 U.S. 154 (1997) ............................................................................... 31

*Biden v. Nebraska,*
  600 U.S. 477 (2023) ............................................................................... 10

*Block v. Community Nutrition Institute,*
  467 U.S. 340 (1984) ............................................................................... 25

*Campaign Legal Center v. Federal Election Commission,*
  31 F.4th 781 (D.C. Cir. 2022) ................................................................. 12

*Center for Biological Diversity v. Bernhardt,*
  480 F. Supp. 3d 69 (D.D.C. 2020) .......................................................... 20

*Center for Biological Diversity v. Environmental Protection Agency,*
  56 F.4th 55 (D.C. Cir. 2022) ................................................................... 19

*Center for Biological Diversity v. U.S. Department of State,*
  2019 WL 2451767 (D.D.C. June 12, 2019) .............................................. 15

*Center for Biological Diversity v. U.S. Department of the Interior*,
144 F.4th 296 (D.C. Cir. 2025) ................................................................. 10

*Coalition for Underground Expansion v. Mineta*,
333 F.3d 193 (D.C. Cir. 2003) .................................................................. 9

*Coalition of MISO Transmission Customers v. Federal Energy Regulatory Commission*,
45 F.4th 1004 (D.C. Cir. 2022) ................................................................ 19

*Cobell v. Kempthorne*,
455 F.3d 301 (D.C. Cir. 2006) ................................................................. 29

*Corner Post, Inc. v. Board of Governors of the Federal Reserve System*,
603 U.S. 799 (2024) ............................................................................... 35

*Delaware Riverkeeper Network v. Federal Energy Regulatory Commission*,
243 F. Supp. 3d 141 (D.D.C. 2017) ........................................................ 17

*Department of Education v. California*,
145 S. Ct. 966 (2025) ............................................................................. 26

*Drake v. Federal Aviation Administration*,
291 F.3d 59 (D.C. Cir. 2002) .................................................................. 34

*Electronic Privacy Information Center v. Presidential Advisory Commission on Election Integrity*,
878 F.3d 371 (D.C. Cir. 2017) ................................................................ 15

*Elgin v. Department of the Treasury*,
567 U.S. 1 (2012) ................................................................................... 22

*Federal Education Association Stateside Region v. Federal Labor Relations Authority*,
104 F.4th 275 (D.C. Cir. 2024) ............................................................... 22

*Fornaro v. James*,
416 F.3d 63 (D.C. Cir. 2005) .................................................................. 24

*Friends of Animals v. Jewell*,
828 F.3d 989 (D.C. Cir. 2016) ................................................... 12, 14, 17

*Global Health Council v. Trump*,
— F.4th —, 2025 WL 2480618 (D.C. Cir. Aug. 28, 2025) ....................... 8

*Grosdidier v. Chairman*,
560 F.3d 495 (D.C. Cir. 2009) ................................................................ 24

*Hecate Energy LLC v. Federal Energy Regulatory Commission*,
126 F.4th 660 (D.C. Cir. 2025) ............................................................... 21

iv

*Hinojosa v. Horn*,
    896 F.3d 305 (5th Cir. 2018) ................................................................. 33

*Humane Society of the United States v. Hodel*,
    840 F.2d 45 (D.C. Cir. 1988) ................................................................ 20

*Humane Society of the United States v. Vilsack*,
    797 F.3d 4 (D.C. Cir. 2015) .................................................................... 9

*Huron v. Cobert*,
    809 F.3d 1274 (D.C. Cir. 2016) ....................................................... 16, 18

*Industrial Energy Consumers of America v. Federal Energy Regulatory Commission*,
    125 F.4th 1156 (D.C. Cir. 2025) ........................................................... 15

*Langeman v. Garland*,
    88 F.4th 289 (D.C. Cir. 2023) ......................................................... 10, 32

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ............................................................................... 9

*Lujan v. National Wildlife Federation*,
    497 U.S. 871 (1990) ............................................................................. 28

*Mahoney v. Donovan*,
    721 F.3d 633 (D.C. Cir. 2013) .............................................................. 24

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ............................................................................. 25

*National Treasury Employees Union v. Vought*,
    — F.4th —, 2025 WL 2371608 (D.C. Cir. Aug. 15, 2025) ........................... passim

*New York v. Kennedy*,
    — F. Supp. 3d —, 2025 WL 1803260 (D.R.I. July 1, 2025) ....................... 21

*Norton v. Southern Utah Wilderness Alliance*,
    542 U.S. 55 (2004) ......................................................................... 28, 29

*Nyunt v. Chairman*,
    589 F.3d 445 (D.C. Cir. 2009) .............................................................. 24

*Organic Trade Association v. U.S. Department of Agriculture*,
    370 F. Supp. 3d 98 (D.D.C. 2019) ......................................................... 17

*People for the Ethical Treatment of Animals v. U.S. Department of Agriculture*,
    797 F.3d 1087 (D.C. Cir. 2015) ............................................................ 15

v

*Scenic America, Inc. v. U.S. Department of Transportation*,
836 F.3d 42 (D.C. Cir. 2016) .................................................................................. 9

*Town of Chester v. Laroe Estates, Inc.*,
581 U.S. 433 (2017) ........................................................................................... 10

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ........................................................................................... 12

*United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*,
517 U.S. 544 (1996) ........................................................................................... 21

*United States v. Fausto*,
484 U.S. 439 (1988) ........................................................................................... 24

*Waterkeeper Alliance v. Environmental Protection Agency*,
853 F.3d 527 (D.C. Cir. 2017) ............................................................................ 14

*Waterkeeper Alliance, Inc. v. Regan*,
41 F.4th 654 (D.C. Cir. 2022) ............................................................................ 10

*Weaver v. U.S. Information Agency*,
87 F.3d 1429 (D.C. Cir. 1996) ............................................................................ 24

*Weingarten v. DeVos*,
468 F. Supp. 3d 322 (D.D.C. 2020) .................................................................... 21

*Williams v. Lew*,
819 F.3d 466 (D.C. Cir. 2016) ........................................................................ 9, 15

*Zaidan v. Trump*,
317 F. Supp. 3d 8 (D.D.C. 2018) ........................................................................ 17

*Zhengxing v. United States*,
204 F. App'x 885 (Fed. Cir. 2006) ...................................................................... 33

**Statutes**

5 U.S.C. § 701(a)(2) ................................................................................................ 34

5 U.S.C. § 704 .................................................................................................... 27, 33

5 U.S.C. § 706(2) ............................................................................................... 21, 28

5 U.S.C. § 706(2)(A) ............................................................................................... 34

15 U.S.C. § 2603(b)(2)(A) ......................................................................................... 4

28 U.S.C. § 1491(a)(1) ............................................................................................ 33

29 U.S.C. § 651(b) ................................................................................................ 3

29 U.S.C. § 669 .................................................................................................... 3

29 U.S.C. § 669(a)(1) .......................................................................................... 3

29 U.S.C. § 669(a)(2) .............................................................................. 3, 13, 16

29 U.S.C. § 669(a)(3) .................................................................................. 3, 13

29 U.S.C. § 669(a)(4) .......................................................................................... 13

29 U.S.C. § 669(a)(6) .............................................................................. 3, 13, 16

29 U.S.C. § 669(a)(7) .......................................................................................... 13

29 U.S.C. § 669(d). ................................................................................ 12, 13, 14

29 U.S.C. § 669a .................................................................................................. 4

29 U.S.C. § 670 .................................................................................................... 3

29 U.S.C. § 670(a) .................................................................................. 3, 20, 26

29 U.S.C. § 671(a) ................................................................................................ 3

29 U.S.C. § 671(c)(2) ............................................................................................ 3

29 U.S.C. § 671(h)(2) .......................................................................................... 4

29 U.S.C. § 671(h)(3) ...................................................................................... 4, 13

29 U.S.C. § 673(a) ........................................................................................... 7, 13

30 U.S.C. § 951(a) .......................................................................................... 4, 12

30 U.S.C. § 951(b) .......................................................................................... 4, 12

42 U.S.C. § 280e-5(a) ..................................................................................... 7, 13

42 U.S.C. § 300mm-5(16) .................................................................................... 4

42 U.S.C. § 7384p ................................................................................................ 4

Mine Improvement and New Emergency Response Act of 2006,
    Pub. L. No. 109-236, 120 Stat. 493 ............................................................... 4

Occupational Safety and Health Act of 1970,
    Pub. L. No. 91-596, 84 Stat. 1590 ................................................................. 3

**Other Authorities**

S. Rep. No. 91-1282 (Oct. 6, 1970) ................................................................................................ 12

**Rules**

D.D.C. Local Civil Rule 7(n)(1) ..................................................................................................... 37

## INTRODUCTION

For decades following its inception pursuant to a 1970 statute, the National Institute for Occupational Safety and Health (NIOSH) performed a vital role in researching the perils faced by American workers in some of the highest-risk occupations. Its statutorily mandated research and investigations have informed occupational safety and health standards that mitigate workplace hazards; led to the identification of unsafe conditions at specific worksites; and given employers, employees, and the general public access to reliable, up-to-date information about occupational safety and health risks and how best to address them. In addition, implementing its statutory directives, NIOSH has funded and coordinated education and training programs to ensure a steady supply of highly trained professionals in the field of occupational safety and health.

In March of this year, however, Defendants U.S. Department of Health and Human Services (HHS) and Secretary of Health and Human Services Robert F. Kennedy Jr. announced a reorganization plan that involved slashing NIOSH's workforce and shutting down the NIOSH components that perform the agency's core statutory functions. The plan took effect throughout April and May, and now that all is said and done, all that remains of NIOSH is a skeleton crew in a handful of offices administering discrete programs that are ancillary to NIOSH's statutorily mandated research, education, training, and grantmaking functions.

Plaintiffs here—a group of unions, nonprofit organizations, and manufacturers that rely on NIOSH's lifesaving work—challenge Defendants' reorganization plan, as well as individual components of the plan, as arbitrary and capricious and contrary to law, in violation of the Administrative Procedure Act (APA). Defendants have moved to dismiss for lack of subject-matter jurisdiction and for failure to state a claim. This Court should deny the motion.

As for subject-matter jurisdiction, Plaintiffs have standing to bring their claims. They rely on NIOSH's research and educational support to further their organizational missions of ensuring the safety and health of American workers and of training new generations of occupational safety and health professionals. The cessation of NIOSH's work in these areas has thus caused Plaintiffs injury that can be redressed by the injunctive relief that they seek. Meanwhile, Defendants' arguments that this Court lacks jurisdiction to hear federal employment disputes or challenges to terminated grants are beside the point, because Plaintiffs do not bring such claims. Rather, they challenge the closure of key NIOSH offices and the consequent termination of the statutory functions that those offices once performed.

As for failure to state a claim, Defendants largely raise threshold issues about whether the challenged actions are reviewable under the APA. They are. Defendants' reorganization plan is a discrete agency action that has been implemented and has become final. The plan in its entirety—as well as the individual components of the plan that Plaintiffs separately challenge—therefore constitutes reviewable "final agency action" within the meaning of the APA. Further, Plaintiffs have no adequate alternative remedies to APA relief. Defendants' arguments to the contrary are based on their mistaken belief that Plaintiffs raise employment disputes or challenges to grant terminations. Finally, Defendants' argument that Plaintiffs challenge actions that are committed to agency discretion by law fails as well. Although Defendants may have considerable discretion as to *how* NIOSH fulfills its statutory functions, they lack discretion as to *whether* NIOSH does so.

When Defendants turn to the question whether their actions were arbitrary and capricious or contrary to law, they have little to say. Indeed, they do not attempt to dispute that the complaint plausibly alleges arbitrary and capricious agency action. And the page and a half that Defendants

devote to arguing that their actions were consistent with the law largely ignores Plaintiffs' plausible allegations that NIOSH is no longer performing its statutory functions.

This Court should therefore deny Defendants' motion to dismiss. Moreover, because Plaintiffs cannot proceed expeditiously on their claims without access to the administrative record, this Court should deny Defendants' request to be excused from Local Civil Rule 7(n) and order them to produce the administrative record without further delay.

## BACKGROUND

### Statutory Background

In the Occupational Safety and Health Act of 1970 (OSH Act), Congress created NIOSH as a component of the agency that is now HHS. Pub. L. No. 91-596, § 22(a), 84 Stat. 1590, 1612; *see* 29 U.S.C. § 671(a). To further the Act's purpose of "assur[ing] so far as possible every working man and woman in the Nation safe and healthful working conditions," 29 U.S.C. § 651(b), Congress assigned NIOSH a vast portfolio of core research, education, training, and grantmaking responsibilities. *Id.* § 671(c)(2); *see id.* §§ 669–670. Among other things, NIOSH "shall conduct" or fund "research, experiments, and demonstrations relating to occupational safety and health," *id.* § 669(a)(1); "shall develop and publish at least annually … criteria" for "identifying toxic substances," *id.* § 669(a)(2); "shall develop criteria dealing with toxic materials and harmful physical agents and substances which will describe exposure levels that are safe for various periods of employment," *id.* § 669(a)(3); "shall determine following a written request by any employer or authorized representative of employees[] … whether any substance normally found in the place of employment has potentially toxic effects in such concentrations as used or found," *id.* § 669(a)(6); and "shall conduct, directly or by grants or contracts … education programs to provide an adequate supply of qualified personnel to carry out the purposes of [the Act]," *id.* § 670(a).

Since then, Congress has assigned NIOSH numerous other statutory functions related to occupational safety and health. For example, in the Mine Improvement and New Emergency Response Act of 2006, Congress created the Office of Mine Safety and Health within NIOSH "to enhance the development of new mine safety technology and technological applications." Pub. L. No. 109-236, § 6, 120 Stat. 493, 499; *see* 29 U.S.C. § 671(h)(2). Congress provided that the office "shall be responsible for research, development, and testing of new technologies and equipment designed to enhance mine safety and health." 29 U.S.C. § 671(h)(3). Relatedly, Congress has assigned NIOSH responsibility for conducting a wide variety of "studies, research, experiments, and demonstrations" aimed at understanding and ameliorating occupational safety and health risks in the mining sector. 30 U.S.C. § 951(a); *see id.* § 951(b) (assigning these functions to NIOSH).

The additional duties that Congress has assigned NIOSH over the years are not limited to the mining context. Among other things, Congress has required NIOSH to consult with the Environmental Protection Agency on epidemiological testing to assess the effects of potentially hazardous chemical substances and mixtures, 15 U.S.C. § 2603(b)(2)(A); help administer a program that compensates people for medical needs related to workplace radiation exposure, 42 U.S.C. § 7384p; conduct research "on the health and safety of workers who are at risk for bioterrorist threats or attacks in the workplace," 29 U.S.C. § 669a; and administer aspects of a program that provides medical evaluations and services to individuals who participated in rescue, recovery, or cleanup activities or were otherwise affected by the September 11, 2001, terrorist attacks, 42 U.S.C. § 300mm-5(16).

**The Challenged Agency Actions**

Immediately upon his inauguration on January 20, 2025, President Donald J. Trump began taking steps to cut federal operations and reduce the size of the federal workforce. ECF 26 (FAC)

¶ 30. That day, he issued a presidential memorandum instituting a hiring freeze across most federal agencies and directing the Office of Management and Budget (OMB) and the Office of Personnel Management (OPM) to "submit a plan to reduce the size of the Federal Government's workforce." *Hiring Freeze*, Presidential Mem. (Jan. 20, 2025).[1] Then, on February 11, President Trump issued an executive order directing agency heads to "promptly undertake preparations to initiate large-scale reductions in force (RIFs)" and to submit a report within 30 days that "discuss[es] whether the agency or any of its subcomponents should be eliminated or consolidated." *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative*, Exec. Order No. 14210, §§ 3(c), (e), 90 Fed. Reg. 9669, 9670 (Feb. 14, 2025).

In response to the President's directives, HHS on March 27 announced a "dramatic restructuring" pursuant to which NIOSH would be combined with several other HHS components into a "new, unified entity" called the Administration for a Healthy America. HHS, *HHS Announces Transformation to Make America Healthy Again* (Mar. 27, 2025).[2] When taken together with resignations that had occurred since January 20, HHS estimated that the proposed restructuring would reduce its workforce by nearly 25 percent from its pre-inauguration levels. *Id.*

Implementation of HHS's reorganization plan has profoundly reshaped NIOSH. Over the course of April and May, approximately 800 of NIOSH's roughly 1,000 civil service employees received notice that their positions would be eliminated in June or July, and many of these employees were immediately placed on administrative leave. FAC ¶¶ 34–36. Hundreds of contractors who support NIOSH programs received termination notices as well. *Id.* ¶ 34. By the beginning of May, around 85 percent of NIOSH's pre-inauguration workforce had resigned, been

---

[1] https://www.whitehouse.gov/presidential-actions/2025/01/hiring-freeze.
[2] https://www.hhs.gov/press-room/hhs-restructuring-doge.html.

terminated, or received notice of imminent termination. *Id.* ¶ 37. As a result, nearly every NIOSH division had been depopulated, and a wide range of the agency's operations had ceased. *Id.* ¶ 38.

HHS later rescinded some termination notices for employees in NIOSH offices running discrete programs that provide specific services, but the offices responsible for NIOSH's core occupational safety and health research, education, training, and grantmaking functions remain fully closed. *Id.* ¶¶ 39, 41. Their employees are still on administrative leave, their work has ceased, and their functions have not been moved elsewhere. *Id.* ¶¶ 40–41. The shuttered offices include:

- **Pittsburgh and Spokane Mining Research Divisions**. Before their closure, these divisions were responsible for testing mine-safety equipment, analyzing field data to identify mines that present unsafe working conditions, conducting research into mining safety and health issues, and training mine operators in aspects of mine safety, among other things. *Id.* ¶¶ 42–43.

- **Division of Science Integration (DSI)**. Before its closure, DSI was responsible for identifying safe levels of exposure to various toxic materials and other harmful substances, publishing and regularly updating these "Recommended Exposure Limits" and other criteria for identifying and dealing with hazardous substances, and conducting, publishing, and updating research on safety and health risks associated with emerging technologies, among other things. *Id.* ¶¶ 44–47.

- *Field Research*, *Health Informatics*, and *Engineering and Physical Hazards Branches* of the **Division of Field Studies and Engineering (DFSE)**. Before their closure, these branches were responsible for supplying the epidemiological, statistical, and engineering support needed for NIOSH to conduct Health Hazard Evaluations—field investigations into potential hazards that have been identified in specific workplaces.

*Id.* ¶¶ 49–50, 54. The branches were also responsible for analyzing the data that NIOSH compiled through a statutorily required National Firefighter Registry for Cancer to assess the link between firefighters' occupational exposure to particular chemicals and the risk of developing cancer. *Id.* ¶¶ 55–56; *see* 42 U.S.C. § 280e-5(a) (establishing the Registry). In addition, the branches were responsible for compiling statutorily required occupational illness and exposure data. FAC ¶ 58; *see* 29 U.S.C. § 673(a) (requiring the creation of a program to collect, compile, and analyze such data). And, among other things, the branches were responsible for conducting research into numerous specific safety and health hazards faced by firefighters and healthcare workers. FAC ¶ 57.

- **Health Effects Laboratory Division (HELD)**. Before its closure, HELD developed and regularly published methods for sampling and measuring chemical exposure hazards, including best practices for testing air, surfaces, blood, and urine. *Id.* ¶ 59. It also performed animal laboratory studies essential to support DSI in developing Recommended Exposure Limits and provided input needed for other NIOSH divisions to conduct Health Hazard Evaluations, among other things. *Id.*

- **Office of Extramural Coordination and Special Projects (OECSP)**. Before its closure, OECSP funded and coordinated Education and Research Centers dedicated to training graduate and post-graduate students in occupational safety and health disciplines. *Id.* ¶¶ 60–61. It also awarded training grants for students and workers, supported multidisciplinary research centers responsible for performing research and outreach activities related to high-risk industries, and supported states in their collection and analysis of safety and health data, among other things. *Id.* ¶¶ 62–65.

7

Taken together, these offices were responsible for conducting virtually all of NIOSH's core research functions. *Id.* ¶ 67. When Defendants closed the offices, those functions ceased. *Id.* And because the offices provided critical interdivisional support for the components of NIOSH that remain, Defendants' actions have fatally degraded NIOSH's ability to perform its statutory functions altogether. *Id.*

**Procedural History**

Plaintiffs—a group of labor unions, nonprofit organizations, and manufacturers that regularly utilize NIOSH's research, publications, education and training grants, and other activities to advance their organizational missions—filed this lawsuit against HHS and Secretary Kennedy shortly after the wave of termination notices in April and May that essentially shut down NIOSH's operations entirely. *See* ECF 1. On July 2, 2025, following the recission of some of these notices and the ostensible restoration of a handful of discrete NIOSH programs, Plaintiffs filed the First Amended Complaint, ECF 26, which is now the operative complaint in this case.

Plaintiffs raise APA claims challenging the cessation of the functions performed by the Mining Research Divisions, DSI, DFSE branches, HELD, and OECSP as arbitrary and capricious and contrary to statutory mandates that require NIOSH to perform those functions (Counts I, III, IV, V, VI, VII, VIII, IX, X, XII). Plaintiffs also raise APA claims challenging Defendants' overall termination of NIOSH's core research functions and degradation of its ability to perform its statutory functions as arbitrary and capricious and contrary to law (Counts XIII, XV, XVI, XVII).[3]

---

[3] The complaint also alleges APA claims against certain of Defendants' actions as contrary to the Impoundment Control Act (Counts II, XI, XIV). In light of the D.C. Circuit's intervening opinion in *Global Health Council v. Trump*, — F.4th —, 2025 WL 2480618 (D.C. Cir. Aug. 28, 2025), these claims are foreclosed unless and until that precedent is overruled.

**LEGAL STANDARDS**

Defendants have moved to dismiss the complaint for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). Because Defendants have neither disputed the facts alleged in the complaint nor adduced additional "undisputed facts" in support of their motion, the Rule 12(b)(1) motion may be resolved "on the complaint standing alone." *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)). Given that "[t]he party invoking federal jurisdiction" must support his or her claim of jurisdiction "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992), a court confronting a Rule 12(b)(1) motion based on the pleadings must ask whether the complaint "has made out a plausible claim" to jurisdiction, *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015). The question for this Court, then, is whether the complaint "alleg[es] sufficient facts" to support subject-matter jurisdiction, *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 48 (D.C. Cir. 2016) (emphasis omitted), if the Court "accept[s] all 'well-pleaded factual allegations as true and draw[s] all reasonable inferences from those allegations in [Plaintiffs'] favor,'" *Williams v. Lew*, 819 F.3d 466, 472 (D.C. Cir. 2016) (quoting *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015)).

As for Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, this Court asks whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In assessing Defendants' Rule 12(b)(6) motion, this Court "must construe the complaint 'in favor of [Plaintiffs], who must be granted the benefit of all inferences that can be derived from the facts alleged.'" *Langeman v. Garland*, 88 F.4th 289, 294 (D.C. Cir. 2023) (quoting *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (per curiam)).

## ARGUMENT

### I.    This Court has subject-matter jurisdiction.

#### A.  Plaintiffs have adequately alleged Article III standing.

Defendants first argue that the First Amended Complaint fails to establish Plaintiffs' standing to bring their claims. *See* ECF 31 (Mot.) at 12–21. At the pleading stage, Plaintiffs' burden is to "plausibly allege standing." *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 144 F.4th 296, 305 (D.C. Cir. 2025). Specifically, Plaintiffs must plausibly allege that they "suffered or [are] imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Air Excursions LLC v. Yellen*, 66 F.4th 272, 277 (D.C. Cir. 2023) (citation omitted). And because standing "is a claim-specific inquiry," *Waterkeeper All., Inc. v. Regan*, 41 F.4th 654, 660 (D.C. Cir. 2022), "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint," *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017); *see Biden v. Nebraska*, 600 U.S. 477, 489 (2023) (requiring only one plaintiff with standing as to each claim).

Plaintiffs have satisfied their pleading burden. The lion's share of their claims challenge the termination of key research and investigatory functions in individual NIOSH divisions and across the agency as a whole. The Union Plaintiffs and Plaintiff Association of Occupational and

Environmental Clinics (AOEC) have organizational standing to pursue these claims because these Plaintiffs themselves have been and will be deprived of vital, statutorily mandated information on which they rely to further their organizational interests in advancing occupational safety and health.[4] The remaining claims challenge the termination of the education, training, and grantmaking functions performed by OECSP. Plaintiff AOEC has organizational and associational standing to raise these challenges because the cessation of NIOSH's ability to provide grant support will harm AOEC's ability to compete for grants in the future and harm AOEC's members, which rely both on NIOSH funding and on the training programs that the funding supports.

> **1. The Union Plaintiffs and AOEC have organizational standing to challenge the division-by-division and cumulative termination of NIOSH's research functions.**

Counts I, III, IV, V, VI, VII, VIII, IX, XIII, XV, XVI, and XVII of the First Amended Complaint challenge the termination of statutorily mandated research functions within particular NIOSH divisions and throughout the agency. The cessation of these functions has deprived the Union Plaintiffs and AOEC of information that they have historically used—and, if relief were granted, would continue to use—to advocate on behalf of their members' safety and health.[5]

As an initial matter, "[t]he law is settled that a denial of access to information qualifies as an injury in fact where a statute (on the claimants' reading) requires that the information be publicly disclosed and there is no reason to doubt their claim that the information would help

---

[4] The Union Plaintiffs are National Nurses United; New York State Nurses Association; California Nurses Association/National Nurses Organizing Committee; American Federation of Teachers; United Mine Workers of America; United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial, and Service Workers International Union, AFL-CIO; International Association of Machinists and Aerospace Workers, AFL-CIO; National Federation of Federal Employees, IAM; International Union, United Automobile, Aerospace and Agricultural Implement Workers of America; and American Federation of Labor and Congress of Industrial Organizations.

[5] Defendants argue that Plaintiffs lack *associational* standing to bring these claims on behalf of injured members, *see* Mot. 18–20, but Plaintiffs pursue these claims on their own behalf.

them." *Campaign Legal Ctr. v. FEC,* 31 F.4th 781, 783 (D.C. Cir. 2022) (citation omitted); *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 441–42 (2021) (noting that the denial of required information is a concrete injury if the denial has "downstream consequences"). In other words, Plaintiffs can establish informational injury if they plausibly allege that "(1) [they] ha[ve] been deprived of information that, on [their] interpretation, a statute requires the government or a third party to disclose to [them], and (2) [they] suffer[], by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016) (citing *FEC v. Akins*, 524 U.S. 11, 21–22 (1998)).

As the First Amended Complaint alleges, Defendants' actions have deprived Plaintiffs of safety and health information that NIOSH is required by statute to produce and disseminate. FAC ¶¶ 42–59, 69–76. When it created NIOSH, Congress recognized the value to the public of the research that NIOSH would produce for workers, workers' advocates, and health and safety experts. *See* S. Rep. No. 91-1282 (Oct. 6, 1970), *as reprinted in* 1970 U.S.C.C.A.N. 5177, 5198 (observing that "[o]ne of the essential contributions government can make to accomplishing the purposes of [the OSH] Act is through the dissemination of vital health and safety information"). Accordingly, the OSH Act requires that "[i]nformation obtained" through NIOSH research "shall be disseminated … to employers and employees and organizations thereof." 29 U.S.C. § 669(d).

The First Amended Complaint alleges that several categories of statutorily required research and investigation are no longer being performed and that NIOSH is therefore no longer disseminating resulting information. FAC ¶¶ 85–88, 95–122, 137–39, 147–57. As pleaded in Counts I and III, the shutdown of NIOSH's Pittsburgh and Spokane Mining Research Divisions has ended the "studies, research, experiments, and demonstrations" related to mine safety and health that NIOSH is required to perform. 30 U.S.C. § 951(a); *see id.* § 951(b) (assigning these

functions to NIOSH); 29 U.S.C. § 671(h)(3) (tasking NIOSH with "research, development, and testing of new technologies and equipment designed to enhance mine safety and health"); *see also* FAC ¶¶ 42–43. As pleaded in Counts IV and V, the shutdown of DSI has caused NIOSH to stop "develop[ing] and publish[ing] … criteria" for "identifying toxic substances," 29 U.S.C. § 669(a)(2), "develop[ing] criteria dealing with toxic materials and harmful physical agents and substances which will describe exposure levels that are safe for various periods of employment," *id.* § 669(a)(3), and conducting "research, experiments, and demonstrations relating to occupational safety and health as are necessary to explore new problems, including those created by new technology," *id*. § 669(a)(4). *See* FAC ¶¶ 44–47. The shutdown of certain DFSE branches, addressed in Counts VI and VII, has rendered NIOSH unable to fulfill its statutory responsibilities to conduct Health Hazard Evaluations, 29 U.S.C. § 669(a)(6), maintain a registry of firefighters to track cancer incidence, 42 U.S.C. § 280e-5(a), study exposure risks in various industries, 29 U.S.C. § 669(a)(7), and develop and maintain surveillance systems to track, analyze, and disseminate data on occupational safety and health, *id.* § 673(a). *See* FAC ¶¶ 48–58. The shutdown of HELD, addressed in Counts VIII and IX, has also fatally degraded NIOSH's ability to conduct Health Hazard Evaluations, 29 U.S.C. § 669(a)(6), and maintain a firefighter registry, 42 U.S.C. § 280e-5(a). *See* FAC ¶ 59. And as pleaded in Counts XIII, XV, XVI, and XVII, the overall effect of Defendants' reorganization plan has been to end each of these functions.

Defendants do not dispute that NIOSH is required to conduct and disseminate research pursuant to several of these statutory provisions. *See* Mot. 14. Given the obvious "interplay" between these provisions and the OSH Act's requirement that NIOSH disseminate its research to organizations of employees, *see* 29 U.S.C. § 669(d), Defendants' actions have necessarily

"reduce[d] the information that must be publicly disclosed," including to Plaintiffs. *Waterkeeper All. v. EPA*, 853 F.3d 527, 533 (D.C. Cir. 2017).

The First Amended Complaint also plausibly alleges that the loss of this statutorily mandated information will cause downstream consequences for the Union Plaintiffs and AOEC, hindering their ability to effectively serve and advocate on behalf of their members. Specific Plaintiffs regularly utilize NIOSH research and publications and depend on their being kept up to date. *See* FAC ¶¶ 69–72 (detailing how the Union Plaintiffs and AOEC use NIOSH research to inform their advocacy efforts and to educate and protect their members). And the insights gleaned through the Health Hazard Evaluations that NIOSH conducts provide "life-saving information and recommendations that … enable the unions and their members to address safety hazards in the workplace." *Id.* ¶ 76. Losing access to this information will thus cause "the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals*, 828 F.3d at 992. In requiring NIOSH to disseminate its research to "interested parties," Congress specifically instructed that information "shall be disseminated" to "employees and organizations thereof." 29 U.S.C. § 669(d). Those organizations of employees include unions, like Plaintiffs, that advocate for the safety and health of their members. What is more, the informational injury that Plaintiffs are experiencing is directly caused by Defendants' shutdown of NIOSH's core research functions and is redressable by an order requiring Defendants to restart critical research and dissemination work.

Defendants' contrary arguments are unavailing. As an initial matter, Defendants devote several pages to arguing that Plaintiffs have not adequately pleaded "organizational standing" because they have not alleged that that Defendants' actions have caused them to divert resources to filling in the lacuna left by the termination of NIOSH's functions. Mot. 15–18. Organizational standing, however, is "the label assigned to the *capacity* in which the organization contends it has

been harmed; it is not a separate *type* of injury." *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 381 (D.C. Cir. 2017) (Williams, J., concurring). "If an organization *qua* organization is injured, it has a right to the redress thereof just like a natural plaintiff." *Indus. Energy Consumers of Am. v. FERC*, 125 F.4th 1156, 1167 (D.C. Cir. 2025) (Henderson, J., concurring). What Defendants in fact argue is that Plaintiffs have not adequately alleged one particular type of organizational standing, often referred to as *Havens* standing. For *Havens* standing, the court considers "first, whether the agency's action or omission to act injured the [organization's] interest and, second, whether the organization used its resources to counteract that harm." *People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (internal quotation marks omitted; alteration in original). Because Plaintiffs do not allege this type of injury, failure to allege a diversion of resources is irrelevant here. *See Ctr. for Biological Diversity v. U.S. Dep't of State*, 2019 WL 2451767, at *3 (D.D.C. June 12, 2019) (recognizing that a plaintiff alleging informational injury has "no need … to allege resource expenditure" because the two frameworks for standing "do not merge").

Turning to the proper test for considering informational injury, Defendants first argue that "it is not clear" that Plaintiffs have indeed lost access to any information to which they are entitled. Mot. 14. According to Defendants, it is "reasonable" to infer that Plaintiffs are seeing a "temporary lapse" in information or research and not a permanent "refusal to provide statutorily mandated services." *Id.* at 15. On a motion to dismiss, however, the Court must draw all reasonable inferences in favor of Plaintiffs, *see Williams*, 819 F.3d at 472, not ask whether inferences that favor Defendants may be available. Properly construed, the First Amended Complaint firmly alleges that the end of NIOSH's research functions is a done deal. *See, e.g.*, FAC ¶¶ 43, 47, 54–57, 59 (alleging that Defendants have halted critical research studies, canceled planned updates to

publications, and made no provision to continue any of this statutorily required work). In other words, Plaintiffs allege that NIOSH has *already* stopped its critical research work, including the publication of statutorily required information, and does not plan to resume. The Union Plaintiffs and AOEC allege that they have already experienced injury due to the loss of up-to-date information on how to protect their members from ongoing harm during the months that have elapsed since Defendants' reorganization plan has gone into effect. *See id.* ¶¶ 68–80. And while Defendants emphasize that some Health Hazard Evaluations may nominally have restarted, Mot. 14–15, they ignore Plaintiffs' plausible allegations that the shutdown of HELD and certain DFSE branches has rendered NIOSH incapable of successfully completing these evaluations. *See* FAC ¶¶ 50–54, 59. Whether Health Hazard Evaluation information has been unavailable "long enough to violate any statutory requirement," Mot. 14, is irrelevant to Plaintiffs' standing, given their allegations that Defendants have rendered NIOSH *unable* to conduct these statutorily required evaluations, both now and indefinitely going forward. *See* FAC ¶¶ 73–76. In any event, "[i]n evaluating standing at this early stage of the litigation," this Court must "assume that the complaint states a valid legal claim" on the merits. *Huron v. Cobert*, 809 F.3d 1274, 1278 (D.C. Cir. 2016).

Defendants also suggest that, because certain statutory provisions require NIOSH to issue or update publications "at least annually," *see* 29 U.S.C. §§ 669(a)(2), (6), any deprivation of information is speculative until an annual update does not occur. *See* Mot. 13–14. But the relevant statutory sections impose ongoing obligations on NIOSH to conduct and publish research on a continual basis, with updates to relevant publications *as needed but at least* annually. *See* 29 U.S.C. § 669(a)(2) (requiring plans for "research, demonstrations, and experiments as are necessary to produce … criteria identifying toxic substances," with publication of such criteria "at least annually"); *id.* § 669(a)(6) (requiring publication of list of toxic substances "as needed but at least

annually"). And as described above, Plaintiffs allege that Defendants have entirely halted the work necessary to carry out those statutory obligations, annually or otherwise.

To be sure, Plaintiffs *also* allege that they will suffer continued injury in the future, because NIOSH continues to be unable to perform its statutorily mandated research functions and so continues to disseminate no critical occupational safety and health information. Defendants are wrong that the prospect of this future injury is "grounded in mere speculation." Mot. 14. "When an alleged injury has not yet occurred, courts must determine whether it is imminent," *i.e.*, whether "the threatened injury is 'certainly impending' or … there is substantial risk that the harm will occur." *Zaidan v. Trump*, 317 F. Supp. 3d 8, 18 (D.D.C. 2018) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). The complaint here satisfies this requirement: As long as Defendants do not reverse course and resume NIOSH's research functions, the agency has neither capacity nor plans to conduct research and disseminate findings. Although Plaintiffs' future lack of access to information has, by definition, "not yet occurred," the agency is alleged to "ha[ve] already taken concrete actions … that will produce the alleged injury." *Organic Trade Ass'n v. USDA*, 370 F. Supp. 3d 98, 109 (D.D.C. 2019). These allegations satisfy the imminence requirement. *See Del. Riverkeeper Network v. FERC*, 243 F. Supp. 3d 141, 150 (D.D.C. 2017) (rejecting a view of standing "that would render declarative or injunctive relief unavailable under any circumstances, if the conduct giving rise to imminent injury had not yet occurred").

Defendants also briefly suggest that, to establish standing, Plaintiffs must show that "information is being intentionally withheld." Mot. 14. Defendants, however, cite no case requiring Plaintiffs to allege such intent, and for good reason. The informational injury standard is concerned with *whether* a plaintiff has been deprived of information, not *why*. *See, e.g.*, *Friends of Animals*, 828 F.3d at 992 (requiring plaintiff to establish that "it has been deprived of

information," without any reference to intent). In any event, the First Amended Complaint, particularly when construed in the light most favorable to Plaintiffs, plausibly alleges intent. After all, the challenged actions were undertaken deliberately, as part of a comprehensive effort to downsize the federal government, and their effects on NIOSH's ability to conduct research were readily predictable.

Finally, Defendants maintain that Plaintiffs cannot establish a deprivation of statutorily required information because HHS has discretion to reorganize its functions. *See* Mot. 15. To begin with, it is not clear how this merits argument goes to the question whether Defendants' actions have caused Plaintiffs cognizable injury. *See Huron*, 809 F.3d at 1278 (noting that a court must "assume that the complaint states a valid legal claim" when evaluating standing at the pleading stage). At any rate, "[e]ven when the Congress gives substantial discretion to the President by statute," the Court must "presume it intends that the [executive] heed the directives contained in other enactments." *Am. Forest Res. Council v. United States*, 77 F.4th 787, 797 (D.C. Cir. 2023). Here, Plaintiffs allege that, regardless of any discretion that Defendants have to reorganize HHS, Defendants have acted in a way that unlawfully flouts their legal obligations to carry out specified research functions. *See* FAC ¶¶ 85–122, 137–57. This Court has jurisdiction to evaluate that claim.

### 2. Plaintiff AOEC has organizational and associational standing to challenge the termination of NIOSH's grantmaking functions.

Counts X and XII challenge the shutdown of OECSP, which formerly administered grants and contracts to fund research into occupational safety and health, including grants that fund training and education programs for early-career researchers. *See* FAC ¶¶ 123–26, 134–36. Plaintiff AOEC has both organizational and associational standing to pursue these claims.

As for organizational standing, the complaint alleges that the shutdown of OECSP has directly injured AOEC by compromising its ability to operate its Occupational Health Internship

18

Program. As the complaint explains, a NIOSH grant administered through OECSP has historically provided the primary source of funding for AOEC to run a summer internship program designed for upper-level undergraduate and early graduate students who want advanced specialized training in occupational health fields. *See id.* ¶ 81. With OECSP's grantmaking functions terminated and not transferred elsewhere, AOEC will no longer be able to compete for NIOSH funding, and it will need to close its summer program beginning next year. *Id.* ¶ 82. AOEC has thus been "walled off from" a funding opportunity "for which it is qualified, prepared, and eager to compete." *Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1016 (D.C. Cir. 2022).

AOEC also has associational standing to challenge the shutdown of OECSP and its grantmaking functions on behalf of its member occupational safety and health clinics. An association has standing to sue on behalf of injured members when "(1) at least one member of the association has standing to sue in her own right (based on a showing of harm, causation, and redressability), (2) the interests the association seeks to protect by suing on its members' behalf are germane to its purpose, and (3) neither the asserted claim nor the relief requested requires individual members to participate in the litigation." *Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 66 (D.C. Cir. 2022). AOEC satisfies all three of these requirements.

To start, AOEC's occupational safety and health clinic members rely on both OECSP funding and OECSP-funded training. *See* FAC ¶¶ 16, 83. Many of AOEC's members are housed in universities that receive grants formerly administered by OECSP. Unless NIOSH's grantmaking functions are restored, the member clinics will be deprived of resources formerly supported by NIOSH grants. *See id.* ¶ 83. Moreover, before Defendants' challenged actions, OECSP served as the primary source of funding for recruitment and training of occupational physicians, nurses, and industrial hygiene professionals in the United States. *Id.* ¶ 81. Without the education and training

programs that had previously been supported by OECSP, the primary source of training for such specialists will disappear, and AOEC's members will face injury in the form of a reduced pipeline of qualified workers. *See id.* An alternate source of training will cure these injuries only if third parties fill that gap. Nothing in the complaint, however, suggests that such a contingency is likely, and Congress's requirement that NIOSH must support sufficient "education programs to provide an adequate supply of qualified personnel to carry out the purposes" of the OSH Act reflects a legislative judgment that NIOSH's support for such programs is critical. 29 U.S.C. § 670(a).

Defendants contend that AOEC cannot plausibly establish associational standing at the pleading stage without naming individual injured members in the complaint. *See* Mot. 18–19. This Court, however, has already determined that a plaintiff association carries its burden at the pleading stage with allegations of member harm, even if it must later "provide evidence verifying these allegations" as its "burden grows heavier" in subsequent stages of the litigation. *Ctr. for Biological Diversity v. Bernhardt*, 480 F. Supp. 3d 69, 74–75 (D.D.C. 2020) (citations and internal quotation marks omitted). And given that more than forty of AOEC's members are occupational safety and health clinics, FAC ¶ 16, it is more than plausible—indeed, it is likely—that those members will be injured by a considerably smaller supply of specialists who are qualified to staff them.

As for the other requirements of associational standing, AOEC is a professional association of occupational safety and health clinics and clinicians, so claims challenging the shutdown of occupational safety and health training programs satisfies the "undemanding" germaneness standard. *Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988). Claims related to the shutdown of OECSP also do not require the individual participation of AOEC members, as the Court need not inquire into their "particular, fact specific experiences" to evaluate the claims or issue declaratory and injunctive relief. *Weingarten v. DeVos*, 468 F. Supp. 3d 322, 335 (D.D.C.

2020); *see United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553–54 (1996).

### 3. Plaintiffs' requested relief is available and appropriate under the APA.

Defendants briefly argue that Plaintiffs have not adequately alleged standing because their requested relief would require the Court to "micromanage federal personnel policies to produce particular downstream effects." Mot. 20. This argument seems to address the merits, rather than standing. But to the extent that Defendants contend that Plaintiffs cannot establish standing's redressability requirement because the remedy they seek is unavailable, Defendants are wrong.

"Redressability examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff." *Hecate Energy LLC v. FERC*, 126 F.4th 660, 665 (D.C. Cir. 2025) (citation omitted). Here, Plaintiffs seek a classic APA remedy that would "hold unlawful and set aside" Defendants' actions. 5 U.S.C. § 706(2). As the D.C. Circuit recently recognized, such a remedy satisfies redressability because it "would enable" agency "staff to proceed with its plans" to carry out statutory functions. *Nat'l Treasury Emps. Union v. Vought*, — F.4th —, 2025 WL 2371608, at *6 (D.C. Cir. Aug. 15, 2025) (*NTEU*); *cf. New York v. Kennedy*, — F. Supp. 3d —, 2025 WL 1803260, at *8 (D.R.I. July 1, 2025) (rejecting redressability argument where government argued chiefly that "any redress[] should be limited and not far reaching, not that the issuance of an injunction would fail to redress the [plaintiffs'] asserted harms"), *appeal filed* (1st Cir. No. 25-1780). While Defendants contend that Plaintiffs' requested relief would require the Court to micromanage NIOSH's activities or enter an order directing NIOSH to "provide [services] in a particular fashion or with particular staff," Mot. 21, Defendants mischaracterize the relief sought. An order requiring Defendants to reverse the termination of NIOSH's functions would not intrude on Defendants' authority to exercise their

discretion to reorganize NIOSH in the future, provided that their actions do not compromise NIOSH's ability to perform its statutory duties.

### B. Defendants' remaining jurisdictional arguments misconstrue Plaintiffs' claims.

#### 1. Plaintiffs do not raise federal employment claims.

Defendants next argue that this Court lacks subject-matter jurisdiction over Plaintiffs' "claims arising from federal employment." Mot. 21 (formatting altered). As Defendants see it, "Congress has precluded jurisdiction for the claims brought by Plaintiffs challenging [HHS's] RIFs" by creating an alternative statutory scheme "for resolving both disputes between employees and their federal employers and disputes brought by unions representing those employees." *Id.* at 21–22. Specifically, Defendants invoke the Civil Service Reform Act (CSRA), which creates a mechanism for federal employees to challenge adverse personnel actions taken against them, *see Elgin v. Dep't of Treasury*, 567 U.S. 1, 5–6 (2012), and the Federal Service Labor-Management Relations Statute (FSL-MRS), which creates a mechanism for resolving charges of unfair labor practices arising between a federal agency and a labor organization that represents the agency's employees, *see Fed. Educ. Ass'n Stateside Region v. FLRA*, 104 F.4th 275, 278–79 (D.C. Cir. 2024). Because these statutes provide specific dispute-resolution procedures, Defendants argue, they provide the exclusive avenues for seeking review of federal labor disputes. *See* Mot. 21–24.

Defendants do not specify which counts of the First Amended Complaint this argument targets, and with good reason—no count raises a federal labor claim. Defendants' argument thus rests on a misconstruction of Plaintiffs' claims. Plaintiffs do not challenge employment decisions, but rather Defendants' termination of NIOSH's statutorily mandated functions. As Defendants admit, Plaintiffs are "stranger[s] to the federal-employment relationship," *id.* at 24, and as such, they do not invoke the rights of federal employees or seek to hold Defendants accountable for

violations of employment contracts, collective-bargaining agreements, or the statutes that govern the relationship between the federal government and its employees. Plaintiffs instead invoke their own rights as members of the public and challenge Defendants' termination of NIOSH's statutory functions, irrespective of whether the RIFs through which Defendants carried out this allegedly unlawful action were themselves consistent with Defendants' legal obligations to their employees.

Plaintiffs' claims are therefore not "of the type Congress intended to be reviewed within th[e] statutory structure" of the CSRA or FSL-MRS and so are not precluded by those statutes' remedial mechanisms. *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 186 (2023) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994)). This conclusion finds support in all three of the factors that courts consider when deciding whether Congress has supplanted judicial review of a given claim by creating a special statutory scheme. First, "precluding district court jurisdiction [would] 'foreclose all meaningful judicial review'" of Plaintiffs' claims. *Id.* (quoting *Thunder Basin*, 510 U.S. at 212–13). Because Plaintiffs are not asserting the rights of NIOSH employees, neither the CSRA nor the FSL-MRS provides an avenue through which they can pursue their claims. "[A]bsent district court jurisdiction," then, Plaintiffs "might never have … judicial recourse" for their injuries. *Id.* at 190. Second, Plaintiffs' APA claims challenging Defendants' shutdown of NIOSH's functions as arbitrary and capricious and contrary to the OSH Act and other substantive statutory authorities are "wholly collateral" to the sorts of employment disputes raised under the CSRA and FSL-MRS. *Id.* at 186 (quoting *Thunder Basin*, 510 U.S. at 212). Third, those claims, unrelated as they are to the employment relationship, are "outside the … expertise" of the agencies that process claims under the special review schemes of the CSRA and FSL-MRS. *Id.* (quoting *Thunder Basin*, 510 U.S. at 212). Those agencies "know[] a good deal about" federal employment law, but they know "nothing special about" NIOSH's statutory mandates. *Id.* at 194.

The cases on which Defendants rely involve claims on behalf of federal employees arising out of the federal employment relationship and are inapposite here. *See United States v. Fausto*, 484 U.S. 439, 440–41 (1988) (no jurisdiction over claim by suspended federal employee seeking backpay); *NTEU*, 2025 WL 2371608, at *4–5 (no jurisdiction over claims by "organizations representing [federal] employees" seeking relief for injuries "flow[ing] from their members' loss of employment"); *Am. Fed. of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) (no jurisdiction over claims by "[u]nions representing federal employees" challenging "executive orders regarding relations between the federal government and its employees"); *Mahoney v. Donovan*, 721 F.3d 633, 634 (D.C. Cir. 2013) (no jurisdiction over claims by an administrative law judge challenging actions of his supervisor); *Nyunt v. Chairman*, 589 F.3d 445, 447 (D.C. Cir. 2009) (no jurisdiction over a federal employee's challenge to his denial of a promotion); *Grosdidier v. Chairman*, 560 F.3d 495, 495–96 (D.C. Cir. 2009) (same); *Fornaro v. James*, 416 F.3d 63, 64 (D.C. Cir. 2005) (no jurisdiction over claims by "retired, disabled federal law enforcement officers and firefighters" seeking "civil service benefits"); *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1432 (D.C. Cir. 1996) (no jurisdiction over claims by "a part-time [federal] employee" challenging an oral admonishment from her employer); *Am. Foreign Serv. Ass'n v. Trump*, 768 F. Supp. 3d 6, 24 (D.D.C. 2025) (likely no jurisdiction over claims by federal employee unions whose "only ripe theories of harm fundamentally rely on their members' employment relationship" with their federal employer).

Defendants acknowledge that Plaintiffs "lack … any role in the federal employment relationship," Mot. 25, but they argue that the lack is irrelevant because allowing Plaintiffs' claims to proceed "would upend the entire reticulated process Congress set out" for those parties who *are* able to bring employment-based claims through the CSRA and FSL-MRS, *id.* at 24. In support of

24

this argument, Defendants cite *Block v. Community Nutrition Institute*, 467 U.S. 340 (1984), Mot. 24–25, but *Block* does not support Defendants here. *Block* held that a "complex and delicate administrative scheme" for setting minimum prices that dairy handlers must pay to dairy producers impliedly precluded end consumers from seeking judicial review of those prices where the scheme expressly provided for participation by handlers and producers—but not consumers—in price-setting and where the scheme created an exclusive administrative review process that handlers, but not consumers, could invoke. 467 U.S. at 348; *see id.* at 346–48. By contrast, here, Defendants identify nothing in the CSRA or FSL-MRS that addresses the sort of claim at issue, let alone that evinces congressional intent to bar injured members of the public from bringing such claims. Without citing any specific statutory provisions, Defendants contend that "Plaintiffs, who are not employees of [HHS], certainly cannot challenge [HHS's] employment actions." Mot. 25. But Plaintiffs' claims, "even though involving [employment], … assert[] a grievance altogether different from the kind the [CSRA and FSL-MRS] concern[]," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Inds. v. Patchak*, 567 U.S. 209, 216 (2012), and there is "no cause to hold … that some general similarity of subject matter can alone trigger a remedial statute's preclusive effect," *id.* at 223. *See also* Mot. 33 (conceding that Plaintiffs "do not … challenge the decision to implement … RIFs"). Absent "inferences of intent drawn from the statutory scheme as a whole" that Congress wished to preclude Plaintiffs' APA claims, *Block*, 467 U.S. at 349, there is no basis for embracing Defendants' understanding of the CSRA and FSL-MRS.

### 2.  Plaintiffs do not challenge grant terminations.

Defendants next argue that this Court lacks jurisdiction over "challenges to the termination of [NIOSH] grants." Mot. 27. Here too, though, Defendants do not identify which counts of the

First Amended Complaint are subject to dismissal under this argument, and as Defendants admit, "Plaintiffs have not … alleged that any … grants have been terminated." *Id.*

Presumably, Defendants raise this argument in response to Plaintiffs' claims challenging the shutdown of OECSP and the termination of its statutory functions. *See* FAC ¶¶ 123–36. As the complaint explains, OECSP formerly fulfilled NIOSH's statutory obligation to "conduct … education programs to provide an adequate supply of qualified personnel to carry out the purposes" of the OSH Act. 29 U.S.C. § 670(a); *see* FAC ¶ 60. To carry out this function, OECSP provided grants and other funding streams to educational institutions responsible for training occupational safety and health professionals. FAC ¶¶ 61–64. Now that OECSP has closed, NIOSH is no longer fulfilling its statutory mandate to support education programs, *id.* ¶¶ 60, 66, and Plaintiffs accordingly seek to restore the functions that OECSP formerly performed, *see id.* at 41.

Contrary to Defendants' suggestion, the requested relief does not require "reinstatement" of grants that have been terminated or "continuation" or specific performance of any grants presently in existence. Mot. 27. Accordingly, the Supreme Court's order in *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam), which stayed an order "requir[ing] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue," *id.* at 968, is beside the point. Far from "enforc[ing] a contractual obligation to pay money," *id.* (quoting *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)), an order granting relief here would require Defendants to resume OECSP's function of supporting occupational safety and health education programs, regardless of whether it fulfilled this function "directly or by grants or contracts," 29 U.S.C. § 670(a). Defendants make no argument that this Court lacks jurisdiction to grant the relief that Plaintiffs actually seek.

**II.    Plaintiffs challenge final agency actions that are reviewable under the APA.**

The APA provides for judicial review of "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704. Plaintiffs' claims target precisely such action. Defendants nonetheless raise several threshold arguments that their actions—even if arbitrary and capricious or contrary to law—are not reviewable under the APA. These arguments lack merit.

**A.  Plaintiffs challenge discrete actions.**

Defendants first contend that Plaintiffs' First Amended Complaint "does not identify a discrete and circumscribed agency action … that could specifically be redressed by a federal court." Mot. 30. Defendants' own characterizations, however, belie this argument. As set forth in the complaint, *see* FAC ¶ 33, Defendants on March 27, 2025, announced a "dramatic restructuring" of HHS pursuant to a comprehensive "plan" that involved, among other things, terminating 10,000 employees, "streamlin[ing] the functions of the [agency]," and consolidating NIOSH with other agencies "into a new, unified entity." *HHS Announces Transformation to Make America Healthy Again*, *supra* p. 5 n.2. And Defendants admit in their motion that the actions they have taken with respect to NIOSH follow from a written "Agency RIF and Reorganization Plan" that they have submitted to OMB and OPM pursuant to an executive order. Mot. 4–7.

Plaintiffs have alleged that the implementation of this comprehensive plan has "caused NIOSH to stop performing … virtually all of NIOSH's core research functions" and has "fatally degraded NIOSH's ability to fulfill its statutory functions altogether." FAC ¶ 67. Furthermore, Plaintiffs have described discrete components of Defendants' plan—the closure of the Pittsburgh and Spokane Mining Research Divisions, DSI, specified branches of DFSE, HELD, and OECSP—that have caused the cessation of specific NIOSH functions. *Id.* ¶¶ 42–66. Contrary to Defendants'

argument, then, Plaintiffs' injuries could be redressed by invalidating Defendants' plan in whole or in part. *See* 5 U.S.C. § 706(2) (authorizing courts to "set aside" a challenged agency action).

The possibility of such targeted judicial relief belies Defendants' claim that Plaintiffs raise a programmatic attack on NIOSH's "day-to-day operations." Mot. 30–31 (quoting *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 899 (1990)). In *Lujan*, the Supreme Court held that an affidavit challenging an agency's failure to "provide adequate information and opportunities for public participation" in connection with a particular project was insufficiently specific to identify an agency action subject to review. *Lujan*, 497 U.S. at 899. Because no "particular ... decision could be identified as the source of the grievance," the Court held that the affidavit failed to "set forth the specific facts necessary" to survive summary judgment. *Id.* Here, in contrast, Plaintiffs have plausibly alleged that Defendants have taken discrete, reviewable actions pursuant to a comprehensive reorganization plan that is itself a discrete, reviewable action. While those actions will of course affect NIOSH's day-to-day operations, *Lujan* does not hold that all actions that affect agency operations are insulated from review. Rather, it holds that an APA challenge must target "an identifiable action or event." *Id*. Plaintiffs have done just that.

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) (*SUWA*), on which Defendants also rely, *see* Mot. 30–31, is similar. Citing *Lujan*, the Supreme Court in *SUWA* observed that "[t]he limitation" of the APA's judicial-review provision "to discrete agency action precludes [a] ... broad programmatic attack" against an agency's general operations. *SUWA*, 542 U.S. at 64. The Court went on to hold that an APA claim asserting that an agency had failed to manage certain wilderness areas "in a manner so as not to impair the suitability of such areas for preservation as wilderness," *id.* at 65 (quoting 43 U.S.C. § 1782(c)), challenged "[g]eneral deficiencies in [the agency's] compliance" with its statutory mandate, which "lack[ed] the

specificity requisite for agency action," *id.* at 66. *See Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (explaining that the APA does not contemplate review of "generalized complaints about agency behavior" in running an ongoing program). Unlike in *SUWA*, Plaintiffs here do not challenge the general manner in which NIOSH carries out its statutory functions. Rather, they "present[] the [C]ourt with a narrow question to resolve," *Cobell*, 455 F.3d at 307, by challenging specific agency actions that Defendants have taken to disable NIOSH from carrying out certain statutory functions altogether.

Indeed, Defendants admit that Plaintiffs challenge "a host of individual actions." Mot. 32. And the recent D.C. Circuit precedent on which Defendants primarily rely, *NTEU*, strongly suggests that such actions *are* reviewable. As Defendants note, *id.* at 31, the plaintiffs in *NTEU* identified "a constellation of … [agency] actions." *NTEU*, 2025 WL 2371608, at *13. But rather than hold that those actions were unreviewable, the *NTEU* court observed that the plaintiffs *had not* "challenge[d] any of these discrete decisions" but instead sought to "dress [them] up … as a single decision in order to challenge all of them at once." *Id.* As for the one subsidiary action that the court did understand plaintiffs to be presenting for its review—an email from the agency head—the court deemed it unreviewable *not* because it was insufficiently discrete, but because it was not final. *Id.* at *10–11.

This Court's opinion in *Association for Education Finance & Policy, Inc. v. McMahon*, — F. Supp. 3d —, 2025 WL 1568301 (D.D.C. June 3, 2025) (*AEFP*), on which Defendants also rely, *see* Mot. 32–34, is similar. Consistent with *NTEU*, this Court in *AEFP* faulted the plaintiffs for "bundling together a collection of discrete actions, presenting them as facets of a single event, and then challenging that event instead of the individual actions." 2025 WL 1568301, at *5. And although the Court observed that APA plaintiffs similarly may not "purport[] to challenge one or

two discrete actions but then extrapolat[e] the requested relief across the board," *id.*, Plaintiffs here do not do so. As Defendants acknowledge, Plaintiffs challenge "a host of individual actions," including the "shutting down of five of [NIOSH's] divisions," Mot. 32, and they ask this Court to set aside each action individually. *See* FAC at 41. The complaint does not support Defendants' characterization of the requested relief as asking the Court to "supervise all [NIOSH's] activities and determine how the agency would accomplish each statutorily-mandated function" going forward. Mot. 32.[6]

Likewise, Defendants are wrong to assert that Plaintiffs have done what *NTEU* and *AEFP* forbid—namely, "bundle [discrete] events to challenge what [Plaintiffs] perceive as the overall dismantling of NIOSH." *Id.* at 33. This argument seems to address Plaintiffs' claims based on the "cumulative effect" of "each discrete divisional shutdown," FAC ¶ 4, presumably Counts XIII, XV, XVI, and XVII, but Defendants have conceded that the divisional shutdowns, which Plaintiffs separately challenge, are "individual actions." Mot. 32. And even as to the cumulative effect, it is Defendants themselves who first bundled these discrete actions together as part of the comprehensive reorganization plan that they submitted to OMB and OPM. *See supra* pp. 27–28.

Unlike the "constellation of then-ongoing actions" that the D.C. Circuit found unreviewable in *NTEU*, 2025 WL 2371608, at *13, in other words, Plaintiffs here challenge Defendants' completed execution of a formal, written "Agency RIF and Reorganization Plan." This existence of a discrete, comprehensive plan, along with this case's procedural posture at the motion-to-dismiss stage, distinguish Counts XIII, XV, XVI, and XVII from the claims in *NTEU*

---

[6] Defendants characterize Plaintiffs' prayer for relief as asking this Court to "enjoin[ ] any further restructuring or RIFs." Mot. 32. The only portion of the prayer for relief that addresses agency "RIFs and reorganizations," however, asks this Court to "enjoin Defendants to reverse … actions" that they have already taken to effectuate the challenged plan. FAC at 42.

and *AEFP*. In *NTEU*, following a two-day evidentiary hearing, the district court had granted a preliminary injunction based on the plaintiffs' APA claims that the government had decided to shut down a federal agency. *See id.* at *3. But, as the D.C. Circuit explained in its opinion reversing the injunction, the plaintiffs had produced neither a "statement, formal or informal, written or oral," directing the shutdown, nor any other evidence of a "single decision" that the court could review. *Id.* at *12–13. And the *AEFP* plaintiffs, who likewise sought a preliminary injunction, suffered from the same evidentiary shortcoming. *See, e.g.*, *AEFP*, 2025 WL 1568301, at *6 (noting that although the plaintiffs challenged the "en masse" termination of contracts as an agency action, it was "unclear" from the evidentiary record that they "all stem[med] from a single decision"). Here, at the motion-to-dismiss stage, there has not yet been evidentiary development. For purposes of resolving Defendants' Rule 12(b)(6) motion, though, it is sufficient that Plaintiffs have plausibly alleged—and Defendants have all but conceded, *see supra* p. 27—that Defendants created and executed a comprehensive reorganization plan. And, as Plaintiffs allege, the effect of this plan was to render NIOSH incapable of performing its statutory functions, in violation of the law.

### B.  The challenged actions are final.

Defendants next argue that the agency actions that Plaintiffs challenge are not "final" within the meaning of the APA. Mot. 34 (citing 5 U.S.C. § 704). To constitute final agency action, a challenged action "must mark the 'consummation' of the agency's decisionmaking process," *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)), and must "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow,'" *id.* at 178 (quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). Plaintiffs have adequately alleged both requirements with respect to the actions at issue.

As for the first requirement, Defendants maintain that the process of implementing the Agency RIF and Reorganization Plan is "ongoing and evolving," but they cite no allegation in the complaint that supports this characterization. Mot. 35. Rather, the First Amended Complaint describes office closures and work stoppages that were announced starting in March and complete as of early May and that remained in effect at the time of the complaint's filing on July 2. *See* FAC ¶¶ 33–41. Nothing in the complaint suggests that Defendants are reconsidering these actions.

Arguing to the contrary, Defendants cite *NTEU* for the proposition that "an agency plan is unreviewable insofar as it reflects only a nonbinding statement of something the agency intends to do in the future." Mot. 35 (quoting *NTEU*, 2025 WL 2371608, at *8). And Defendants also point to statements in their March 27 press release that supposedly reflect the "developing nature of the agency's actions." *Id.* But whether Plaintiffs could properly have challenged Defendants' plan back in March, after it was announced but before it was implemented, is beside the point. As *NTEU* instructs, Plaintiffs "await[ed] further agency actions implementing" the plan, 2025 WL 2371608, at *8, and so have challenged the plan (and certain of its constituent parts, *see supra* pp. 27–30), as it was ultimately revised and executed. Although Defendants claim that the plan is still "unfolding," Mot. 36, the complaint—especially when read in the light most favorable to Plaintiffs, *see Langeman*, 88 F.4th at 294—plausibly alleges otherwise.

As for the requirement that legal consequences flow from the challenged agency actions, Defendants make essentially the same argument, and it fails for the same reasons. Specifically, Defendants argue that "the [March 27] press release" announcing Defendants' plan to restructure HHS "has 'no direct and appreciable legal consequences.'" Mot. 36 (quoting *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 638 (D.C. Cir. 2019)). Again, though, Plaintiffs do not challenge the press release as final agency action; they challenge Defendants' reorganization plan as it was

finally revised and implemented, along with several discrete actions that Defendants took to effectuate the plan. And Defendants make no argument that the actions that they have in fact carried out fail to produce the sort of appreciable consequences that characterize finality.

### C.  Plaintiffs lack adequate alternative remedies.

Defendants briefly argue that Plaintiffs lack an APA cause of action because they have adequate alternative remedies under the CSRA and the FSL-MRS for their "employment" claims and under the Tucker Act for their "contract claims." Mot. 37; *see* 5 U.S.C. § 704 (providing that agency action is reviewable under the APA if "there is no other adequate remedy in a court"). As explained above, however, Plaintiffs do not raise employment claims or contract claims. *See supra* Part I.B. Consequently, none of the statutes cited by Defendants afford Plaintiffs an adequate alternative to APA relief on their claims. Again, Defendants concede that Plaintiffs are "stranger[s] to the federal-employment relationship" and so could not raise their claims pursuant to the CSRA or FSL-MRS. Mot. 24; *see Hinojosa v. Horn*, 896 F.3d 305, 310 (5th Cir. 2018) (per curiam) (explaining that whether an alternative remedy is adequate under the APA "entails a case-specific evaluation" (citing *Bowen v. Massachusetts*, 487 U.S. 879 (1988))). And the Tucker Act, which creates a remedial scheme for claims based on "any express or implied contract with the United States," 28 U.S.C. § 1491(a)(1), does not offer a mechanism for Plaintiffs to challenge Defendants' actions terminating NIOSH's grantmaking functions going forward. *Cf. Zhengxing v. United States*, 204 F. App'x 885, 886–87 (Fed. Cir. 2006) (per curiam) (noting that Tucker Act jurisdiction does not extend to challenges to governmental actions that may affect "future contracts").

### D.  The challenged actions are not committed to agency discretion by law.

Defendants lastly argue that their actions are not reviewable because "staffing decisions and other reorganization decisions" fall into the category of actions that are "committed to agency

33

discretion by law." Mot. 38; *see* 5 U.S.C. § 701(a)(2). The APA exception for discretionary actions, however, is a "very narrow" one that "applies only 'in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002) (internal quotation marks omitted; quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)). Here, the underlying statutory mandates do not delegate authority to Defendants to eliminate NIOSH's ability to perform statutorily required functions and, thus, those mandates supply "law to apply" when assessing Defendants' actions. *Id.* (quoting *Overton Park*, 401 U.S. at 410). Whether Plaintiffs are correct that Defendants have contravened those mandates—rather than simply engaging in permissible agency reorganization—is a factual issue that is not properly evaluated without the administrative record.[7]

In making their argument about agency discretion, Defendants do not address NIOSH's statutory mandates at all, let alone explain how they confer discretion on the executive to disregard them. Defendants instead flip the burden to Plaintiffs, faulting them for failing to "point to a particular statute limiting [NIOSH's] inherent discretion to reduce headcount or any requirement to have the exact same organizational structure that was previously in place." Mot. 39. But interpreting the APA to forbid review unless the plaintiff can identify a specific statutory provision that expressly constrains agency discretion—beyond the APA's underlying prohibition on agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A)—would turn the APA's narrow exception into the rule. Besides,

---

[7] Defendants also argue that their decisions about how to allocate appropriated funds are committed to agency discretion by law. Mot. 40–42. But because Plaintiffs' only appropriations claims allege violations of the Impoundment Control Act, and the D.C. Circuit recently held that this Act is not subject to private enforcement, *see supra* p. 8 n.3, the Court need not consider these arguments.

Plaintiffs *have* identified statutory provisions from the OSH Act and other statutes governing NIOSH's operations that limit Defendants' discretion to terminate NIOSH's functions.

Defendants' remaining arguments on this point simply mischaracterize Plaintiffs' claims. According to Defendants, Plaintiffs ask this Court to micromanage agency decisions about how best to "improve efficiency," Mot. 38, "provide better service to the American people," or "exercise[e] control over … staffing," *id.* at 39. Plaintiffs, however, do not challenge day-to-day management decisions; they challenge the wholesale dismantlement of entire NIOSH divisions that perform essential, statutorily mandated work that has not been transferred elsewhere. Congress has not conferred discretion on Defendants to flout legislative mandates in that way. Nor is it relevant, as Defendants claim, that NIOSH "has stated its commitment to performing its statutory obligations." *Id.* The complaint plausibly alleges that NIOSH has broken that commitment. And although Defendants once again maintain that the process of reorganizing NIOSH "is still ongoing," *id.*, Plaintiffs have plausibly alleged that the agency decisions that they challenge have been finalized and implemented. *See supra* Part II.B.

Finally, Defendants' remedial argument that Plaintiffs are not entitled to have Defendants' actions set aside but are entitled only to additional explanation, Mot. 40, is premature. The availability of remand without vacatur in an APA case is "the subject of some debate," *Corner Post, Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 603 U.S. 799, 837 n.6 (2024) (Kavanaugh, J., concurring), and it is in any event not "the normal remedy." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). Whether to grant this unusual form of relief "depends on the 'seriousness of the [agency action's] deficiencies' and the likely 'disruptive consequences' of vacatur." *Id.* (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). Defendants do not address either of these factors, and it would not be

advisable for this Court to do so at this early stage of litigation, before the administrative record has been produced and the full scope of the challenged actions' deficiencies can be evaluated.

## III.    Plaintiffs adequately allege that the challenged actions are arbitrary and capricious and contrary to law.

When Defendants finally turn to the question whether Plaintiffs have adequately alleged that the termination of NIOSH's statutory functions was arbitrary and capricious or contrary to law, they devote less than two pages to the issue. *See* Mot. 42–43. Notably, Defendants do not even attempt to argue that Plaintiffs have inadequately alleged arbitrary and capricious agency action. Accordingly, Defendants' arguments for dismissal of Counts III, V, VII, IX, XII, XV, and XVII rest entirely on threshold issues and should be rejected for the reasons given above.

As for the remaining counts, Defendants assert that the restructuring plan is "still in progress" and that any problem with the alleged termination of NIOSH's statutory functions has largely "been resolved by the recalling of over three hundred [NIOSH] employees." Mot. 42. On the first point, though, and as explained above, *see supra* Part II.B., the First Amended Complaint plausibly alleges that the aspects of the reorganization plan to which Plaintiffs object—the closure of the specified NIOSH offices and consequent cessation of their statutory functions—are final. Certainly, Defendants identify nothing in the complaint that suggests otherwise. On the second point, the complaint expressly acknowledges the recission of certain termination notices but explains that the offices that have been restored "generally administer smaller programs focused on providing specific services, rather than performing NIOSH's core occupational safety and health research, education, training, and grantmaking functions." FAC ¶ 39. Here too, Defendants identify nothing that calls this allegation into question.

Defendants' remaining argument is that "some" of the functions that the closed NIOSH offices formerly performed are not statutorily required. Mot. 42. This argument, though, does not

36

undermine Plaintiffs' well-pleaded allegations that many other functions that the closed offices performed or played a necessary role in supporting *are* statutorily required and have not been transferred elsewhere. *See, e.g.*, FAC ¶¶ 41–42, 44–46, 48–49, 55, 57–60. And to the extent that Defendants suggest that NIOSH is not required to carry out its statutory functions in the precise *way* that the closed offices formerly did, the point is irrelevant. For example, Defendants point out that there is "no statutory requirement for OECSP to fund and coordinate centers at universities that provide training on Occupational Safety Hazard disciplines," Mot. 42, but they concede that NIOSH *is* statutorily required to support "education programs to provide an adequate supply of qualified personnel to carry out the purposes" of the OSH Act, *id.* (quoting 29 U.S.C. § 670(a)). Plaintiffs have alleged that OECSP fulfilled this statutory function by funding and coordinating Education and Research Centers at universities, among other things, and that now that OECSP is closed, no NIOSH division is performing this function. FAC ¶¶ 60–61, 124–26. Whether NIOSH could fulfill this statutory mandate in another way is beside the point, because Plaintiffs have plausibly alleged that NIOSH is not fulfilling this (and other) statutory mandates in *any* way.[8]

## IV.    Defendants' request for relief from Local Civil Rule 7(n) should be denied.

Local Civil Rule 7(n)(1) provides that, absent an order of the court, "[i]n cases involving the judicial review of administrative agency actions, … the agency must file a certified list of the contents of the administrative record with the Court … simultaneously with the filing of a dispositive motion" if an answer has not yet been filed. Defendants admit that they have not complied with this rule, but they argue that they should not have to do so. Mot. 44–45. As Plaintiffs

---

[8] Defendants also argue that Plaintiffs have not plausibly alleged a violation of the Impoundment Control Act. Mot. 43. Because Plaintiffs concede that recent D.C. Circuit precedent now forecloses them from basing APA claims on a violation of that Act, *see supra* p. 8 n.3, the Court need not address this argument.

explain in their pending motion to compel production of the administrative record, ECF 32, they hope to move expeditiously for summary judgment in light of the grave and mounting harms resulting from the ongoing closure of core NIOSH offices. Plaintiffs, however, are unable to do so without the administrative record. Accordingly, for the reasons stated in Plaintiffs' motion to compel, this Court should deny Defendants' request to be excused from complying with Rule 7(n).

## CONCLUSION

This Court should deny Defendants' motion to dismiss the First Amended Complaint and order Defendants promptly to produce the administrative record by a date certain.

Dated: September 3, 2025

Matthew Ginsburg (DC Bar No. 1001159)
Craig Becker (DC Bar No. 371239)
Maneesh Sharma (DC Bar No. 1033407)
Bart Sheard (DC Bar No. 1542094)
AFL-CIO
815 Black Lives Matter Plaza NW
Washington, DC 20006
(202) 637-5310

*Counsel for Plaintiff AFL-CIO*

Respectfully submitted,

/s/ Nicolas Sansone
Nicolas Sansone (DC Bar No. 1686810)
Allison M. Zieve (DC Bar No. 424786)
Stephanie Garlock (DC Bar No. 1779629)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*